```
 1                      IN THE UNITED STATES DISTRICT COURT

 2                      IN AND FOR THE DISTRICT OF DELAWARE

 3                                  - - -

 4
         AGROFRESH INC.,                   :    CIVIL ACTION
 5                                         :
                        Plaintiff,         :
 6                                         :
             vs.                           :
 7                                         :
         ESSENTIV LLC, DECCO U.S.          :
 8       POST-HARVEST, INC.,               :
         CEREXAGRI INC., d/b/a DECCO       :
 9       POST-HARVEST, and UPL,            :
         LTD.,                             :
10                                         :
                        Defendants.   :    NO. 16-662-MN
11

12                                  - - -

13                                 Wilmington, Delaware
                                   Monday, September 30 2019
14                                 8:57 o'clock, a.m.

15                                  - - -

16      BEFORE:  HONORABLE MARYELLEN NOREIKA, U.S.D.C.J.
                 HONORABLE JENNIFER L. HALL, U.S. MAGISTRATE JUDGE
17                                  - - -

18      APPEARANCES:

19

20               BARNES & THORNBURG LLP
                 BY:  CHAD S.C. STOVER, ESQ.
21

22                      -and-

23

24
                                   Valerie J. Gunning
25                                 Official Court Reporter
```

1    APPEARANCES (Continued):

2

3              BARNES & THORNBURG LLP
               BY:   ROBERT D. MacGILL, ESQ.
                     JESSICA LINDEMANN, ESQ. and
4                    MATTHEW CIULLA, ESQ.
                     (Indianapolis, Indiana)

5

6                    Counsel for Plaintiff

7

8              RICHARD, LAYTON & FINGER
               BY:   FREDERICK L. COTTRELL, III, ESQ.

9

10                       -and-

11

               FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER
12             LLP
               BY:   GERALD F. IVEY, ESQ.
13                   JOHN WILLIAMSON, ESQ.
                     DANIEL F. ROLAND, ESQ.
14                   (Washington, D.C.)

15

                     Counsel for Defendants
16

17                       -   -   -

18

19

20

21

22

23

24

25

1              **P R O C E E D I N G S**

2

3              (Proceedings commenced in the courtroom,

4    beginning at 8:57 a.m.)

5

6              THE COURT:  Good morning.  Please be seated.

7              Why don't we start with some introductions.

8              MR. STOVER:  Good morning, Your Honor.  Chad

9    Stover from Barnes & Thornburg for the plaintiff, AgroFresh.

10             With me today, Robert MacGill, Matt Ciulla and

11   Jessica Lindemann.

12             THE COURT:  Good morning.

13             MS. LINDEMAN:  Good morning, Your Honor.

14             MR. CIULLA:  Good morning, Your Honor.

15             MR. COTTRELL:  Good morning, your Honor.  Fred

16   Cottrell from Richards Layton for the defendants.

17             With me from Finnegan Henderson at counsel

18   table, Gerald Ivey, John Williamson, Mike Jakes and Dan

19   Roland, and I believe Ms. Pedi from my office will be

20   joining us momentarily.

21             THE COURT:  Great.  Thank you very much.

22             MR. COTTRELL:  Thank you.

23             THE COURT:  Okay.  So we're here for the

24   pretrial conference.  Judge Hall is going to be picking the

25   jury with you all on Friday, so I thought it might be

helpful to have her here in case any issues with respect to

that come up, and also there are many issues in the pretrial

order, so I thought it would be nice to have multiple people

listening to them.

So what I typically do in a pretrial conference

is I would start with talking about the motions in limine,

but given that we have so much and we have some limited

time, I wanted to start with trial logistics here so that we

don't run out of time to deal with them.

So the first issue is the number of hours for

trial.  Each side will have 12 hours for opening and

presenting their case and each side will have one additional

hour for closing arguments, so a total of 13 hours, but one

of those is for closing arguments.

With respect to charges for time, neither side

will be charged time for voir dire unless it becomes

excessive, and Judge Hall will be the one who determines

that.

And also in this case, because we are doing jury

selection on a non-trial day, I will not charge you for

peremptory strikes.  I ask you to be pretty efficient with

those because we are using the jury's time and the folks who

aren't on the jury's time, but, nevertheless, we're not

going to charge you for the strikes.  But other than that

and other than when I'm reading the jury instructions to the

1     jurors, if we're in the courtroom, time will be charged.  So

2     arguments, whatever, time will be charged.

3                  Trial days run from 9:00 a.m. to 4:30 p.m.  We

4     will take a 15-minute break in the morning, a lunch break,

5     which we usually do around 45 minutes, and a 15-minute break

6     in the afternoon.

7                  Okay.  With respect to voir dire, we're trying a

8     few different things to get things a little bit quicker with

9     the picking of juries.  And so what we're going to do this

10    time is, the jurors are going to be given a copy of the voir

11    dire and a pen or a pencil, and it's going to be the

12    plaintiff's responsibility to bring in copies, enough copies

13    of the voir dire for the panel.

14                  So what we're going to do is, Judge Hall will

15    read the voir dire and the jurors will be told to check off

16    if they answer yes to any of the questions so they don't

17    have to stand up and we don't have to count them.  They are

18    just going to do it on their own and keep track.

19                  With respect to bringing enough copies, I think

20    if you bring 50 to 60 copies, that should be sufficient, and

21    also bring pens for them.

22                  What we'll do is, after the voir dire, we'll

23    call out numbers and fill up the panel, fill up the jury box

24    over here.  Then the lawyers and I, the lawyers and Judge

25    Hall will go back to the jury room and we'll start with the

1    person in the first seat and ask, did you answer yes to any

2    questions.  If they say yes, they'll come back.  We'll be

3    told what questions they answered yes to and we'll go

4    through the, you know, asking questions, determining if

5    there's any motion for cause to strike.  If that person is

6    not stricken, they'll go back to their seat and we'll move

7    to the next person.

8              If that person is stricken, we will call another

9    number, ask the person from the back, did you answer yes to

10   any questions.  If they say yes, they'll come back and talk

11   to us.  If they say no, they'll sit in the seat and they

12   will be the person who is in that seat.

13             It has worked reasonably well for us in the past

14   and now we're just tweaking it a little bit with copies of

15   the voir dire.

16             Are there any questions on that?

17             Okay.  I'm generally disinclined to close the

18   courtroom, but if you anticipate attempting to seal the

19   courtroom at any time, keep it to a bare minimum.  Try to,

20   you know, take any questions that require closing the

21   courtroom and keep them altogether as much as possible and

22   also provide sufficient advance notice to the other side and

23   to the Court.

24             I can't guarantee that I will seal the courtroom

25   at any particular time, but if you give me advance notice

1   and we try and keep it to a minimum, we'll deal with that on

2   a case-by-case basis.

3           No exhibits will be admitted unless offered into

4   evidence for a witness.  I think that is already in your

5   pretrial submission.

6           No exhibit should be published to the jury until

7   it is admitted into evidence, so that is the parties have to

8   move to admit each exhibit individually prior to showing it

9   to the jury.  Once an exhibit has been admitted, however,

10  you can use it freely with the jury.

11          With respect to objections during trial, if the

12  parties are unable to reach agreement after meeting and

13  conferring about objections, they must e-mail my judicial

14  administrator, Diana Welham, by 7:00 o'clock in the morning

15  on the day the witness is to testify, or the exhibit is to

16  be offered or the demonstrative will be used.

17          If I need to hear objections, I will do it in

18  the morning before the jury is brought in or perhaps at

19  lunch, depending on when the objected to evidence is going

20  to be used, but whatever time we use will be charged to the

21  parties.

22          Consistent with the practices here in the

23  District Court, the parties should provide a completed AO 47

24  Exhibit list to the courtroom deputy on the first day of

25  trial.

1              To approach or move around the courtroom, you

2     only need to ask one time and then you'll be free to move

3     about once I grant permission, but I just ask you, don't

4     encroach on the jury's space.  That's the only thing.  If

5     you are moving around, just don't hover there.

6              For access to the courtroom for setup, you can

7     do that on Friday after the jury selection has been

8     completed.  The only thing I will ask is normally when you

9     are setting up, the jurors are not here.  Since we're going

10     to be picking them on Friday, to the extent anyone sees

11     jurors or whatever, I just ask you not to interact with any

12     of the jurors after this little -- they still may be here

13     for a little while.

14              There was a request somewhere that, or

15     something, I don't know if it's in the pretrial order or one

16     of the other submissions where juror notes would be

17     collected at the end of each day.  We're not going to

18     collect the jury notes at the end of each day, but we will

19     instruct them to leave any notes that they take in the jury

20     room and the notes will be collected at the end of trial and

21     disposed of.

22              I know that you all have submitted voir dire and

23     jury instructions.  I will take a look at the voir dire and

24     the preliminary instructions in the next day or so and get

25     you draft proposals for you to let us know if you have any

1    objections or proposed edits.

2           As to the jury instructions, I'm not going to

3    read a glossary to the jury.  If there are certain terms

4    that you all agree on and their definitions, you may put

5    those in a jury binder to give to the jurors, but otherwise,

6    if you can't agree on what a term means and you need to

7    explain it to the jury, you're going to have to use your

8    time at the trial to do so.

9           For guidance with trial preparation, I'm letting

10   you know that I'm going to grant the defendant's Daubert

11   motion seeking to preclude Mr. Kleinrichert from offering

12   expert testimony on the costs associated with the developing

13   the 1-MCP product and SmartFresh.  There's not a sufficient

14   fit between Mr. Kleinrichert's testimony and the issues in

15   this case such that his testimony will assist the trier of

16   fact.

17          I will issue an order on that in due course, but

18   I wanted to provide a heads-up now in case the plaintiffs

19   want to do something different with their fact witnesses.

20          Okay.  Any questions up to now on trial

21   logistics?  Okay.

22          So now we're at the motions in limine and some

23   of these I think I can rule on, some of these I might need

24   to hear a little bit of argument.

25          MR. IVEY:  Your Honor.

```
 1                    THE COURT:  Yes?
 2                    MR. IVEY:  I really apologize.  I apologize for
 3     being a little late to get up here.
 4                    With regard to the selection of the jurors, are
 5     consultants allowed to be present for the voir dire
 6     questioning in the back, or how does the Court want to do
 7     that?
 8                    THE COURT:  The consultants may be present, but
 9     I would prefer that they not be -- you know, they can't ask
10     any questions of the witnesses, and to the extent that, you
11     know, they're not going to interfere with the process,
12     that's fine, but, yes, I will leave that to Judge Hall's
13     discretion to the extent they seem to be interfering with
14     the process.
15                    MR. IVEY:  They won't say anything other speak
16     up.  I just want to know before we went back as to who can
17     go back or not.
18                    THE COURT:  Yes.
19                    MR. IVEY:  Thank you.
20                    THE COURT:  Okay.  Motions in limine number one.
21     Plaintiff's motion in limine number one, which is to
22     preclude defendants from offering evidence or arguments
23     regarding the IPR on the '216 patent.  And this one I am
24     inclined to grant, so I want to hear from the defendants why
25     I should not.
```

1          MR. IVEY:  Your Honor, the reason that we have

2     opposed this has to do with the basic question of whether

3     the trade secret arguments that are being made by the

4     plaintiff are going to be sufficiently robust that the IPR

5     ruling, the final written decision by the PTO is relevant to

6     the issue of obviousness and anticipation, meaning that the

7     evidence that has been submitted in that regard is already

8     in the public domain and has been found to be so by a public

9     agency.

10          The final written decision takes it out of the

11     idea that this might be a preliminary or interim decision.

12     Therefore, something subject to change at the PTO level.

13          THE COURT:  Isn't there a difference between

14     whether a claim is obvious versus I think their point is

15     that there's other more specific aspects, such as examples

16     or figures in the specification?  Isn't that different from

17     the PTAB finding that a claim is obvious?

18          MR. IVEY:  It can be, but specifically what

19     we're getting at here and as we put in our motion papers is

20     the final written decision does get to the issue of the

21     information that is public knowledge being generally

22     available to those in the industry.

23          The fact that there are prior art references

24     which cause the PTO to believe that this technology is not

25     novel, is not new, goes specifically to the actual issue

1    that is a difficult one for us in this case for a number of

2    reasons that I won't rehash now, but we've had issues with

3    regard to what exactly the identification and specificity of

4    the trade secrets are.  As those topics have remained more

5    generic, we submit that the IPR ruling is one of definitive

6    areas where the people of skill in the art have spoken, and

7    have spoken that this is not protectable, it's not novel.

8              There are also issues with regard to

9    willfulness, Your Honor.

10             THE COURT:  But it's not necessarily

11   inconsistent to say -- I mean, a lot of times when people

12   are making a determination do I want to keep this as a trade

13   secret or file for a patent, one of the things that they

14   might consider is, it might not be patentable, it might not

15   be patentable, so I'm going to keep my specific process as a

16   trade secret.  Right?

17             MR. IVEY:  Yes, Your Honor, and in that regard,

18   what we're talking about is generally confidentiality with

19   regard to how you do things, your means and methods, but

20   that does not mean that those means and methods as

21   confidential are necessarily technological trade secrets in

22   the fact that they are identifiable, novel points that are

23   protectable and not known to the general people of skill in

24   the art and have otherwise been protected and are valuable

25   because they're secret.

1               What we have here is not that at all.  This is

2    essentially one where the confidentiality of it may be what

3    it is, but it's no different than essentially in some

4    respects what we've seen in this case is me saying that my

5    home address is confidential.  I can put a stamp on anything

6    I want.  It doesn't mean that people can't find my address

7    if they go to the Internet or if they check public records.

8    And so what we have here is essentially that kind of a

9    problem.

10               This is not one where there's an actual formula

11   such as the Coca-Cola formula which has ingredients which

12   may indeed be known to everybody in the food industry, but

13   it's the combination of those that is protected.  In that

14   instance, you might not want to take the risk of trying to

15   patent that because all of those ingredients are out there

16   and it's just the different tweaking of the way that you do

17   it that makes it work.  We've got nothing like that in this

18   case.  We don't have algorithms or that types of secret

19   sauce ever being articulated in any respect.

20               So to the extent that the '216 is what they say

21   embodies their trade secret, to the extent that that is the

22   claims and the specification as it gives public notice of

23   what is there, we submit that the final written decision of

24   the PTO with regard to that should be allowed to come in.

25               THE COURT:  Okay.  So I'm going to grant

plaintiff's motion in limine number one.  I think that

novelty and obviousness of claims are different inquiries

than whether something qualifies for a trade secret.

I understand your issue with respect to the

specificity of the trade secrets and we're going to have to

address that at some point, and I think one of the other

motions in limine may get at that.  But to put in the IPR

proceeding in this case I think is likely to confuse the

jury and prejudice the plaintiffs.

So I'm going to say no one is permitted to

reference -- you can sit down -- no one is permitted to

reference the IPR proceedings.  Defendants may use evidence

used in the IPR proceedings to the extent properly disclosed

in this case, but without referring to the IPR proceedings

and the final written decision, neither of which will be

used.

Okay.  Next we have plaintiff's motion in limine

number two, to preclude Dr. Mir from offering testimony that

contradicts the consent judgment against the MirTech

defendants and to preclude defendants from eliciting such

testimony, and I think that's also related to defendants'

motion in limine number three, seeking to preclude plaintiff

from using the consent judgment and preclude reference to

the Court's Phase 1 ruling.

So I'm going to hear both of those together.

1    I'm not sure who it makes sense to hear from first, but

2    being they rise and fall together about what we're going to

3    do with this consent judgment.

4                    MR. MacGILL:  May I proceed on that, Your Honor?

5                    THE COURT:  Sure.

6                    MR. MacGILL:  Your Honor, good morning.  May it

7    please the -- Your Honors, I should say, may it please the

8    Court, just to bring into focus I think maybe the central

9    point that we wanted to emphasize in relation to this motion

10   or to these two related motions.

11                   With respect to the legal standards and what

12   we're involved in, what's involved here, it is a consent

13   judgment which we would say respectfully is analytically

14   distinct from and legally distinct from settlement

15   negotiations or discussions leading up to a settlement

16   agreement.

17                   This is a formal filing that was made with the

18   United States District Court on which the Court relied in

19   all its particulars.  It was a solemn indication to the

20   Court indicating that Dr. Mir new in all respects what he

21   was doing.  He knew what the allegations were.  He was

22   required to confirm to the Court that he knew the

23   allegations.  He was required to confirm to the Court

24   specifically, Your Honor, that he had the right to contest

25   the allegations, and that he was admitting each of the

allegations and the particulars submitted to the Court.

Now, with respect to that framework, the Court is aware of the framework and what I've mentioned, but there's something that's very different about this case and this particular two motions, or these particular two motions.

The defense, Decco, used this consent judgment to its advantage in a separate court proceeding, and they submitted to the Chancery Court, specifically Chancellor Laster, the claim or the consent judgment as a basis for dissolving Essentiv.  So they affirmatively used and the -- before the Chancellor that specific portion.

And there's legal significance to that from the standpoint of judicial estoppel.  And what we have done, Your Honor, is done a couple of things in terms of how the defendants in this case acted to make use of the details, all the details of the consent judgment.

And with respect to the Decco brief that was filed in this matter, we did file this as a part of our proceedings.  There are two sentences I would make reference to.  Decco, before Chancellor Laster, said the following, and this is at Document 51912 and specifically page 64 in their brief.  They said that, they wrote the following sentences.  By that point, Mr. Girin had lost his trust in Dr. Mir's result of the mini breaches of his representations

1    and warranties contained in the joint venture documents as

2    well as his willingness to simply concede to all of

3    AgroFresh's claims.

4          And that was the first reference we wanted to

5    make reference to in terms of how they petitioned the Court

6    here in Delaware, Chancellor Laster, but it wasn't just

7    their petition based on his statements in relation, Your

8    Honor, to all of the claims.

9          Judge Laster relied on that submission, and

10   here's what he said, and I'm referring to Document 51912

11   again, this time, Your Honor, to page 69.  And here's what

12   Judge Laster had to say after having submitted the consent

13   judgment to him in all respects.

14         Here's the Court:  During his deposition, Dr.

15   Mir appeared to argue that despite the broad rights granted

16   to AgroFresh in the settlement agreement and the final

17   consent judgment, MirTech and Decco continued to engage in

18   the 1-MCP business using MirTech's licensed technology.

19         Here is the Court:  This is incorrect.  As

20   explained above, all, all of MirTech's IP rights with

21   respect to the licensed technology have now been assigned to

22   AgroFresh (Chancellor Laster), which is hardly surprising.

23   Given that he never read the documents, it is the legal

24   effect, it is the legal effect of the documents that he

25   signed and authorized.

1          So that's the first thing we wanted to make

2     mention of.

3          THE COURT:  Now, how do you intend to use the

4     consent judgment, if at all, at trial?

5          MR. MacGILL:  We believe that the consent

6     judgment should come in, that we should have Dr. Mir

7     identify the consent judgment.  We've subpoenaed him for

8     Tuesday of trial.  We asked him to identify the consent

9     judgment.  Did you sign this judgment, sir, which he did.

10    Did you know you did it?  Did you know it was being

11    submitted to a United States Judge?  Yes.

12         Cross-examination.  We'll note that no documents

13    did this that because you wanted to settle the case.  Fine,

14    but the fact is, he admitted it -- I mean, I'm sorry.  He

15    made that submission to the Court, so that's how we would

16    intend to use it.

17         THE COURT:  Yes, but in relevance of that to the

18    issues with respect to this defendant?

19         MR. MacGILL:  There are two, there are two

20    contexts that are very important, Your Honor.  One, with

21    respect to the findings that we'll talk about later from

22    Judge Robinson, and, second, this gives vital context to

23    what happened here.  He was a co-conspirator.  According to

24    our view of the evidence, he was a co-conspirator with Decco

25    and he so admitted.  And with respect to that submission, as

we said on brief 801-D2A, shows that this is a personal
admission.

What we're proposing is not to make a naked
assertion, but to simply use it in connection with putting
Dr. Mir on the witness stand, asking him about it, and they
can certainly cross-examine.  But under 801-D2A, we believe
it's an admission that he must stand by or if he wishes to
in your presence and in the presence of the jury to deny it,
he would certainly have whatever right he has if you deny
our motion in limine, but the fact is he shouldn't have a
right to do that.

Now, the final thing I wanted to mention, Your
Honor, is not only did your defendant, Decco, rely on the
entire consent judgment, they submitted a brief to the
Supreme Court of Delaware doing exactly the same thing.  And
what they said to the Supreme Court of Delaware, and this is
at document 519, this time page, I believe it's 772.  This
is their brief.

Here's what they said.  The Court of Chancery
properly concluded that Essentiv's 1-MCP business was no
longer reasonably practicable as a result of final consent
judgment in the District Court in which MirTech, one, agreed
that AgroFresh was the owner of the licensed technology;
two, agreed with all, agreed with all of AgroFresh's
allegations in the complaint in the District Court action;

1    and, three, consented to judgment against MirTech and Dr.

2    Mir on 20 counts of wrongdoing, including fraud, unfair

3    competition, willful patent infringement, and

4    misappropriation of trade secrets.

5              That's what they said to the Supreme Court of

6    this state.  What did the Supreme Court or what else did

7    they say with respect to the brief?  One other item.  They

8    said part of what we're saying to the Court here in support

9    of our motion in limine arguments and response.  Here's what

10   they said and this is document 519, again, page 772 and

11   Exhibit 13.  Here's what they said in the other part of

12   their brief.

13             Accordingly, the final consent judgment went far

14   beyond the scope of the District Court opinion, which was

15   limited to the '216 patent.  In fact, the final consent

16   judgment expressly provides that AgroFresh is the owner of

17   not just the '216 patent, but also several other patents and

18   patent applications relating to 1-MCP technology that

19   MirTech had purported to own.  As a result, says Decco in

20   the brief to the Supreme Court of this state, as a result,

21   AgroFresh became owner of all the patents and patent

22   applications that are contained within the definition of

23   licensed technology as set forth in the agreement.

24             So in the Court of Chancery and the Supreme

25   Court of the State, the Courts, this is what they've

submitted.  Chancellor Laster made the ruling.  The Supreme

Court affirmed on the basis of that brief and that

submission, affirmed Judge Laster.

So we have a little different situation in the

sense we have two things to say in summary.  Number one,

this consent judgment does not fall within the ambit fairly

read of the settlement protection, protection of settlement

communications.  They are not parties to those

communications.

Second, it's an admission.  But if the Court

were not satisfied with either of those rationales or either

of those points of logic, if the Court were not satisfied,

there is a judicial estoppel that is very unusual here,

petitioning the Chancery Court as they did and petitioning

the Supreme Court, and it wasn't just a petition where it

was an argument made on the brief and it fell off the table.

It was relied on twice.

Now, for those reasons, Your Honor, we would ask

that the Court deny the motion in limine to allow the

consent judgment to be referenced.

In answer to the Court's question, I've done my

best how we would propose to use it, and that is the

proposed use that we have.  Call Dr. Mir, have him confirm

the judgment, what he did in relation to that, and they may

cross-examine.

1            Thank you.

2            THE COURT:  Okay.  Does the defendant intend to

3    assert that AgroFresh does not own the rights in question

4    here?

5            MR. IVEY:  No, no, Your Honor.

6            THE COURT:  Does defendant intend to suggest

7    that Dr. Mir did not do anything wrong?

8            MR. IVEY:  No, Your Honor.  I think you've --

9    we've gotten off in kind of the lanes of the highway here a

10   little bit on a couple of points here.

11            One thing that has happened here with regard to

12   the settlement agreement and the consent judgment, as I

13   believe counsel just admitted that we were not party to any

14   of that.

15            The other thing that was mentioned, and it is a

16   tremendous sideshow with regard to a jury trial, is what

17   happened in Chancery Court.

18            THE COURT:  I think it's very different putting

19   something in front of a Vice Chancellor versus putting it in

20   front of a jury.

21            MR. IVEY:  Just so we're clear, the point of

22   that Chancery proceeding was to do away with the dissolution

23   of the partnership because of the breach of the reps and

24   warranties.  The documents that may or may not have come in

25   or whatever they were, but the Court's observation, we

agree, doing what you've done in front of a Chancery Court

and pretending that that somehow or another doesn't create

tremendous issues with regard to a jury trial would be

efficient.

THE COURT:  I think that it may be relevant to

the point if you all are asserting a settlement that

shouldn't come into play at all, but I think that there's a

difference in the prejudicial value.

MR. IVEY:  Yes, Your Honor.  We submit here, and

what I think the Court just heard is something of the kind

of horror show that we would expect that this would create

in front of a jury, which is the litany, point after point,

reference after reference, paragraph after paragraph about a

consent judgment which we're not a party to and didn't sign

being exposed to the jury over and over and asking them to

try to divine what that had in terms of the significance of

our actual case, the fact that we're presenting and the

defenses that we have raised.

It's pretty clear that the point here is

essentially to use Mir's admission of guilt as though they

were Decco and UPL essentially just barring us or tarring

with the same brush before anything happens in the substance

of our liability.

THE COURT:  Let me just ask:  They moved to

preclude Dr. Mir from offering testimony that contradicts

1    the consent judgment.

2              MR. IVEY:  Yes, Your Honor.

3              THE COURT:  And you all didn't agree to

4    that.  What is your motion with regard to their motion in

5    limine?

6              MR. IVEY:  I don't know that we believe, Your

7    Honor, that Mir should be able to contradict the

8    representations he has made to this Court.  We're not his

9    attorneys and we're not on his behalf, so I think we didn't

10   necessarily enter into the fray with regard to what that

11   means.  There has been a suggestion a number of times that

12   what Dr. Mir did a constitute admissions.

13             THE COURT:  He's not a defendant anymore.

14             MR. IVEY:  So if I answered the Court's

15   question, I didn't mean to push past that.

16             THE COURT:  No, I think you did.

17             MR. IVEY:  We have an extraordinary risk here of

18   confusion with the imprimatur of Court decisions as though

19   they apply and should lessen the job that the jurors have

20   with regard to deciding the guilt and the liability with

21   regard to the identification of trade secrets, the

22   protection of those trade secrets, and our ability to

23   operate, freedom to operate in these areas according to the

24   evidence that we intend to put forward during the course of

25   the trial.

1        The overheated rhetoric is inescapable in this

2    reference and the idea that somehow or another the jurors

3    will be able to disentangle the idea that there were

4    negotiations and there were agreements between Decco and Dr.

5    Mir, AgroFresh and Dr. Mir and somehow or another we're not

6    all in this tied up as though there's essentially no

7    distinction between us, I don't see how that happens.

8        And because of the likelihood of confusion and

9    the extraordinary prejudice that would occur if, in fact,

10   what's happening here is it sounds as though the Court has

11   already said, Decco and UPL are responsible as in, quotes,

12   use the overheated term "co-conspirators with somebody who

13   has admitted liability."  There's not a whole lot of room to

14   daylight with regard to how are we going to be able to

15   present a case on first impression to the jury that we're

16   going to select on Friday.

17       THE COURT:  All right.  I think I've heard

18   enough.

19       MR. IVEY:  All right.

20       THE COURT:  So with regard to plaintiff's motion

21   in limine number two and defendants' motion in limine number

22   three, I'm going to grant both of those.

23       It would be confusing to the jury and

24   prejudicial to defendants to admit the consent judgment

25   which includes admissions made by parties no longer in this

action, and it would be confusing to the jury and

prejudicial to use phrases like the Court previously found

with respect to the prior findings of the Court.

So we're not going to, I'm not going to allow

in the consent judgment, and plaintiff may not make

statements that the Court previously found things in the

earlier case.

Defendants, I think, in their papers suggested

that there may be a way to propose a stipulation to

instruct the jury with something regarding that prior

case, and so I will leave it to you all to come up with

something.

Now, that being said, if Dr. Mir opens the door

by stating that he believed he did nothing wrong or

plaintiffs violate the Court's order by eliciting such

testimony, plaintiff may use the consent judgment solely for

impeachment.  It will not be coming into evidence.  And I

would ask that the defendants make Dr. Mir and his attorneys

aware of this ruling, that they are not to elicit that

testimony from him either.

MR. IVEY:  Your Honor, we are unaware of any

trial subpoena that has been issued for Dr. Mir, and I think

the point the Court touched on and we want to just make sure

we've been heard on this or we're protected on it is, this

is an easy area to get into a straw man problem, where all

1    of a sudden this comes roaring in because some questions

2    have elicited it.  I'm not sure how much relevance the

3    testimony that Dr. Mir has beyond what we've discussed

4    with the Court this morning, so we're not planning to call

5    him.

6              THE COURT:  All right.  So what I will say to

7    the extent that either party thinks that if Dr. Mir

8    testifies and either party thinks that his testimony has

9    somehow opened the door to change my ruling before, you

10   know, kicking through that door, we'll have a sidebar where

11   you can explain to me why you think the door has been opened

12   and I will rule on whether or not I agree.

13             MR. MacGILL:  May I ask just one question, Your

14   Honor?  So you've granted our motion and you've granted

15   their motion on this topic.  I just want to make sure my

16   notes are correct.

17             THE COURT:  Yes.

18             MR. MacGILL:  Okay.

19             THE COURT:  So the consent judgment is not

20   coming in.  The prior proceedings are not coming in.  That

21   being said, they also can't ask Dr. Mir to contradict what

22   was in the consent judgment.

23             MR. MacGILL:  Understood.  Thank you.

24             THE COURT:  Okay.  So then we move to

25   plaintiff's motion in limine number three, to prevent

defendants from referring to plaintiff as a monopoly or

monopolist.  And this one I think I can rule on the papers,

and I'm going to deny this motion, because that term

characterization appears in plaintiff's own documents, so I

will allow defendants to use -- I will allow defendants

limited use of the term monopoly or monopolist and only with

respect to plaintiff's witnesses and in closing.

I think that defendant has represented it didn't

intend to do that in the openings or with its own witnesses,

so I'm going to hold you to that representation.

I'm going to require that the defendants stay

close to the context of the documents and the testimony in

the closing.  For example, you know, plaintiff's documents

state X and the plaintiff may rebut the description.

So I'm going to keep it as narrow in my ruling

and the whole trial is not going to be about plaintiff being

a monopoly, but you may use the documents and you may ask

the questions, the witnesses questions, but there will be no

suggestion that plaintiff engaged in anticompetitive

behavior, because that is not something that has been

disclosed in this case.

All right.  So I think that's the end of

plaintiff's motions in limine and now I'm going to turn to

defendants'.

Defendants move to preclude plaintiffs from

1    offering evidence or referring to UPL's failed $400 million

2    bid to purchase AgroFresh as well as any other bid to

3    purchase AgroFresh.

4              So this one I guess I need to understand from

5    plaintiff, because in reading your response, I understand

6    why you want to have that they put in a bid, but why do we

7    need the number?

8              MR. STOVER:  Your Honor, Chad Stover.

9              On the number -- so the defendants concede that

10   the fact the bid was made is coming into evidence and we

11   cited in our papers the, what's called the dozer, but

12   communication from Decco to UPL talking about why they're

13   going to launch their TruPick products, and that, that

14   document referenced the $800 million ultimately successful

15   bid number.

16             So the jury is going to have $800 million number

17   in front of them and they're going to have the fact that the

18   bid was made in front of them.  So in order to put that into

19   context, in order to show that that bid was low compared to

20   the ultimately successful bid, half.

21             THE COURT:  Of course, it was low, because it

22   wasn't accepted.  So why do you need $400 million?  That

23   seems like it has a lot of potential to be prejudicial.

24             MR. STOVER:  Okay.

25             THE COURT:  I understand that you're saying we

want to get in that they made the bid.  There doesn't seem

to be any dispute on that.  I understand that you want to

say, ultimately, this entire business was worth

$800 million.  It seems valuable, jurors.  Right?  But I

don't understand why you need to say, defendants, it was

low.  Okay.  It was.  It wasn't successful.  But why do you

need the number?

          MR. STOVER:  Because the jury needs the context

to know how much lower it was, and the reason for that is to

show intent.  I mean, the reason why we're putting this

evidence in is not for damages.  It's to show intent, and to

show that they made an offer, a low offer that was rejected,

and then when that didn't work, they went and they took the

technology they couldn't buy.

          And so in order to tell the jury that story, we

need to know how much that bid was relative to the winning

bid, that they made a low bid, a low ball offer, it was

rejected, and then they went in and they started with Dr.

Mir and they took the trade secrets and ultimately destroyed

AgroFresh's business.  That's why.

          THE COURT:  Okay.  So I'm not going to let the

$400 million in, but, Mr. Ivey, I want to hear from you or

whoever is on your team arguing this.  Why doesn't

$800 million come in?

          MR. IVEY:  On behalf of Decco and UPL will be

1    Mr. Roland, with the Court's permission.

2               MR. ROLAND:  Good morning, Your Honor.  Our

3    arguments for the $800 million bid are similar to those for

4    the $400 million bid.  It's not relevant in this case and

5    it's highly prejudicial.

6               They have not suggested that the $800 million

7    bid is relevant to damages.  No expert relied on it.  And

8    you can't reasonably extrapolate the defendants placed some

9    value on trade secrets based on the total value of

10   AgroFresh's company after it was acquired.  And it would be

11   highly prejudicial.  It's similar to the Kay Beer case.

12   Allowing a bid for a company to come in is simply so the

13   jury can use that number in assessing damages.  In the Kay

14   Beer case, the Court excluded it for that reason.

15              It's similar to the Nilsson Technology case,

16   where the number in issue didn't relate to the trade secrets

17   at issue, and the Court there said it's improper for that

18   number to come in in any guise, particularly when it's not

19   relevant to damages, and they have not shown that it's

20   relevant here to damages or to the value of the trade

21   secrets.

22              THE COURT:  Are there any other bids that are

23   going to be coming in that anybody wants to get in other

24   than the 400 and the 800?

25              MR. ROLAND:  We're aware of no other bid.

1          MR. STOVER:  No, Your Honor.  Not that I know

2    of.

3          THE COURT:  Okay.  So what I'm going to do is,

4    I'm going to grant defendants' motion in part and deny it in

5    part.  The value of UPL's failed bid does not seem

6    particularly relevant to any issue and plaintiffs can tell

7    their story without that number.

8          The $400 million value is just going to confuse

9    the jury and prejudice defendants, and this outweighs any

10   marginal probative value so that plaintiffs may state that

11   UPL attempted to acquire AgroFresh, but that it was acquired

12   by another, but no evidence of the financial bid, or the

13   failed bid.

14          I will allow plaintiff to offer evidence that

15   the $800 million bid was the winning bid, and defendants are

16   free to cross-examine, to establish that that is not

17   relevant to the issues here, that that encompassed the

18   entire business, not just the trade secrets at issue in this

19   case.

20          MR. ROLAND:  Thank you, Your Honor.

21          THE COURT:  Okay.

22          MR. STOVER:  Your Honor, one clarifying

23   question, if I could.  Are we allowed to then say that the

24   bid that they made was lower than 800 million?  I assume so,

25   but I just wanted to clarify.

1            THE COURT:  Yes, but you can't --

2            MR. STOVER:  I can't say how much lower.

3            THE COURT:  Right.  I don't want you to quantify

4    it and say, it was a little bit lower, it was half as much.

5    There's nothing like that.  There's no quantification.

6            MR. STOVER:  All right.

7            THE COURT:  Instead you can just say they tried

8    to get it and theirs was not the winning bid.

9            MR. STOVER:  Thank you, Your Honor.

10           THE COURT:  All right.  We have defendants'

11   motion to preclude plaintiff from referring to defendants as

12   thieves, criminals or the like, or other inflammatory

13   language as well as arguing that defendants engaged in

14   criminal espionage or stole trade secrets.

15           I notice plaintiff's response focuses on theft

16   and corporate espionage and criminal conspiracy, but largely

17   it ignores the other accusations that they have made.

18           Now, I have read the submissions and I was

19   disturbed by the conduct of plaintiff's counsel during the

20   deposition of Mr. Oakes, arguing in front of the witness and

21   saying on the record that he was there to prove that that

22   particular witness was a fraud and defendants are fraudsters

23   and apparently launching a diatribe about criminal conduct.

24   That's unacceptable and that will not happen at this trial

25   or there will be consequences.

So my ruling on that is I am going to grant in part the motion in limine.  Plaintiffs shall not use the following terms in any way during the course of trial: Fraud.  There are no allegations of fraud here.  Fraudster, crime, criminal, criminal activity, criminal espionage, thief, thieves, or economic espionage pursuant to Section 1831.

Plaintiff may say that there was a theft of trade secrets.  They may argue about a civil conspiracy because it's an asserted cause of action in this case, and they may refer to espionage because it is part of the definition of improper means in Section 1839 for misappropriation of trade secrets.

Any questions there?

MR. MacGILL:  No.

THE COURT:  Okay.  A couple of other miscellaneous issues from the pretrial order.  Documents that are used solely for impeachment will not be received into evidence unless they all, they also appear on a party's exhibit list.

Plaintiff, in the pretrial order, seeks to amend the complaint to make express that the confidential information appropriated under the tortious interference counts was also converted.  This doesn't seem to fall within the provisions of Rule 15(b) and defendants oppose the

1      request.

2              So where are we on that?

3              MR. MacGILL:  Your Honor, on behalf of the

4      plaintiff, AgroFresh, with respect to the property, the

5      interference under the contractual relationships, as the

6      Court knows in the prior arguments, we have three sets of

7      contracts under which there was an appropriation or misuse

8      of confidential information.

9              There was the Dr. Oakes severance agreement,

10     which the Court has heard about, and with respect to that,

11     we promise not to use their confidential information in the

12     future.

13             With respect to Dr. Mir, he agreed he would be

14     our exclusive consultant and keep secret all the

15     confidential and trade secret information.

16             Third, UPL agreed with respect to the contract

17     as did all of its subsidiaries with respect to the

18     commercial relationship that they would not use anything

19     gained in connection with the proposed bid of the purchase

20     of our business at the $800 million ultimate price, and for

21     those contracts and the confidential information that it was

22     appropriate pursuant to those contracts that defines a zone,

23     Your Honor, or a collection of confidential information that

24     is the subject of the already pled counts of interference in

25     the two respects that we have in the complaint.

1              What we're asking in connection with this

2    amendment is to make the amendment to bring the conversion

3    count into consistency and compliance with those same

4    arguments and that same evidence, to make it clear the

5    conversion count includes that same trade secret information

6    and confidential information misappropriated.

7              THE COURT:  All right.  So, Mr. Ivey, if it's

8    already applied in the cause of action and these issues have

9    been disclosed in discovery, what is the issue here for

10   defendant?

11             MR. IVEY:  Your Honor, basically, what happens

12   is we have Count 11 from the Amended Complaint, which

13   doesn't refer to any of the things that counsel just

14   mentioned, and there has been no motion for leave to amend

15   to bring these things in on a timely basis.  This is just

16   something that wound up stuck in this pretrial submission

17   and we objected to it because this is the first we're

18   hearing about the nature and the scope and specificity of

19   it.

20             We think they should be held to what they have

21   done appropriately with regard to their actual amendments,

22   and having never asked for leave to amend, we don't think

23   they should be allowed to expand what they've done.

24             We think this is quite different from

25   subsequently amending the pleadings to conform to the

evidence that comes in naturally with regard to issues

during the case.  This is them adding new things in,

bringing in contracts, specific conversations and so

forth.  None of that has been disclosed previously, Your

Honor.

THE COURT:  Are these issues that were disclosed

during discovery?

MR. IVEY:  The basic issue with regard to

conversion under Count 11 certainly disclosed, was a matter

with regard to interrogatories, and we didn't get specific

answers such as we got here a moment ago either.  And so as

I say, Your Honor, there has never been an effort to either

supplement their responses to discovery under Rule 26(e).

There has been no motion for leave to amend to basically

bring in the issues that they are identifying for the Court

the first time here.  We don't think it should happen this

way.

THE COURT:  Okay.  So I'm going to deny the

request to amend the complaint at this late date.  That

being said, I will allow the plaintiff to proceed to the

extent that the issues raised were properly disclosed during

discovery.

Okay.  So I think that brings us to the section

of the pretrial order that was my favorite, "The other items

to be addressed at the pretrial conference."  That one

appears to have additional motions in limine, one from the

plaintiff and nine from the defendants, which is past my

limit.

Now, I will note that I am not obligated to hear

and decide motions in limine in advance of trial and that I

could instead have the parties use their time next week to

raise these objections, but we have some time today, so what

I'm going to do is, I'm going to allow you -- some of these

issues I can rule on easily.  Some of them I'm going to

allow you to argue, but the time spent arguing these is

going to come out of your trial time.  So you're going to be

on the clock for some of these.

A couple of them that I can deal with without

argument.  Plaintiffs' request that defendants de-designate

highly confidential documents.

I read the protective order on this issue and

I'm not sure why the parties agreed to a protective order if

it didn't require objections to confidentiality designations

earlier, but that was a choice you made.

So the way we're going to deal with this now is

that if you want to raise objections to confidentiality

designations on a case-by-case basis, you may do that, and I

will resolve the objections on a case-by-case basis, and

that will come out of your trial time.

I can't deal with it in the abstract.  I just

have a request from plaintiff that says they improperly

designated documents.  I don't know what documents that

you're talking about.  It's not specific.  I can't deal with

that issue based on what I have.  So if you really want to

pursue that, it's going to have to come out of your trial

time on a case-by-case basis.

           The same thought, similar thought goes into

defendants' related request that documents be stripped of

their confidentiality branding.  We can deal with that on a

case-by-case basis.  What I would propose though is that we

deal with that with a jury instruction.  And the parties

need to work together and propose a joint proposal to me for

a jury instruction that indicates that simply because

documents are marked as confidential in connection with the

lawsuit does not mean that anyone has made a determination

that those documents are, in fact, confidential.

           MR. IVEY:  Your Honor, may I be heard on that

one point?  I appreciate that this may be docked as part of

my trial time.

           THE COURT:  Okay.

           MR. IVEY:  We would propose to basically take

the discovery designations off of all documents where they

were post hoc applications for purposes of discovery or

otherwise so that we have a full set of documents where

there's confidentiality stamps that are contemporaneous to

1    the time that they were so stamped.

2              It's an important issue for us, Your Honor,

3    because the battle over whether, in fact, things were

4    protected at the time is absolutely essential to us, and the

5    idea that we would be able to on a case-by-case basis with a

6    jury instruction prior to the jury going back concerns us as

7    something that would be almost impossible for the jury to

8    follow and understand.

9              We are prepared --

10             THE COURT:  Why is this coming up now?  Right?

11   You want me to say all the documents that have been marked

12   as exhibits in the next week have to be reproduced without

13   the confidentiality restrictions.  Why is it coming up now?

14             MR. IVEY:  Your Honor, we tried to work this out

15   before coming to the Court.

16             THE COURT:  I get it, but you had years where

17   you knew this was going to be an issue coming up.  Why is

18   this coming up now?

19             MR. IVEY:  I don't think I've ever been in a

20   case where parties were unwilling to basically make sure

21   that the documents were best evidence and in their original

22   form and that designations were attorneys' eyes only years

23   after the documents were created was going to be something

24   someone was going to try to use or hope that someone might

25   misconstrue to mean these documents were marked at the

1    time.

2            We are prepared, Your Honor, at our expense to

3    make sure that the entire set, both plaintiff's and

4    defendants', are clean with regard to this prior to the

5    selection of the jury.  We can do that.  We understand that

6    this is an imposition on the Court.  We're prepared to pay

7    the costs for that because we think it's that important of

8    an issue, and --

9            THE COURT:  All right.  Let me hear from

10   plaintiff.  What about that proposal?

11           MR. MacGILL:  Your Honor, as we've said, we've

12   explained this.  The proposal doesn't work.  We designated

13   trade secret information extensively.  There are more than

14   2,000 exhibits.  Case-by-case solves this.

15           We're happy to -- you know, we've got Court

16   requirements here in Delaware to disclose exhibits before.

17   We can deal with issues on a case-by-case issue as we

18   confer, but we're talking about 2,000 exhibits, and the

19   protective order protects our trade secret information.

20   It's there for good reason.

21           The attorneys' eyes only, it's an important part

22   of this, so we would ask that the case-by-case basis, that

23   we work with it on that basis, not global removal of the

24   trade secret designation.

25           THE COURT:  Okay.  So I'm going to let you

1   deal with it on a case-by-case basis, and we're also going

2   to come up with an instruction that you all need to try

3   and agree to that says, litigation branding does not

4   confer trade secret status and does not make it actually a

5   secret.  And I will instruct the jury with respect to that

6   both in the preliminary instructions and in the final

7   instructions.

8          Okay.  Defendants' other item number one,

9   objecting to testimony from their counsel, Mr. Sharma.  And

10  the issue there appears to be a privilege log.

11         So I want to hear from the plaintiff, why a

12  privilege log should come in.

13         MR. MacGILL:  So, Your Honor, as you're aware,

14  there was a designation initially of more than -- almost

15  3,000 documents as privileged.  There was litigation over

16  about 500 of those documents as privileged documents.

17         We pursued the documents, as the Court knows.

18  Judge Fallon ordered production.  It's under appeal with the

19  Court.

20         At a minimum, we'd like to authenticate that

21  privilege log.  And I believe it's Exhibit --

22         THE COURT:  Okay.  Hypothetically, if I sustain

23  those objections and don't order those documents to be

24  produced, tell me where the privilege log comes in.

25         MR. MacGILL:  The privilege log comes in because

1    it shows direct action and control by UPL.  Mr. Kumar, the

2    general counsel of the company, was involved in hundreds and

3    hundreds of these.  We summarized his involvements.  I

4    believe it's Exhibit -- I believe it is Exhibit 73 in the

5    case, which summarized the different entries.  The filing,

6    Your Honor, is DI 392.

7              So our proposal if the Court were to grant --

8    I'm sorry.  If the Court were to overrule Magistrate Judge

9    Fallon and say none of these three categories provide any

10   discoverable information, if she is so overruled on each of

11   those categories, we would propose the following.

12             That we have this log authenticated so that we

13   could show, as we've shown here in DI 392, specifically, the

14   involvements of the general counsel of the company and other

15   officials in India at UPL in various issues in at least

16   three respects.

17             One, where Mr. Kumar gave legal advice with

18   respect to the contractual matter of the formation of

19   Essentiv is one example of that that is prominent through

20   his involvement.

21             THE COURT:  Okay.  I'm going to say no.  The

22   privilege log is not coming into evidence.  It's not

23   evidence.  It was created after the fact by attorneys in the

24   litigation.

25             So the question I have is:  Given that, it's not

1    coming in, does Mr. Sharma need to testify?

2              MR. MacGILL:  Mr. Sharma -- ideally, we would

3    have Mr. Kumar testify, and that would shortcut -- I don't

4    know if he's going to be here in person, but we could have

5    him identify his involvements as shown in this particular

6    exhibit.

7              We asked again --

8              THE COURT:  I don't know what exhibit.  You're

9    talking about something on your exhibit list that I don't

10   have.  I don't know what you are talking about.

11             MR. MacGILL:  So there is a summary, Your Honor,

12   that we submitted as a part of the litigation over the

13   privileged documents, and I think it is DI --

14             THE COURT:  Do you have a copy so I don't have

15   to go look for it?

16             MR. MacGILL:  I sure do.  Any objection to me

17   handing up DI 392?

18                 (Mr. MacGill handed a document to the Court.)

19             MR. MacGILL:  And, Your Honor --

20             THE COURT:  You're not putting this, it says

21   privilege log entries, in front of the jury.  This is

22   essentially just taking the privilege log and summarizing

23   the parts of it that you like.

24             MR. MacGILL:  We understand that.  In answer to

25   your question, you asked me, I think, that what would we

1      propose with Mr. Kumar to have him identify his involvements

2      as shown by that log.

3              If he's on the stand, I wouldn't need that log.

4      I would ask him the information pertaining to that, his

5      involvements and key points in time.  It's that reference,

6      Your Honor, on the chronology that is there that I would ask

7      him about.  If he were on the stand, I wouldn't need this

8      log.

9              THE COURT:  So you're saying you would just ask

10     him, were you involved with discussions back in 2015?

11             MR. MacGILL:  Yes.

12             THE COURT:  Or are you going to get more

13     specific than that?

14             MR. MacGILL:  Well, I wouldn't --

15             THE COURT:  I mean, if you are going to ask him

16     if he gave legal advice on the formation of company and

17     things like that, isn't that getting into some dicey issues

18     of legal advice?

19             MR. MacGILL:  I think it would have to be

20     carefully structured, yes.  It would have to be carefully

21     structured to his involvement on behalf of UPL, and I think

22     that we would have to structure that carefully.  At the time

23     we took his deposition, Magistrate Judge Fallon had just

24     made her ruling the prior week, so we didn't -- we couldn't

25     get into that productively because we were still trying to

1      ascertain what her ruling was and what it meant, but that

2      was in December of 2018 that she made her ruling.

3                  So the purpose of this was to focus on the dates

4      and his involvements, and, of course, we would not be asking

5      him what legal advice did you give, but to confirm his

6      involvements for two reasons legally.

7                  One, the direct action against them, and,

8      second, we have submitted to the Court's consideration

9      agency instruction to show that Decco was the agent for UPL

10     in multiple respects, including the formation of Essentiv,

11     where that was handled exclusively in London by UPL and Dr.

12     Mir.

13                 So those are the -- that is the proposal.

14                 THE COURT:  All right.  The issue before me here

15     is not Dr. Kumar, so if Dr. Kumar is going to be called and

16     there are going to be issues, you all can raise those the

17     morning or before he testifies.

18                 The privilege log though is not going to come

19     into evidence.  I have not heard any, anything to suggest

20     there's a need for Mr. Sharma to testify.  The privilege log

21     isn't coming in.  So Mr. Sharma will not testify and we'll

22     deal with any issues regarding Mr. Kumar when I have more

23     context.

24                 MR. MacGILL:  Your Honor, we had one question

25     related to that.  We've been trying to find out if Mr. Kumar

1    will be here in person.  We've not gotten an answer yet.

2    Perhaps they're still resolving that.  But if he's not

3    available, we would need someone to bring that --

4                 THE COURT:  Did you take his deposition?

5                 MR. MacGILL:  We did.  The problem was what I

6    mentioned.  We took his deposition days after Magistrate

7    Judge Fallon had made her ruling and we expected the

8    documents that, we had hoped that the documents might be

9    produced.

10                THE COURT:  But did you establish with him his

11   role at various times?  You didn't have the documents, which

12   I'm thinking you're not going to have the documents for

13   trial, so did you establish what you could establish with

14   him at his deposition?

15                MR. MacGILL:  In part, we did.  In part, we did.

16   And the full scope of it is not represented by those

17   questions and answers because of the depth of the

18   information that's in that privilege log.

19                And with respect to --

20                THE COURT:  But you had the privilege log and

21   you had -- you had essentially at the time you took his

22   deposition everything that you'll likely have at trial.  So

23   you could have asked him anything you wanted at his

24   deposition, right, on those issues?  I'm not understanding

25   why you think there's something you couldn't have asked him

1    if I say we're going to maintain the status quo and not,

2    you're not going to have the particular documents that Judge

3    Fallon had ordered to be produced.

4              So what's different now?

5              MR. MacGILL:  Well, I'm saying as a questioning

6    lawyer, it's entirely different for this reason.  We were,

7    we were analyzing as best we could the meaning and extent of

8    what Magistrate Judge Fallon decided.  As I said, it was a

9    number of days.  We were taking depositions of him.

10             We went as far as we reasonably could to say how

11   are you involved, and we did explain to the Court, we did

12   ask him some of these preliminary matters and some of the

13   substantive matters of were you involved.  Okay.  We did ask

14   that.

15             But the nature and extent of his involvement has

16   not been made apparent yet and we certainly didn't, we made

17   the election not to do it based on the Magistrate Judge's

18   ruling the week prior.

19             THE COURT:  All right.  Look, I will deal with

20   Mr. Kumar when and if that issue becomes ripe.

21             MR. MacGILL:  Understood.

22             THE COURT:  If you are not going to call Dr.

23   Kumar, you should tell them so that they can designate

24   portions of his testimony and if the plaintiffs question

25   back during the deposition of Mr. Kumar, that's a call that

1   you all made that I can't really address at this point.

2   So you can either play his deposition or he'll appear at

3   trial.

4              MR. MacGILL:   I understand the ruling, of

5   course.   Could we have a date by which we know about Mr.

6   Kumar?   We're going to have to cut his testimony, I think,

7   Friday, so is there a date by which we can know about his

8   availability?

9              MR. IVEY:   We'll make sure that's reasonably

10  made in advance, Your Honor.   We're happy to work with

11  counsel on that.

12             One thing to keep in mind is there were two days

13  of deposition for Mr. Kumar already and they have already

14  put in designations.   We'll work with him to make sure that

15  doesn't come back before the Court.

16             THE COURT:   I understand.   They need to know if

17  they are going to be preparing a cross-examination or

18  designating.   I would let them know before Friday of this

19  week.

20             MR. IVEY:   Absolutely, Your Honor.   We will do

21  that.

22             THE COURT:   Okay.   Defendants' other item number

23  two, using testimony from defendants' experts, plaintiff

24  using testimony from defendants' experts in its own

25  case-in-chief.

1          I always love these motions because you wonder

2     what the expert said that makes the plaintiff want to use

3     it.  But here's what we are going go to do.  Plaintiff is

4     not going to use the deposition testimony of defendants'

5     experts in the case-in-chief.  If plaintiff chooses, it may

6     call the witnesses live in its case-in-chief, but if they do

7     that, defendant is going to have some wide latitude on cross

8     and to ask whatever questions they want.

9          MR. MacGILL:  Your Honor, may I be heard briefly

10    on one?  With Dr. Beaudry, we just want to identify one

11    document.  That's the purpose, that we have one document

12    that we wanted.  That's the scope of what we wanted to ask

13    him about.

14         THE COURT:  Can we not stipulate on the

15    identification of this document without putting the jury

16    through watching a clip of a deposition where the witness is

17    going to testify live?

18         MR. IVEY:  I can't imagine that we can't do

19    that, Your Honor.  It seems to me that's perfectly

20    reasonable.

21         Now, frankly, there's a whole lot of

22    gamesmanship going on with trying to call our expert.

23         THE COURT:  I get it.  I gave you I thought a

24    pretty good ruling there.  If they call him live, they're

25    going to be mucking up their case-in-chief, so if they want

1        to call your witnesses, they can.

2                    MR. IVEY:  Is the field open?

3                    THE COURT:  The field is not completely open.

4        There's still going to be some limitation.  If they want to

5        call your expert, it's not going to be just snippets and

6        sound bites out of context.  I will give you latitude to put

7        anything that they say in context, but if it's really what

8        we're talking about here, an identification of an exhibit,

9        we're not putting testimony in for that.  You need to agree

10       to that.

11                   MR. IVEY:  Yes, Your Honor.

12                   MR. MacGILL:  It's Exhibit 753 for the record.

13       That's the sole thing we designated with this witness.  He

14       was a participant.  He's not just an expert.  He

15       participated in the activities here.  It's his slide show

16       that we want to put in our case-in-chief.  It is a matter of

17       a few pages that we're proposing to read.

18                   If we get a stipulation on the admissibility of

19       753, no problem, but we couldn't get it.  We tried, but

20       that's the sole reason for Dr. Beaudry in our case and we

21       have so designated and provided to counsel.

22                   THE COURT:  All right.  See if you can work that

23       out.

24                   MR. IVEY:  All right.

25                   THE COURT:  Okay.  Defendants' other item number

1    three, objecting to plaintiff introducing testimony of Nance

2    Dicciani, a fact witness not identified in Rule 26

3    disclosures in this phase of the case.

4              So was this person identified anywhere in this

5    phase of the case?

6              MR. MacGILL:   I can speak for plaintiff, Your

7    Honor.   The answer is no, and as it turns out, as we've

8    evaluated the time, we will not have time to call Nancy

9    Dicciani.

10             THE COURT:   Thank you.   Thank you for

11   pronouncing her name correctly.

12             Okay.   Defendants' other item number five,

13   objecting to attempts to introduce evidence or arguments

14   that defendants committed economic espionage under

15   Section 1831 and/or violated CIPLA and/or 40 C.F.R., Section

16   168.22.

17             So for this one, at the summary judgment

18   hearing, plaintiff said that it was not seeking criminal

19   penalties, but that it was going to argue that the wrongful

20   conduct occurred because economic espionage occurred and

21   that it's wrongful because it's criminal conduct.

22             What I'm going to do here is, the section that I

23   think is appropriate here is Title 18, United States Code,

24   Section 1836, not the economic espionage Section 1831, so

25   we're not going to have reference to criminal statutes,

criminal activity, or economic espionage under Section 1831.
We will use the definition for trade secret misappropriation
and improper means as used in Section 1839.

So this is consistent with my prior ruling.
We're not going to talk about criminals and criminal
activity, but you will be allowed to assert that they did so
by improper means.

Defendants' other item number six requests
plaintiff to disclose its trade secrets that it will be
presenting to the jury with reasonable particularity.  This
is an issue that keeps coming up over and over again.

So here's what I need to understand from the
plaintiffs.  I saw the proposed verdict sheet and that's
just not going to work, where we say they proved trade
secrets, any one of the above, because when I go to look at
post-trial motions or the appellate court goes to look at
it, I don't know what we're determining that the jury
actually determined.  So we're going to have to do it trade
secret by trade secret.

So what I would like from the plaintiff is some
understanding of what trade secrets you're asserting and
give me a shorthand notation for how we can refer to those
in the verdict sheet so that we can look at this question
when after trial and determine whether there's, you know,
sufficient evidence to support a particular finding.

So if you have the trade secrets relating to

disclosures in the '216 patent, if you have trade secrets

relating to, you know, things put in manuals.  I need to

know how many we're talking about and I need to know, you

know, what it is that you're going to be proving at trial,

because right now I don't really have an understanding of

what trade secrets you're planning to go forward on and then

it's impossible for the defendants to know how they're going

to prepare.

So I would like before the end of this week for

you to submit to me and to the defendants at least some way

of telling us which trade secrets you're going to be

asserting so that we know how many and give me a name for

them so that when we're fighting about it during trial, I

know what we're fighting about.  So that's the way we're

going to handle that one.

Defendants' other item, number seven, objecting

to plaintiff providing an unjust enrichment damages theory.

This came up in connection with the Daubert

motions.  I've heard some substantial argument on this.

Unjust enrichment was disclosed generically, but

plaintiff didn't provide the specific number for unjust

enrichment.  That being said, I'm not going to preclude

plaintiff from using fact witnesses to present its unjust

enrichment evidence so long as the witness or witnesses

1    proposed fairly were disclosed as having knowledge regarding

2    the financials and there was an opportunity for the

3    defendants to ask.  But as I said before, plaintiff is not

4    going to be using its expert, Mr. Kleinrichert.

5              Defendants' other item number eight, asking

6    plaintiffs's rebuttal case to be limited to validity of the

7    Daly patents.  That one I'm going to deny.

8              Plaintiff may present its rebuttal case as it

9    sees fit, but it needs to be rebuttal and not raising new

10   issues.  If you raise new issues and defendants have time, I

11   may allow them some extra time.

12             Then we get to the deposition of Dr. Zettler,

13   and a lot of the motion or the discussion of it in the

14   pretrial order had to do with plaintiff's assurances on

15   the scope of the deposition, and I asked the plaintiffs to

16   give those assurances and they did in a pretty forthright

17   manner.

18             So what's the problem?  The man had a sick wife

19   and he can't come to trial.  If he came to trial,

20   presumably, they wouldn't even have to give you some of the

21   assurances they would have to give you, but they would have

22   to give you the documents that they intend to use with him

23   in advance, which I think can be worked out if that hasn't

24   already been done.

25             So what's the problem?

1          MR. WILLIAMSON:  Your Honor, there is no problem

2     with that respect.  This is this is about the scope of this

3     witness' testimony and our concerns about the scope of the

4     witness' testimony.

5          Dr. Zettler had been held out at the Daubert

6     hearing as someone who may be providing testimony on the

7     very issue that Your Honor just identified, the scope of

8     their unjust enrichment case, but Dr. Zettler was not

9     disclosed in discovery properly as a witness who had that

10    knowledge.

11         So while they have represented in response to

12    your Honor's order asking them to identify what the scope of

13    this testimony is going to be, while they have represented

14    that he is not going to testify outside the bounds of what

15    he has been properly disclosed for in discovery, I think

16    that we are -- we remain concerned that the parties have a

17    misunderstanding or a dispute over what that disclosure was

18    with respect to Dr. Zettler.

19         And another reason we remained concerned about

20    the scope of the testimony is that under paragraph 43 of the

21    pretrial order, those documents were due to us last night

22    and we asked for them last night, the documents that they

23    intend to use in the direct examination of Dr. Zettler.  And

24    to the extent that that exhibit set was going to be a whole

25    bunch of spreadsheets and financials and everything else

concerning their unjust enrichment case and an avoided cost

theory, we were expecting to have known that today as we

stand here today under the procedures of the pretrial order.

Those have been ignored, so we don't have that context

before you, and we think it would be helpful to have a

genuine disclosure of exactly what Dr. Zettler is going to

testify about.

He has testified for five days in this matter

already and we have offered a procedure, an expedited

procedure such that they can designate anything they want

from those five days of testimony.

THE COURT:  All right.  But if he was going to

come to trial, then presumably, you know, he would be asked

the same question he was previously asked in a different way

or perhaps different questions that are framed more

specifically to help the jury understand.  So the fact that

he has been deposed for five days doesn't really do much.

MR. WILLIAMSON:  Okay.

THE COURT:  So here's what we're going to do.

The deposition of Dr. Zettler should go forward at a time

that is convenient to both sides.  I know plaintiff wanted

it to go tomorrow.  I don't know if that works for the

defendants or not.

You should immediately produce, give them the

documents that you intend to use with Dr. Zettler, and I

1    will let the deposition go forward, but I will withhold

2    ruling on what may actually be played for the jury until the

3    defendants have an opportunity to make the arguments and I

4    can see specific questions and answers and where, whether

5    those are appropriate and within the context of the

6    disclosure.  It's too hard to deal with it in the abstract.

7                 MR. WILLIAMSON:  Thank you, Your Honor.

8                 THE COURT:  So I think that deals with the

9    issues that were in the pretrial order.  Is there anything

10   else that we need to address?

11                MR. MacGILL:  Your Honor, the preliminary

12   instructions, we had an issue of reference to the findings

13   in Phase 1 and we'd like to address that briefly, if we

14   may.

15                THE COURT:  Okay.  Before we do that, let me

16   just clarify one thing.  In the pretrial order, Judge Hall

17   just noted it says it will be eight jurors and two

18   alternates.  We typically do not have alternates.  We have

19   eight jurors, and we can, without requiring consent, go down

20   to six, so we do have actually some wiggle room in case

21   something happens to one of the jurors.  So we will seat

22   eight jurors and not have two designated as alternates.

23                MR. MacGILL:  Will all eight deliberate?

24                THE COURT:  All eight will deliberate.

25                MR. MacGILL:  Okay.  So, your Honor, one of the

things that is for the Court to decide is what you wish to

say in your preliminary instructions to the jury.  The Phase

1 opinion, as you know, the parties spent considerable time

litigating the issue of who owned the patented technology,

the '216 patent and related technologies that the Court is

aware of the findings.

So to bring those rulings into focus, what we

have asked in the preliminary instruction is to have a

description through the Court of, through an appropriate

mechanism decided upon the Court to decide what happened in

the Phase 1 trial and what has been decided already.

THE COURT:  I have pulled them up, the

preliminary instructions that you all have submitted.

Can you point me to which instruction you're

talking about?

MR. MacGILL:  Yes, ma'am.  I sure can.  Pages 25

through 27, Your Honor.  This is document 530.

So what we have proposed for the Court's

consideration is to give a preliminary instruction on the

findings of fact and the Court's Phase 1 opinion in the

order that was entered by Judge Robinson.

And what we have done with respect to bringing

into focus what has happened there is we have, I hope with

in all respects with appropriate citations, given the

findings that we're proposing that the Court instruct as

1     findings of fact that had previously been or findings have

2     been resolved, and then a short blank statement of the

3     conclusion of law on page 27, Your Honor.

4               That is to -- we're proposing that the Court

5     describe in the preliminary instructions that in its opinion

6     as an order, the Court also made the conclusions of law.  In

7     relevant part, our Court concluded that, et cetera, et

8     cetera.  And I shouldn't say et cetera, et cetera.  That the

9     provisions between MirTech and AgroFresh were unambiguous

10    and that AgroFresh owns the '216 patented technology

11    pursuant to those agreements.  That is the finding of Judge

12    Robinson that she provided after hearing all the evidence in

13    this case and working quite hard to publish an opinion.

14              So with respect to this, this is, of course,

15    distinct from reference to the content judgment.

16              THE COURT:  All right.  Let's just stop right

17    there.

18              MR. MacGILL:  Sure.

19              THE COURT:  I'm not going to put this in the

20    preliminary instructions.  I thought when I talked about the

21    consent judgment, I said if there are facts that you all can

22    stipulate to about the prior one, you should work at doing

23    that, but this is way too much detail to give the jury in a

24    preliminary instruction and, you know, look, I will consider

25    whether we need to do something of this in the final

1    instructions, but to me, this is probably, you know, getting

2    through and giving these specifics, it's too prejudicial,

3    especially coming from the Court where it sounds like, you

4    know, I am instructing them of something that may be

5    relevant to this case.

6              So this seems controversial and prejudicial to

7    me, but in any event, I'm not going to do it in the

8    preliminary instructions.  But to the extent things from the

9    first case need to come in, you need to come up with a way

10   to put them in, and defendants have said they would be

11   willing to discuss a stipulation that can be read to the

12   jury about that case.  So I need you guys to go back and

13   actually try to agree on something there.

14             MR. MacGILL:  Understood.

15             THE COURT:  So with respect to the preliminary

16   instructions, I will take a look at them.  I will send out a

17   revised version and you can note your objections, but I'm

18   not in the preliminary instructions going to include the

19   consent judgments or the Phase 1 aspects of the trial that

20   have been requested.  I think, one, it is not appropriate

21   for preliminary instructions; and, two, it may not

22   ultimately be relevant to the issues in the case; and,

23   three, it seems unduly prejudicial from the outset.

24             So are there any other issues?

25             MR. MacGILL:  We had -- Your Honor, Rob MacGill

1    once again for AgroFresh.

2            We had one relatively restricted question.  So

3    our expert, Dr. Walton, will have a trade secret component

4    through her testimony, Your Honor, and she will also have a

5    patent portion.

6            If it's permissible from the Court, we'd propose

7    that I would do the trade secret portion.  Mr. Stover would

8    take a separate direct on the patent if that's agreeable to

9    the Court.

10           THE COURT:  Does defendant have any real

11    objection to that?

12           MR. IVEY:  I don't have any objection at all.

13           MR. MacGILL:  Thank you.

14           MR. STOVER:  Your Honor, just one minor

15    housekeeping matter that came up yesterday, actually.

16    Paragraph 35 of the pretrial order conflicts with paragraph

17    43, and Mr. Ivey mentioned, or Mr. Williamson, I believe,

18    mentioned something about this disclosure of exhibits before

19    a witness is going to take the stand, and paragraph 43

20    talks about doing that two days before the witness takes

21    the stand and paragraph 35 talks about doing that the night

22    before.

23           We would propose that we say for paragraph 35 --

24    I'm not sure how both of those paragraphs ended up in there,

25    but they did.  We would propose for AgroFresh that we

1    disclose, make those disclosures the night before, have that

2    meet and confer between the parties the night before and

3    then bring any remaining issues to Your Honor the morning

4    of.

5              MR. WILLIAMSON:  Your Honor, we don't see the

6    conflict that Mr. Stover sees because paragraph 43 in the

7    third line is limited to exhibits on direct examination that

8    have not been stipulated by the parties in advance as

9    admissible, so for that universe of exhibits, there would be

10   sort of a two-day window for the parties to kind of work

11   through their objections.  You'd have an additional day to

12   work through your objections.

13             THE COURT:  How many exhibits have been

14   stipulated to that wouldn't fall within that exception?

15             MR. WILLIAMSON:  Right now, there are none.

16             THE COURT:  Okay.  So they do overlap right now,

17   because what you are saying, what you are saying is the

18   exception for 43 applies to every single exhibit they could

19   possibly identify.  Right?

20             MR. WILLIAMSON:  Right now today, yes.  And we

21   are still working on, and I think Mr. MacGill just

22   referenced an exhibit from Dr. Beaudry's examination.  We're

23   still working together as part of this pretrial process to

24   see if we can stipulate to admissibility of exhibits.  To

25   the extent we can't, we wanted enough leeway to work through

1      any objections and potentially reach those stipulations the

2      night before.

3                  I know it is typical practice.  The night before

4      does put a lot of pressure on that ability to kind of work

5      through, find any potential stipulations there.  But as we

6      read it, yes, the exception right now swallows the entire

7      thing, but there is no conflict as we see it between those

8      two paragraphs.

9                  THE COURT:  Okay.  I am going to go with

10     paragraph 43 for all disclosures of exhibits and that goes

11     to both sides.  I just think that you all don't really agree

12     on anything, and to the extent you have more time to talk

13     about it rather than less, it probably is better for your

14     use of time and for my use of time.  So you're going to have

15     to disclose things two days in advance.  I realize that

16     might not actually work for Dr. Zettler, depending on when

17     his deposition is, but I will ask you to get the Dr. Zettler

18     exhibits out ASAP.

19                 MR. MacGILL:  We will, and -- we will.

20                 THE COURT:  Okay.  Now, the last thing that I

21     didn't mention before is witness binders.  It would be

22     helpful if we had for each witness on direct a binder and

23     each witness on cross a binder, and that we have copies of

24     them that are enough for at least extra ones for me, my

25     clerk and the court reporter, so just keep that in mind.

1          I don't know how you were planning to do it, but

2     I find it works better than having the attorneys walk up and

3     down, you know, multiple times, especially when we're in a

4     timed trial.

5          In the binders I would like to have all of the

6     PTX exhibits together and all of the DTX exhibits together,

7     because if you just go by what the actual number is,

8     sometimes it's hard for me to find them and it's hard to

9     follow.

10          So just like, you know, PTX-1 ascending up to

11     whatever the last PTX number you'll use with that witness

12     and then start with the DTX's and also do them in ascending

13     order.

14          And finally, speaking of binders, jury binders.

15     The jurors will each have a binder that has a pad and paper

16     in it for taking notes.  To the extent that you all agree on

17     anything else that should go in there, for example, copies

18     of the patents, a glossary of any terms that you want them

19     to understand, if you agree, we will include them in the

20     jurors' binders.  If you don't agree, then they won't go

21     into the binders.  Okay?

22          So anything that you agree on, we would ask that

23     you let us know by let's say before the end of the day

24     Friday so that we have a chance to make appropriate copies

25     and include them in any binders.  And if I got that wrong

1    about how we deal with jury binders, Mr. Buckson will tell

2    you the appropriate way to do it.

3              So is there anything else that we need to

4    discuss?

5              MR. MacGILL:  Nothing from plaintiff, Your

6    Honor.  Thank you.

7              MR. IVEY:  No, Your Honor.  Thank you.

8              THE COURT:  Okay.  Thank you very much.  We'll

9    be adjourned.

10             (Court recessed at 10:27 a.m.)

11                        -   -   -

12

13

14

15

16

17

18

19

20

21

22

23

24

25