```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -

 4
        AGROFRESH INC.,                 :   CIVIL ACTION
 5                                       :
                      Plaintiff,         :
 6                                       :
            vs.                          :
 7                                       :
        ESSENTIV LLC, DECCO U.S.         :
 8      POST-HARVEST, INC.,              :
        CEREXAGRI INC., d/b/a DECCO      :
 9      POST-HARVEST, and UPL,           :
        LTD.,                            :
10                                       :
                      Defendants.    :   NO. 16-662-MN
11

12                              - - -

13                              Wilmington, Delaware
                                Thursday, September 5, 2019
14                              9:33 o'clock, a.m.

15                              - - -

16      BEFORE:  HONORABLE MARYELLEN NOREIKA, U.S.D.C.J.

17                              - - -

18      APPEARANCES:

19
                  BARNES & THORNBURG LLP
20                BY:  CHAD S.C. STOVER, ESQ.

21
                         -and-
22

23

24                                      Valerie J. Gunning
                                        Official Court Reporter
25
```

1    APPEARANCES (Continued):

2
          BARNES & THORNBURG LLP
3         BY:  ROBERT D. MacGILL, ESQ.
               JESSICA LINDEMANN, ESQ. and
4              MATTHEW CIULLA, ESQ.
               (Indianapolis, Indiana)
5

6              Counsel for Plaintiff

7

8         RICHARD, LAYTON & FINGER
          BY:  FREDERICK L. COTTRELL, III, ESQ.
9

10                   -and-

11
          FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER
12        LLP
          BY:  GERALD F. IVEY, ESQ.
13             JOHN WILLIAMSON, ESQ.,
               RAJ GUPTA, ESQ. and
14             ANAND SHARMA, ESQ.
               (Washington, D.C.)
15

16             Counsel for Defendants

17
                     -  -  -
18

19

20

21

22

23

24

25

                     **P R O C E E D I N G S**

                         (Proceedings commenced in the courtroom,
      beginning at 9:33 a.m.)

                         THE COURT:  Good morning.
                         (Counsel respond, "Good morning, Your Honor.")
                         THE COURT:  Please be seated.  Let's start with
      some introductions.
                         MR. STOVER:  Good morning, Your Honor.  Chad
      Stover from Barnes & Thornburg.
                         With me today are Robert MacGill, Matthew Ciulla
      and Jessica Lindemann, all from Barnes & Thornburg in
      Indianapolis.
                         THE COURT:  Good morning and welcome.
                         Mr. Cottrell?
                         MR. COTTRELL:  Thank you, Your Honor.  Good
      morning.  Fred Cottrell from Richards, Layton & Finger for
      the defendants.
                         With me first from Finnegan Henderson, Gerald
      Ivey, John Williamson, and Raj Gupta.  Also from Finnegan,
      Anand Sharma, and our clients are here from UPL.  Rumit
      Kumar, who is the Global General Counsel, and Carlos
      Pellicer, who is the Global COO of Strategy for UPL.
                         THE COURT:  Good morning, and welcome to

1    Delaware.

2          MR. COTTRELL:  Thank you.

3          THE COURT:  So we've reviewed the omnibus

4    summary judgment motion from defendants as well as the

5    Daubert motion that defendants filed, and I wanted to hear a

6    little bit more from you on some of the issues.  We had a

7    few questions.  And then I also want to talk a little bit

8    about the trade secret disclosures at the end.

9          So if you don't mind -- Mr. Ivey, if you don't

10   mind, I would like to take it starting with the Daubert

11   motion first, and I would like to hear from the plaintiff

12   first on this one even though it's defendants' motion.  I am

13   inclined at the moment to grant the motion and exclude

14   Mr. Kleinrichert's testimony, but I want to hear from the

15   plaintiff first.  Mr. Ivey?

16         MR. IVEY:  Yes.  Our motion.  Good morning, Your

17   Honor.  Gerald Ivey.  The issue on behalf of Finnegan, UPL

18   and Decco will be addressed by John Williamson with the

19   Court's permission.

20         THE COURT:  Of course.

21         MR. IVEY:  Thank you.

22         THE COURT:  But first, plaintiff.

23         MR. STOVER:  And, Your Honor, with your

24   permission, Mr. MacGill will handle that.  I also neglected

25   to introduce Mr. Thomas Ermi and Mina Thomas, who are

1    in-house counsel for AgroFresh.

2              THE COURT:  Welcome to you as well.

3              MR. STOVER:   Thank you.

4              THE COURT:  Anyone who wants to argue, just make

5    sure you introduce yourself for the first time and that's

6    fine.

7              So I had a couple of questions on this motion,

8    and what I really didn't understand from the response is,

9    what is it that you are proposing happen at the trial?  So

10   it just seemed like all Mr. Kleinrichert did is add some

11   numbers up, and that then there's this kind of big hole

12   where I hear there will be other evidence and testimony that

13   I don't quite understand what it is that's going to pull all

14   of this together and come up with a number.  And so I'm

15   trying to understand what it is that is actually going to

16   happen with some specifics as opposed to kind of more

17   generality.

18              MR. MacGILL:  Thank you, Your Honor, and good

19   morning once again.  I'm Rob MacGill, representing your

20   plaintiff in this case, AgroFresh.

21              And maybe to start with, the data that we have

22   that we're presenting to the Court in terms of these costs

23   of development.  And if we looked at some slides -- and if I

24   may have those binders, please.

25              And if we look at the beginning of this, Your

Honor, in terms of getting an orientation to the factual

evidence that we have that we would be presenting to the

Court, we can start with the details associated with what

Mr. Kleinrichert will testify to.

If we go to slide 3 of the case overview, you

see from materials that have been presented to Your Honor,

this is the table that Mr. Kleinrichert and FTI have used to

amalgamate and summarize the costs of development for a

14-year period of time, and they use data, specific data

that came from Dow, which was the legacy.  We acquired this

company from Dow in a transaction some years ago.

Now, where is the data and where does that come

from?  In answer to the Court's question, the data comes

from Dow, and there's a witness who testified,

Mr. Chandramouli.  And Mr. Chandramouli identified in his

deposition in January of this year the Excel spreadsheets,

which are the data that make up these costs of development.

So these are -- and the Court would, as you

would anticipate, voluminous materials over a period of time

and they fall into two categories.  They fall into

categories as we reference.

And if we could go to --

THE COURT:  No.  I understand.  They fall into

development of the 1-MP stuff in general and then the

product specifically.  Right?

1            MR. MacGILL:  They do.

2            THE COURT:  Okay.  So I got that and I read all

3    of your papers.  What I don't understand though is what is

4    going to happen?  He can't testify that any of these costs

5    have anything to do with a particular trade secret or even

6    the trade secrets altogether, and all I understood from your

7    papers is, oh, but someone else somehow else is going to do

8    that.

9            Are you planning to come up with a number to

10   give the jury for unjust enrichment?  And if so, who is

11   going to do that and what's the number going to be and where

12   has it been disclosed?

13           So I have this feeling that if I say go ahead,

14   we're just going to have a free-for-all at trial and there

15   is going to be some number for the first time the defendants

16   are seeing at trial, and that doesn't seem right to me.  So

17   I'm trying to understand, what are you proposing to do with

18   this at trial?  And give me specifics, not somebody

19   somewhere is going to say something to tie it all together,

20   believe me.

21           MR. MacGILL:  Okay.  So Mr. Kleinrichert will

22   testify on three distinct assumptions.

23           Number one, he will testify to material evidence

24   and testimony that at the trial, in front of -- in your

25   presence and in front of the jury.  Your Honor, we will

1    establish that these costs are limited, or at least narrowly

2    limited to costs that were relative to developing the costs,

3    I should say, they relate to the trade secrets at issue in

4    this case.

5             So with respect to that first assumption, that

6    will come from a variety of witnesses.  Dr. Beaulieu, who is

7    our current head of research, will confirm that.

8    Mr. Cassidy, who has financial orientation and detail, will

9    testify to that.

10            THE COURT:  So they're going to go through

11   specifically and say each of these things, for example, the

12   rental car costs with respect to selling another product

13   that the defendant pointed out?  Someone is going to go

14   through, and for every cost that Mr. -- how do you say his

15   name?

16            MR. MacGILL:  Kleinrichert Richard.

17            THE COURT:  Kleinrichert included, someone is

18   going to say, yes, that relates to something here?

19            MR. MacGILL:  It will.

20            THE COURT:  And what I'm trying to figure out,

21   you're going to have two people saying these costs to be

22   included relate to a trade secret issue?

23            MR. MacGILL:  Yes.  And this will come --

24            THE COURT:  You know you only get five days for

25   this trial?

1          MR. MacGILL:  We do.  We understand that.  We

2    understand this is a timed trial and there are limitations

3    that we need to deal with and be prepared to meet.

4          But, Your Honor, with respect to the specific

5    testimony we will offer on this point.  Dr. Beaulieu, you

6    can go to what we filed with you and the Court last week and

7    you can see the listing of the trade secrets that are at

8    issue here, and you'll see with respect to that listing, he

9    will testify that each and every one of those trade secrets

10   were developed over a 20-year period of time.  They were

11   informed by thousands of studies.  Okay.  Those thousands of

12   studies that were done over a 14-year period of time are

13   included in the summary here.

14         Dr. Beaulieu and Mr. Cassidy will confirm what

15   was done to present and prepare these studies.  To be more

16   specific, what will Mr. Cassidy share in terms of details

17   about the costs that are included in these Excel

18   spreadsheets and during the period of time of his

19   involvement?

20         He will show, for example, through his trial

21   testimony, Your Honor, he will testify specifically, he will

22   be able to describe that for a period of years, he will be

23   able to describe the number of studies done, the costs

24   associated with those particular studies.  He will show, for

25   example, in a 2010 to 2014 or '15 period of time, during his

tenure, his involvements in his accounting and his financial

recordkeeping, he will be able to establish, for example,

with respect to different tests that were done, how many

hours were spent by how many people.  He will be able to

show you specifically how many hours were spent on this

study, how many items of fruit were actually tested in

connection with this specifically.  And he'll be able to

provide to you examples.

And if we could take a look at a couple of other

references here, he will be able to describe specifically by

particular study and particular year, he'll be able to show

what the specifics were in terms of number of fruits that

were tested.  Examples that he'll give will include during

his tenure and specifically what he did.

THE COURT:  But how is this within -- why can't

he just testify about the costs of these?  What is it that

you need Mr. Kleinrichert for?

MR. MacGILL:  We need Mr. Kleinrichert to do

what Courts, what the Third Circuit has authorized we think

repeatedly what's helpful to the jury to amalgamate these

costs into discernible elements.  Okay.

THE COURT:  But they have to be discernible

elements that are relevant to the particular issues in the

case.  Right?

MR. MacGILL:  Yes, of course, they do.

1            **THE COURT:  So who is going to go through and**

2     **say what is the relevance of, for example, the rental car**

3     **costs associated with selling?  Who is going to go through**

4     **and tell me that so that when you put this big number in**

5     **front of the jury, I know that that number had something to**

6     **do with the issues in this case?**

7            **I completely understand what you are telling me**

8     **about these other folks, that Dr. Beaulieu is going to say**

9     **we have all of this testing and it was a huge project and it**

10    **cost a lot of money and which of these tests cost whatever.**

11    **But this, what you are suggesting with Mr. Kleinrichert is**

12    **just some amalgamation of everything that we threw into a**

13    **pile for developing 1-MCP products, and I'm not sure I**

14    **understand who is going to go through and say, each of those**

15    **costs is associated with something relevant to this case and**

16    **the trade secret issues, because it didn't seem like he**

17    **could do that.**

18            **MR. MacGILL:  Okay.  Can we turn to the slide**

19    **number 9, please.**

20            **And, Judge, if I may to be specific and answer**

21    **the question you just asked me, so we've listed for purposes**

22    **of an overview the different issues for jury resolution and**

23    **summary judgment.  I think it's useful for answering your**

24    **question.**

25            **If we look at the left-hand side, in terms of**

1     the trade secrets at issue, what we have done is listed

2     these trade secrets specifically in relation to the

3     disclosure that we provided to the Court last week in

4     response to your request.

5           If you look at the trade secret misappropriation

6     section, and specifically trade secret one, patent

7     technology, treatment parameters, safety and use

8     information, accumulated knowledge, business information,

9     that's grouping.  And then you look to the right-hand side,

10    Your Honor, to the AgroFresh testing protocols, you'll see

11    trade secrets 5, 4 and 8 are referenced there.

12          The witnesses that will provide the testimony as

13    to the technology, development, the market development in

14    each of these particular trade secrets that occurred over

15    this period of time comes from those, general data.

16    Mr. Cassidy, who will provide the assumption that I have

17    provided to you and described to you, and Dr. Beaulieu, the

18    current head of research.  And what they will do is show

19    that with respect to the legacy costs that are in these two

20    exhibits, these Excel spreadsheets, they will show you that

21    these legacy costs are costs that were incurred to develop

22    these technologies and these trade secrets.  Okay.  Those

23    two witnesses.

24          THE COURT:  The technology and the trade secrets

25    though aren't exactly the same.  Right?  Technology -- are

you saying, you said the technology and the trade secrets.

So we have a list of trade secrets that you're asserting.

Technologies can be broader than the trade secrets.  Right?

Not every technology you have was necessarily being asserted

as a trade secret?

        MR. MacGILL:  That's correct.  Not every

technology we have, but the '216 patent technologies are our

trade secrets.  All of those are our trade secrets.

        What was done to develop those trade secrets

over a 14-year period of time, the precipient witnesses are

Chandramouli with respect to the data, and then the linkage

between Mr. Cassidy and Dr. Beaulieu that will be provided

to say and confirm that these costs with respect, Your

Honor, to the trade secrets that we have listed here are

related to two components.

        THE COURT:  These costs.  What are these costs?

Just the big old number he gave you?

        MR. MacGILL:  No.

        THE COURT:  I would like to tie what you are

saying their witnesses are going to do with what you want to

do with Mr. Kleinrichert.  Mr. Kleinrichert has two big

numbers here, $116 million for costs of development of

products and actually $223 million for products utilizing

1-MCP and then another 160 for SmartFresh.  You're going to

put those numbers in front of the jury and then you're going

1    to talk about some of the other things with some of the

2    other folks, and I'm missing the connection here.

3              MR. MacGILL:  Okay.  Let me see if I can't do

4    better with the description.

5              So if we put it in a logical sequence, witness

6    number one, Mr. Chandramouli, you identified this during

7    your January 18th deposition.  What is this?  These are

8    Excel spreadsheets showing the costs that have been incurred

9    over time in developing this product, this suite of

10   products.

11             What years are included?  Years X through Y,

12   2002 to forward.

13             All right.  Next witness.  Mr. Cassidy, what is

14   your role with the company?

15             I am the financial officer and had the financial

16   role and accounting role during this period of time.

17             Did you look at these materials?

18             Yes, I have.

19             Now, with respect to the costs that were

20   incurred, can you tell the Court specifically, and the jury,

21   can you answer, were these costs that Mr. Chandramouli

22   provided, do these costs relate to, repeat, relate to the

23   trade secrets at issue listed here, Your Honor?

24             Yes, they do.

25             Tell the Court how they relate to the trade

1    secrets at issue, Mr. Cassidy.

2              Second witness.  Ann Beaulieu, Dr. Beaulieu.

3              THE COURT:  We don't have the total number yet

4    because we're only on the second witness or third witness

5    now, and Mr. Kleinrichert hasn't testified?

6              MR. MacGILL:  Correct.  Third witness.

7              THE COURT:  So these folks are just talking

8    about them in generalities, not specific costs included?

9              MR. MacGILL:  No.  Chandramouli first is what

10   we're contemplating.

11             Second, Mr. Cassidy.  Mr. Cassidy, the Court has

12   received into evidence these legacy costs, presumably.

13             And with respect to these legacy costs, would

14   you tell the Court how these costs that are referenced here

15   relate to the trade secrets at issue?  Specifically --

16             THE COURT:  Generally the trade secrets or each

17   trade secret specifically?

18             MR. MacGILL:  We would go through each one

19   specifically as listed here.

20             Do they relate to the patent technology?

21             Yes.

22             How?  Do they relate to the treatment

23   parameters?  How?  Do they relate to the safety and fire

24   information?

25             Yes.

1          How?

2          And going through that sequence would be what --

3          THE COURT:  Are the costs going to be

4   apportioned between the trade secrets or just say, all of

5   these costs in here relate to the trade secret one.  All of

6   these costs in here relate to trade secret two.

7          MR. MacGILL:  I believe they relate to the trade

8   secrets which resulted in a product.  If you look, Your

9   Honor, at these trade secrets, each of them listed here,

10  these trade secrets, were, in our view, appropriated by us

11  and resulted in the TruPick product.  You couldn't do

12  TruPick without each and every one of these things.

13         Mr. Cassidy, TruPick was a product.  Did TruPick

14  involve each of these trade secrets, the technology, et

15  cetera?

16         Yes.

17         Dr. Beaulieu, head of research.  Yes.

18         Mr. Chandramouli has testified as to the Excel

19  spreadsheets with these legacy costs.  Have you looked at

20  that series of Excel spreadsheets?

21         Yes.

22         Can you tell the Court and can you explain to

23  the jury, how do these costs relate?  Okay.  The same series

24  of questions.

25         Then, with respect to Dr. Beaulieu, one further

1    detail, Your Honor, from the standpoint of our proof.  We

2    would further ask Dr. Beaulieu the following:

3              Dr. Beaulieu, how do these trade secrets relate

4    to the development of SmartFresh?  Dr. Beaulieu, how do

5    these trade secrets specifically, repeat, specifically

6    relate to the development of TruPick?

7              Well, they all relate.

8              Tell the Court how.  Tell the Court, tell the

9    jury why.

10             Well, there is no TruPick without the '216

11   technology.  There's no TruPick without any of these things.

12   Okay.

13             Continuing with Dr. Beaulieu.  So she testifies.

14   There is one other Federal Rule 902(11) submission.  There's

15   the custodial affidavit from one of the Dow witnesses that

16   will also connect up some of the same data.  Okay.  We

17   supplied that to counsel and counsel has that.  But with

18   respect to -- counsel for the defendants has that.

19             With respect to that feature, Your Honor, I

20   would add the following foundational note.  That with

21   respect to Mr. Chandramouli's data and Mr. Cassidy's

22   testimony, Mr. Beaulieu's testimony, we would add questions

23   to both witnesses, both precipient witnesses.

24             You have this additional data authenticating the

25   Dow legacy cost.  Do you have that, Mr. Cassidy?

1                    Yes, I do.

2                    What are these costs?

3                    Okay.  These are the costs for this period of

4       time.

5                    How do you know?  This is what her affidavit

6       says.  Fine.

7                    With respect to what she provided in her

8       declaration, provided to this Court, how do these costs

9       that she identified and she authenticated relate to trade

10      secret 1 through 7 and these?  Same line of testimony.

11                   THE COURT:  Who is going to do that?

12                   MR. MacGILL:  Mr. Cassidy and Dr. Beaulieu.

13                   THE COURT:  Were they there at the time?

14                   MR. MacGILL:  Well, we have authenticated, we

15      have Mr. Chandramouli saying, these are the costs.  We have

16      this Dow witness saying, these are the costs.  Then they --

17      and then Mr. Cassidy also has personal knowledge during his

18      tenure.

19                   With respect to those legacy costs, those are

20      the foundational elements for their testimony.  But with

21      respect to what they then provide, we come to your first

22      question.  What does Mr. Kleinrichert do?  Okay.

23                   I've been in many courtrooms where I've had a

24      lot of data where I've had to submit.  Okay.  And we could,

25      of course, submit this and say, ladies and gentlemen of

1    the jury, here's the date.  You will go back in the jury

2    room.   The Judge is going to allow you to have the exhibits.

3                THE COURT:   I get it.  You want to summarize it

4    and add it up, but I'm not understanding why you need an

5    expert to do that when you have all of these witnesses that

6    are going to say, this is the data.  I've been through the

7    data.   I've been through the spreadsheets.

8                Usually in a situation you're talking about the

9    expert says, I've summarized the data and I have an opinion

10   that's relevant to the case.  Here he says, I added up the

11   data and I don't know how it relates to anything here.

12   Someone else is going to testify about it.  How does this

13   particular cost relate to a trade secret?  It beats me.  I

14   just added the numbers.  And that's where I'm getting

15   confused.  This doesn't seem like something that is properly

16   the subject of expert testimony other than to have an expert

17   stand there and put a big number in front of the jury

18   whereas these other witnesses could be saying, look, I've

19   looked at this stuff and, you know, they can add.  The jury

20   can add.

21               MR. MacGILL:  We can have Mr. Cassidy do it.  We

22   can have Mr. Beaulieu do it, too, as a 1006 summary.  We can

23   do it that way, too.  This isn't the first time this has

24   come up.  In the Southern District of New York, Your Honor,

25   as you know, had this very issue that came up.  This is

1    the case we cited, the Louis Vuitton case, Southern District

2    of New York, 2015, reported at 97 F.Supp. 3d, 485 at page

3    504.

4              Interestingly, Your Honor, the expert for the

5    defense is Mr. -- Ms. Mulhern.  Her testimony, she gave

6    testimony of the very same type of testimony that's being

7    proposed here from Mr. Kleinrichert, their expert.  Her

8    testimony was moved to be excluded on similar grounds that

9    they say here, and the Court, the Southern District of New

10   York rejected that Daubert challenge to Ms. Mulhern, their

11   expert, and said specifically that compiled and aggregated

12   data is appropriate and it can be presented in a more

13   readily ascertainable format for the jury.  Ms. Mulhern's

14   testimony, their expert in a different case, authorized

15   as a summary.

16             So we don't do this in a vacuum, Your Honor, but

17   there's one other point, or two other points we'd like to

18   make quickly.  Our Third Circuit here has been very specific

19   about what the standard is for reviewing this type of

20   evidence and we've cited multiple cases to the Court.  But

21   the Third Circuit has said repeatedly, at least three cases

22   that we've cited to the Court, where this testimony would be

23   helpful to the jurors.  Okay.  That's the standard that we

24   believe applies to this particular issue.

25             And with respect to Mr. Kleinrichert, we would

1    submit respectfully that it is no small job to create a

2    summary and that he would be better for purposes of your

3    jury and this Court to be the person summarizing this data

4    and presenting it in a more readily understandable format.

5    That's what the Southern District of New York said.

6                   And the third --

7                   THE COURT:  Does that intent to use

8    Mr. Kleinrichert's costs --

9                   MR. MacGILL:  I'm sorry.  I didn't hear the

10   first part of your question.

11                  THE COURT:  Do you intend to use

12   Mr. Kleinrichert's compilation of costs to calculate unjust

13   enrichment damages?

14                  MR. MacGILL:  We do.

15                  THE COURT:  And are you planning to put a number

16   for unjust enrichment damages in front of the jury?

17                  MR. MacGILL:  We are.

18                  THE COURT:  What is that number?

19                  MR. MacGILL:  The costs of development, we are

20   going to put in the first element of the costs of

21   development, which is what is the cost of developing this

22   process had this been done legitimately.  What is the

23   cost --

24                  THE COURT:  What's the number?  What's the

25   number?  Trial is in a month.  Presumably, this has already

1   been disclosed, so what is the number you're intending to

2   ask the jury?

3         MR. MacGILL:   Could we go back to the summary?

4   It would be -- the jury would be able to look at one of two

5   numbers, 160.5 million or 223.5.

6         THE COURT:   And where was that disclosed

7   previously?   Just here?   I mean, he's not going to testify

8   that this is unjust enrichment.   He's just going to give a

9   number.   Right?   Mr. Kleinrichert is not saying, my opinion

10  is that they were, that defendants were unjustly enriched?

11        MR. MacGILL:   No.   He cannot and he will not.

12        THE COURT:   So how is that number -- that

13  number, what?   It's just going to be argument in front of

14  the jury?   You're going to say Mr. Kleinrichert said it cost

15  this much to develop it and therefore that must be the

16  unjust enrichment that defendants received?

17        MR. MacGILL:   No, I don't believe we get to do

18  that.   I believe this is completely up to the Court.   This

19  Court will decide how this is going to go, and here's why.

20        THE COURT:   I need to know what you are

21  proposing so I can decide whether I can decide this motion.

22        MR. MacGILL:   What we're proposing is that we

23  follow Third Circuit law that is the leading case in the

24  United States on the topic, and the Third Circuit says to

25  us, the Third Circuit is the leading light, so to speak, of

1   this standard, standard of comparison.

2          What we will ask for specifically, Your Honor,

3   is a jury instruction which follows Third Circuit law and

4   law throughout the United States.  And what we're going to

5   ask for in the form of jury instruction, we don't get to

6   speak these words.  Only the Court will speak to the jury on

7   this.

8          The Court will decide what the jury instruction

9   is, and what we submit, Your Honor, is the jury instruction

10  that's appropriate here has three elements.  The jury

11  instruction will be that you're instructed, ladies and

12  gentlemen of the jury, to make an analysis of whether or not

13  there was unjust enrichment.  There are elements for your

14  determination as jurors.

15         Number one, what was the cost of development had

16  it been done properly?  If you feel, if you decide there

17  was some inappropriate trade secret appropriation, what

18  would be the cost of developing this appropriately?  Element

19  one.

20         Element two.  What did the defendants spend?

21  How much did they spend to develop the product?  Subtract

22  that.  That's element two.

23         Number one, our number, 160, or 223.

24         Number two, their deduction for costs of

25  development.

1          Number three, net element.  It will be their

2     discretion, your instruction, their discretion.

3          THE COURT:  And how does the fact that they

4     aren't doing anything and haven't been on the market with

5     anything for more than a year and sold only a limited

6     quantity fit into that?

7          MR. MacGILL:  Excuse me one second.  It's a very

8     important question.  This is law that has been around here,

9     Judge, for 70 years.  What our Courts have decided, Third

10    Circuit leading decision, is that an appropriator of trade

11    secrets, a misappropriator of trade secrets must not just

12    answer in lost profits to the --

13         THE COURT:  I get it.  I know the law on unjust

14    enrichment, but typically it would be, you know, that they

15    are being enriched because they are selling this product and

16    making money for it because they used trade secrets.  But

17    they were only on the market for a very short period of

18    time.  They have not been on the market for I think more

19    than a year now.  So I'm just trying to figure out, does

20    that fit into this analysis at all, or you just say, that

21    500,000 or $700,000 they made, they were unjustly enriched

22    by $219 million?

23         MR. MacGILL:  I can tell you we can go circuit

24    by circuit.  We cited on brief the Ninth Circuit, the Tenth

25    Circuit, the Eleventh Circuit of examples of exactly why the

1    Court's instruction should be as we've indicated.

2              Here's what the Tenth Circuit said -- I'm sorry,

3    the Ninth Circuit in the Bornes case that we cited.  It

4    affirms the calculation of $9 million when the defendants

5    saved "at least three years of development by its torts

6    and plaintiff's yearly development cost of 3 million was

7    found to be appropriate."  The Eleventh Circuit, similar

8    language.

9              THE COURT:  Were those people all on the market

10   at the time or not?

11             MR. MacGILL:  I think there's a -- there are

12   some cases that are and some cases that are not.

13             THE COURT:  Can you tell me the ones that

14   they're not?  That's what I want to focus on right now.

15             MR. MacGILL:  I will have to triple-check --

16   double-check this, but I believe that the Bornes case, the

17   Salisbury case, and the Telex case were examples of where

18   they were on the market.  I will have to double-check that,

19   but I think those are three examples where they were on the

20   market.

21             THE COURT:  They were?

22             MR. MacGILL:  Were.

23             THE COURT:  Okay.

24             MR. MacGILL:  Now --

25             THE COURT:  I'm just trying to understand if

1     there's any effect on all of this where they're not on the

2     market.

3                  MR. MacGILL:  Okay.  Yes.

4                  And if I may answer one more specific.  Judge

5     Robinson listened to this case before, but for Judge

6     Robinson, they would still be on the market.  Okay.  We

7     stopped them, and we stopped --

8                  THE COURT:  I understand.  I'm just trying --

9     I'm just trying to understand the fact that they're not on

10    the market.  Maybe you're telling me it means absolutely

11    nothing under the facts of this case, but that's my

12    question.  Does that play into it at all, the unjust

13    enrichment, you know, because typically, unjust enrichment

14    is that they benefited to a certain extent because of using

15    the trade secrets.  And my question is:  Does it matter if

16    their benefit was for a limited period of time and they are

17    not currently receiving any benefit?

18                 MR. MacGILL:  No, and decisively no for these

19    reasons.  Our courts have wrestled with this across the

20    country and our courts have said consistently at the

21    district court level and at the circuit level, they've said,

22    this is an appropriate measure of damages, and it includes

23    cost of development that you avoided.  That's unjust

24    enrichment.

25                 And specifically, with respect to unjust

enrichment, what they're saying is that a misappropriator

should not get the benefit of avoiding a cost of

development, and that for purposes of definition here is

unjust enrichment.

Now, one other piece of this that's extremely

important.  The damages that are available to the plaintiff

here, depending on -- well, this Court will tell us what

damages are available, of course, but the law says that

there is a -- there are two elements of damages that may be

recovered by the plaintiff in our circumstances.

One, we can get the costs of development, so

we say, according to the authorities that we have given

you.

And, number two, we get lost profits from their

participation in the market.  Okay.

They did participate in the market, Your Honor,

in this case, so with respect to our profits and what is

involved here, those are the two elements of damages that we

would ask the Court to review and make decisions on in terms

of instructing this jury at the end of the day.

Now, what's important about that?  We asked

their expert, Ms. Mulhern, from Analysis Group, we asked her

specifically, Your Honor, is there any overlap in this case

between our lost profits due to price erosion and the cost

of development damages?  Her answer:  No, there is no

1    overlap.

2            So with respect to those conceptions and these

3    details specifically, that is the -- that's the reality that

4    we have.

5            Now --

6            THE COURT:  So here's what I would like you to

7    do since you're telling me I'm going to have to make some

8    decision on -- we got kind of far away from the Daubert, but

9    now you are telling me I'm going to have to make some kind

10   of decision on the jury instructions on this issue.

11           I would like you to submit to me cases in which

12   these damages are appropriate, you know, essentially all of

13   the development costs are appropriate fair game when the

14   defendant is not on the market or was only on the market for

15   a limited period of time.

16           MR. MacGILL:  Certainly.  Could I adjust one

17   sentence here?  You asked me a question a few minutes ago.

18   Mr. Ciulla handed me a case, the Telex case, which I did

19   mention.  It's the Tenth Circuit case.  In that case, the

20   product was not complete.  The product specifically -- this

21   was a theft that was proven by IBM against the defendant

22   there, and they found that they did not complete the

23   particular project.

24           And in the words of the Tenth Circuit,

25   nevertheless, the trial court was of the view that Telex had

1    saved itself 10 million in development costs and that it

2    was unjustly enriched in that amount.   Tenth Circuit.   We

3    agree.

4                  THE COURT:   I get it.

5                  MR. MacGILL:   Okay.   Enough said.

6                  THE COURT:   So that's one.   That's a good

7    example.   I was just -- you know, any others that you have?

8    There's a very big difference between $10 million and

9    possibly 390, 380.

10                 MR. MacGILL:   May I add one detail that we think

11   is very important?   If I could go to the slide on the

12   $100 million.   The entire predicate for what these folks did

13   at UPL is this.   In 2016, they acknowledged themselves, Your

14   Honor, that -- and here they congratulate one another on

15   having misappropriated our materials, and here's what they

16   say.   This is an e-mail from Mr. Girin, the CEO at America.

17                 He writes, and specifically he's writing the

18   Chief Operating Officer Worldwide of UPL.   You heard this

19   morning as we started, the chief operating worldwide of UPL

20   is here in our courtroom today, the man who replaced

21   Mr. Karthik.   Okay.   This is the highest level of UPL, one

22   of the defendants.

23                 Here is what he said to the COO.   Market

24   assessment, 2015, global 1-MCP sales estimated at

25   $200 million, mostly apples.   And then he continues for what

1    we wanted to share with you this morning.  Twenty-plus years

2    of efforts by AgroFresh, ex-Dow, Rohm & Haas, and greater

3    than 100 million, greater than 100 million invested to

4    develop novel storage/ethylene ripening control.  Private

5    equity acquisition of over 800 million in mid-2015.  Key

6    patents expire after 2019.

7               Judge, in 2016, your defendant, UPL, is

8    acknowledging at the highest levels that we spent over

9    $100 million.

10              THE COURT:  I get it.  I get it.  I've read the

11   documents and you're making an argument to the jury here.

12   I'm not making the decision here.  I just want to understand

13   for the Daubert issues and how as a legal matter what you

14   intend to show as damages, where it was disclosed

15   previously.  And I'm trying to figure out, since you say I

16   have to instruct the jury on what they are doing, whether

17   it's appropriate under the circumstances here.

18              MR. MacGILL:  All right.  On the disclosure

19   point that you raised, if I may go to that slide.

20              In 2016, Your Honor, again --

21              THE COURT:  Is there any place that you

22   disclosed, we are going to be seeking unjust enrichment

23   damages of X?

24              MR. MacGILL:  Yes.  Repeatedly.

25              THE COURT:  Where?

1          MR. MacGILL:  All right.  Let's go to --

2          THE COURT:  Of X.  I've seen in the

3    interrogatories where it says, and will calculate that in

4    expert testimony, but where is it that you said, here's my

5    calculation?

6          MR. MacGILL:  Okay.  In terms of the disclosures

7    that were given, in terms of the costs of development

8    disclosures, they're here.

9          And the Court can see --

10          THE COURT:  Where is the number?  Did you ever

11   give them a number so that until you just said today we're

12   going to say to the jury either this one or this one or

13   something, do they know the number?  I just want to make

14   sure their expert is not just making stuff up the night

15   before he testifies because they don't know what's coming.

16          MR. MacGILL:  Repeatedly.

17          THE COURT:  Where?

18          MR. MacGILL:  Repeatedly.

19          THE COURT:  Where?

20          MR. MacGILL:  Let me use one example.  The head

21   of our sales organization on the West Coast, Mr. Harker,

22   Mr. Scott Harker, was deposed on December 6th, 2018.  And if

23   we could go, as referenced here, where he testifies

24   specifically, and this is his testimony, and I believe all

25   the lawyers, most all of the lawyers who are here were

1    there.  Mr. Ivey was there.  I think Mr. Williamson was in

2    by phone, and there were some others as well.

3              He was questioned aggressively about how much

4    did you spend historically on developing this product?  How

5    much did you spend?

6              Mr. Harker testified, AgroFresh did hundreds of

7    millions of dollars worth of research to understand what

8    1-MCP did to apples in the storage room.  That's our

9    technology.  We did thousands and thousands of trials with

10   each new variety of apples that was coming out.  Okay.

11             With respect to the legacy costs of development

12   that occurred, we then had a variety of exchanges with

13   counsel.  Give us more detail.  What else do you have?

14             THE COURT:  I'm just asking as a matter of

15   litigation, where did you, the plaintiff, tell the

16   defendant, this is what we are going -- here's a number we

17   are going to ask the jury for.  Usually, you have an expert

18   who says, my opinion, this is the appropriate measure of

19   damages.  I'm just trying to figure out, where did you do

20   this?  Saying we spent over $100 million isn't exactly

21   telling them, by the way, here's our damages.  Right?

22             MR. MacGILL:  Right.

23             THE COURT:  So where did you tell them, this is

24   the number I'm seeking in damages?

25             MR. MM<okay.  They knew it was 100 million.  We

1      told them again in detail.  They knew all of this going in.

2      Mr. Harker was questioned aggressively about this.

3                     THE COURT:  So you didn't give them a number.

4                     MR. MacGILL:  We did.

5                     THE COURT:  Where?  Where did you give them?  I

6      want the number that you are going to put in front of the

7      jury.  Where did you give it to them?

8                     MR. MacGILL:  December 12th, 2018.

9                     THE COURT:  Where?

10                     MR. MacGILL:  Okay.  The exchanges that we had

11     between counsel, what else do you have?  December 12th,

12     2018.  We produced the legacy AgroFresh development records

13     from the Dow computer system.  It was a third-party

14     production.  It took time to get it.  What are we referring

15     to?  Right here.  These Excel spreadsheets.  So that was the

16     disclosure that we made.

17                     And then with respect to the continued

18     questioning, December 18, Mr. Cassidy from AgroFresh, who we

19     talked about previously, Your Honor, was questioned

20     aggressively about costs of development and his trade secret

21     information.  The level of detail in that deposition was

22     extraordinary.  What did you do?  What studies?  How much

23     cost?  How many man hours?  Those kinds of details were

24     elicited specifically from his testimony on December 18th,

25     2018, the same day, Your Honor.  If I may, the same day.

While the lawyers from Finnegan are questioning Mr. Cassidy,

I'm questioning their CEO and he comes forward with the

costs of development they want to have in element two of the

formula that you will decide upon.

What was their cost of development?  And what he

says is, their cost of development was approximately

$4 million.  So they prepared not only to respond to us, but

to inform the second element of the calculation on

December 18th, 2018.

THE COURT:  Did they ask you a contention

interrogatory on what you were asking for number in

damages?

MR. MacGILL:  I'm reading right now, Your Honor,

specifically.  On December 20th -- on December 19th, we

explained to them how we were going to go about calculating

damages and the types of damages and what was included in

the costs of development, and we indicated to them --

THE COURT:  Did they ask you a contention

interrogatory on damages?

MR. MacGILL:  Not that I recall.  And with

respect to what we did do, Your Honor, is we explained to

them there was expert discovery that was going to be coming

forward.  With respect to the expert discovery that was

coming forward, we did exactly what Mr. Kleinrichert has

done, is to summarize the details of the costs that were

1  already provided on December 12th through the third-party

2  discovery to Dow, through the December 18th communications

3  with testimony of Mr. Cassidy, and the December 18th

4  testimony from the CEO of America.

5          Now, one item that's important, you may find

6  important.  On December 11th, Mr. Karthik, who is the chief

7  operating officer worldwide, the former chief operating

8  officer worldwide of UPL, I asked him about costs of

9  development, and specifically he testifies as to their cost

10  of development of this product, and he testified that it's

11  approximately $600,000 to inform the second element of a

12  cost, or a method of comparison calculation.  So that was

13  his testimony.

14          And then on December 10th, Mr. Ivey, I believe

15  it was, in discussions we had with Judge Fallon, referenced

16  cost of development.  This is four days after Mr. Harker

17  testified.

18          THE COURT:  Did you give them the number for

19  lost profits damages?

20          MR. MacGILL:  We did.

21          THE COURT:  So why didn't you give them a number

22  for unjust enrichment?

23          MR. MacGILL:  We did.

24          THE COURT:  You've given me paragraphs here that

25  never have a number in them.  So what I'm trying to figure

1    out is, what's the number for lost profits damages?

2              MR. MacGILL:  All right.  Could we go --

3              THE COURT:  And where did you disclose that?

4              MR. MacGILL:  FTI.  We have two experts from

5    FTI.

6              THE COURT:  And no one from FTI gave an opinion

7    on unjust enrichment damages.  Right?

8              MR. MacGILL:  They gave a summary of these costs

9    of development, a summary of what we produced, Your Honor,

10   on December 12th in the legacy costs of development that

11   were provided on a third-party basis from the Dow computer

12   system.

13             THE COURT:  Right.  But for lost profits

14   damages, you didn't just produce your financial reporting

15   and say, hey, defendant, go figure out what our profits were

16   and we lost them.  Right?  You have an opinion from an

17   expert?

18             MR. MacGILL:  We do.

19             THE COURT:  Here, you don't have an opinion from

20   an expert.  Right?  You just have the documents on general,

21   overall costs for the development of 1-MCP and for

22   SmartFresh, and then you want the jury to come up with a

23   number based on jury instructions.  Is that my

24   understanding?

25             MR. MacGILL:  We look at it a little

1    differently.  We say that the data specifically to support

2    the financial, the costs of development, element one of the

3    comparison method, is right here in this exhibit.  That is

4    the data, and from that data we have prepared a summary of

5    Mr. Kleinrichert.  A summary of that data will be helpful to

6    the jury and assist them in understanding this.  They can

7    cross-examine, and they will.  You did this and that?

8    That's not a good summary.  We're not hearing that.

9              THE COURT:  Well, we are kind of hearing that in

10   that it's not relevant to some of the issues before us

11   because there are things included in there that nobody can

12   explain why they are included.

13             MR. MacGILL:  Mr. Cassidy can.  Dr. Beaulieu

14   will, and that's the cross-examination for them.  In other

15   words, Mr. Cassidy, you say that this is related to the

16   trade secrets.  Tell me.  Okay.  I will.

17             Dr. Beaulieu, you are a doctor in this field.

18   Tell us how this is related to those trade secrets.  Tell

19   me.  Those are the cross-examinations pertaining to what's

20   in here and what it means.  Okay?

21             Let's go back to your lost profits question for

22   a second.  The expert disclosures were required in the

23   January period of time and after pursuant to a court order.

24   We gave a lost profits calculation that you asked about for

25   Mr. Vince Thomas.  Mr. Thomas provided an opinion distinct

1    from Mr. Kleinrichert, who summarized --

2              THE COURT:  I get it.

3              MR. MacGILL:  Okay.

4              THE COURT:  I understand you have an opinion

5    on one.  You don't have an opinion on the other.  And I get

6    it.

7              MR. MacGILL:  Okay.  So I'm just answering your

8    question, if I may.

9              THE COURT:  You're not really answering my

10   question, which is why I'm frustrated, but go ahead and say

11   whatever you want to say.

12             MR. MacGILL:  Mr. Thomas provided an opinion

13   that was provided pursuant to the disclosures of the Court,

14   disclosures required by the Court, and he gave that, Your

15   Honor, he gave that opinion and provided the lost profit

16   that has been occasioned by their entry into the market

17   unlawfully, in our view.  So that's the lost profit.

18             And the summary for Mr. Kleinrichert of what is

19   here is what we have described.  But that is the data, and I

20   think it's important to focus on your question for obvious

21   reasons.  What is the data that supports this?  It's this

22   and it's that 900211 declaration from the legacy Dow

23   employee.  That is the data.  Who is going to affirm its

24   relevance?  The witnesses we've described through their

25   testimony.

1                    And with respect to Mr. Kleinrichert, those

2     predicates to his testimony are all subject to the Court's

3     rulings and decisions as we go through the lawsuit and

4     through the trial.  But that is the testimony that would

5     come forward on these topics.  It's also possible that Dr.

6     Zettler, the prior research and development head, might also

7     give testimony tying up a portion of this, although we don't

8     foresee that as necessary today.  It could be.  He's a

9     former employee and now retired.

10                    But that, Your Honor, is a summary of where we

11    are in terms of the offer of this.  And we understand the

12    additional filing that you have asked for, but the existing

13    rationales for confirming that unjust enrichment is measured

14    in this distinct context legally as an avoided cost of

15    development, we'll put further briefing out there for you in

16    relation to your questions.

17                    THE COURT:  Yes.  I don't want further briefing.

18    I just want you to submit to me a couple of questions that I

19    can read that answer my question.

20                    MR. MacGILL:  Okay.  We will do so.

21                    And then finally, Your Honor, I would just

22    harken back to just two or three quick things in terms of

23    the perspective of how do we have an efficient and

24    appropriate trial.

25                    THE COURT:  Yes.  You know what, I just want to

1    make clear, you're at about 45 minutes, so you might want to

2    just save some time for the summary judgment.

3              MR. MacGILL:  That I will do, Your Honor.  Thank

4    you.

5              THE COURT:  Mr. Williamson, if you want to

6    address any of those points, you may.  I guess I would like

7    to know, is there a disclosure from the plaintiff as to what

8    is going to be sought in terms of unjust enrichment?

9              MR. WILLIAMSON:  No, there's not, Your Honor.

10             THE COURT:  Is there a contention interrogatory

11   on damages?

12             MR. WILLIAMSON:  We did a number of things.  We

13   asked a contention interrogatory on damages.  That's DI 490,

14   Exhibit 11 in this case.  That contention interrogatory on

15   damages was ignored for the entire course of discovery.  It

16   says, describe fully the method by which AgroFresh contends

17   the amount of alleged damages in this case should be

18   calculated, including a description of each damages theory

19   that AgroFresh alleges should be used in a damages

20   calculation, the specific factors that AgroFresh alleges

21   should be used under each such damages theory, the amount of

22   damages resulting from the calculation under each damages

23   theory.  Identify any documents, identify witnesses.

24             They ignored that interrogatory answer for the

25   entirety of discovery.  On the last day of discovery, the

1      day before the last day of discovery --

2                  THE COURT:  Is that December 20th?

3                  MR. WILLIAMSON:  That's December 18th.

4      Discovery closed on the 19th.  On December 18th, we put this

5      interrogatory answer, their non-answer to number 9, our

6      interrogatory number 9 in front of their 30(b)(6) witness,

7      Mr. Cassidy, on cost and damages, and we asked him:  Do you

8      have anything more to add to what is shown here, which is a

9      complete non-answer?  And he said no.

10                 The very next day, Your Honor, which is the last

11     day of discovery, we get a supplemental answer that claims,

12     we are seeking $250 million in damages and does not give us

13     any theories whatsoever.

14                 So this standard of comparison theory that you

15     are hearing about now, which I would like to address, was

16     never disclosed to us at any point ever, Your Honor.

17                 So it's not just that it wasn't disclosed in an

18     interrogatory answer.  There are initial disclosure

19     obligations under Rule 26 that require this disclosure to be

20     made.  Damages disclosures are built into the Federal Rules.

21     We asked -- the cross-examinations that Mr. -- that

22     Mr. MacGill is talking about, we asked those

23     cross-examinations, Your Honor.

24                 With your indulgence, I would like to show you

25     some of the testimony that these witnesses have already

1    given as corporate representatives as to the connection

2    between the costs and the trade secrets that they are

3    asserting in this case.

4              We went after that.  Despite not knowing their

5    theories, we went after that anyway, and they've already

6    testified about all of this.  They have disclosed complete

7    ignorance to being able to address the trade secrets and the

8    connection between the trade secrets and the costs.

9    Chandramouli, Cassidy and Beaulieu, all of them.  So this

10   has been dealt with in discovery.  What we're talking about

11   now is reinventing this entire case now with a theory we've

12   never heard of before.  Their expert doesn't come in.  They

13   have no expert on damages and unjust enrichment, which is

14   highly, highly unconventional.

15             The idea that we would just throw all of this

16   is -- enormous number.  These spreadsheets, we can take a

17   look, Mr Lee, maybe quickly.  Just pop one up.  And I should

18   mention, Your Honor, there are a number of corporate

19   representatives in the room today.  We've agreed, and

20   counsel has accommodated, that we won't be shuffling in and

21   out because we're just going to be touching on some things

22   very briefly here even though they're designated under the

23   protective order.  That has been agreed upon?

24             MR. MacGILL:  Agreed.

25             MR. WILLIAMSON:  Okay.  So if we could just pop

1  up quickly, Mr Lee, your reference No. 19, which is one of

2  these spreadsheets that we're talking about.

3  On the second page you can see, this is a 15,000

4  line spreadsheet, line items of costs, and they are obscure.

5  They are things like other expenses, $950,000.  No one can

6  link these.  No one has tried to link these to the trade

7  secrets at issue.  What they want to do is throw all of this

8  before the jury and have some hand-waving-type testimony

9  that our development of our company is in the hundreds of

10  millions of dollars.  We did lots of studies, but nobody is

11  actually going to explain, okay.  Line item number 14953,

12  that actually, that actually is an R&D cost that goes to an

13  experiment we did and then made public in one of our

14  hundreds of patents.  And so that's not part of this case.

15  That's irrelevant.  By definition, it can't be a cost that

16  we avoided because of the misappropriation.  Nobody is going

17  to do that.  Nobody can do that.  We've already been through

18  all of that with the fact witnesses.

19  So the theories have not been disclosed.  The

20  methodologies have not been disclosed, not in 30(b)(6)'s,

21  not in interrogatory answers, not in their initial

22  disclosures.  We have asked, we have asked repeatedly.  We

23  were before Magistrate Judge Fallon on a number of these

24  issues over and over again on their fair disclosures of

25  their damages case.  What they're actually proposing to do

1    at trial, Your Honor, will contravene Judge Fallon's express

2    orders in this case.  And, in particular, this trilogy of

3    witnesses here that we're going to have Mr. Chandramouli

4    come in and then Mr. Cassidy come in and Ms. Beaulieu come

5    in, that is expressly in contravention of the magistrate

6    judge's orders.  It's a tactic that they've employed.  What

7    they've decided to do is not disclose the actual witness who

8    is going to stand behind an opinion for unjust enrichment.

9    The statute in this case, both the state and federal trade

10   secret statutes, require that any avoided development costs,

11   any unjust enrichment -- I'm sorry, any unjust enrichment be

12   caused by the misappropriation.  And what that means is, if

13   they're going to use their costs as a proxy for costs that

14   we have allegedly avoided, they have to be costs that are

15   connected directly to their trade secrets, not something

16   else.

17           And what would happen in discovery, Your Honor,

18   is, we would take a deposition on a key witness and whether

19   it be a trade secret issue or fact issue, and after the

20   deposition was closed, what would happen is, AgroFresh would

21   file a supplemental Rule 26(a) statement identifying a

22   witness identifying subject matter that we just covered.  We

23   brought this practice to Magistrate Judge Fallon's

24   attention.

25           And if we could go to Reference 5.5, please,

1    this is a December 10th, 2018 transcript.  We'll look,

2    please, at page 66, 7 to 15.  We actually moved to preclude

3    the witnesses, Your Honor, these late disclosed witnesses

4    who kept popping up in new Rule 26 statements.

5         And the Judge said she's not going to exclude

6    the witnesses, but we're at lines 7 to 15.  What she says

7    is, she's going to order on line 10 that the limited

8    relief -- I'm sorry, on line 12.  She's going to order to

9    grant proper disclosures within a week of today's date.

10   She's not going to exclude the witnesses.  She's going to

11   give us depositions, but a proper disclosure under Rule

12   26(a)(1).  And towards the end of the page on 22, line 22 to

13   24, she specifically called out, because this is the problem

14   we were having, the subject of that information.  That the

15   disclosing party may use to support its claims or defenses.

16   That has to be used to support the court order.

17        On the next page, to put a fine line on it, page

18   67, lines 1 to 5, that's the operative language of the rule

19   she's focusing on, the subject of the information.  A proper

20   disclosure of the subject of the information that these

21   witnesses possess.

22        So AgroFresh goes ahead and files the amended

23   Rule 26 statement that is supposed to give us the roadmap

24   that we were supposed to have at the beginning of discovery,

25   and that is, if we could go to Reference 6, please, Mr Lee.

And here we are.  If we go to page 4, Item 1, they disclose
Mr. Cassidy has, and the third line down, has information
concerning the cost of development, information concerning
the cost of development.

Page 7, item 24, they disclose Mr. Chandramouli.
Item 24.  May have discoverable information concerning the
cost of developing AgroFresh's 1-MCP technology.

After the court order, those are the only two
witnesses they disclose.  Dr. Beaulieu is not in this
disclosure.  Dr. Beaulieu gave us, Your Honor may recall, a
Rule 26(c) employee expert report as a rebuttal with no
opening expert report on trade secrets, as a rebuttal to our
report on trade secrets.  And Dr. Beaulieu's report goes
into the technical nature of the trade secrets.  It does not
go into costs of development.  She was not disclosed as a
witness on costs of development.

And we deposed both of these Court ordered and
disclosed witnesses already.  These witnesses who are
supposed to be coming to trial and filling all the gaps and
doing a calculation, and really doing a calculation is what
we're talking about.  Some witness is going to connect these
tens of thousands of line items for every year to the
specific trade secrets and then do some sort of calculation,
which we have not seen, ever, and have never seen and don't
even know what it is.

1          Mr. Chandramouli for his part, Reference 8,

2    please, Mr Lee.  This is Chandramouli's deposition testimony

3    on the very point that Mr. MacGill was suggesting Mr.

4    Chandramouli would testify to at trial.

5          We asked him:  Do you have any knowledge of the

6    trade secrets that AgroFresh is claiming in this case?

7          Remember, he is the one who has been identified

8    to us, the cost of AgroFresh's development, and it has to be

9    for the trade secrets.  It can't be something else.  That's

10   the whole point.  The point of our motion is, relevance here

11   is defined by the trade secrets, which is a separate issue

12   as to what that means given their trade secret disclosures,

13   but we know the law requires that the relevance for an

14   unjust enrichment claim has to be defined by the trade

15   secrets.

16         He professes ignorance about any of the trade

17   secrets.  He doesn't have knowledge about the trade secrets.

18   He has no knowledge of the cost of development of any trade

19   secrets that AgroFresh is claiming in this case.  That's the

20   person they want to bring in to fill in this gap, to plug

21   the hole they have on foundational relevance, which is

22   entirely improper.

23         We took him through nevertheless each and every

24   trade secret, so one by one.  Categorically, he has denied

25   it.  We went through belt and suspenders.

1          If we could turn to page 128, lines 5 through

2    16.  We took him through each and every trade secret.  An

3    example would be Decco 72503.  This is with the trade secret

4    in hand and the witness in the chair, Your Honor, were going

5    to walk through the trade secrets.

6          We could take a look at Decco 72503 quickly, Mr

7    Lee, if you would.  This is a disclosure that AgroFresh

8    included in its trade secret disclosure.  They're alleging

9    that this data, this data right here has been

10   misappropriated.  So we get right down to the details.  If

11   we could go back to the deposition testimony, please.

12         We asked him, for this trade secret, can you

13   tell me what their specific costs of development are?  And

14   the answer is, no, he does not know it, and he doesn't know

15   any document.  This is the guy who is bringing the documents

16   now into trial.  He doesn't know of any document that can

17   show us that.  We got the same answer for every trade secret

18   as well as categorical denial.

19         So what we're talking about is a witness, his

20   subject matter and his presence and his testimony in this

21   case was ordered by Judge Fallon.  We took his deposition

22   and this is what we got.  He should not be permitted to

23   come in here at trial and give some sort of different

24   testimony, some sort of different calculation we've never

25   even seen.

1          So --

2              THE COURT:  I'm assuming this is part of a

3    motion in limine that yet hasn't been brought, because I

4    don't think it's right in front of me at this moment.

5    Right?

6              MR. WILLIAMSON:  We are objecting to Mr.

7    Chandramouli as a witness to do this, yes, as part of our

8    pretrial.  We will.

9              THE COURT:  I understand you're dealing with it

10   now because that's what the plaintiff said they were going

11   to do to bolster the Kleinrichert testimony.  I understand

12   that.

13             MR. WILLIAMSON:  Exactly.

14             THE COURT:  You don't have to get into too much

15   detail on this because I'm assuming it will come later.

16             MR. WILLIAMSON:  Exactly, Your Honor.  The point

17   here is, our Daubert motion on Mr. Kleinrichert is focused

18   on relevance, and really, that he is -- almost two things.

19   He's a conduit of information.  He's a conduit of what they

20   are calling business records.  We also think those are

21   inadmissible for a whole host of reasons.  Again, we don't

22   need to get into that now.  But he's a conduit of

23   information and he's a conduit of irrelevant information.

24   That's the point for today.

25             What they are saying in response to that is,

well, we can go back and they recognize that they have a

foundational relevance problem because just throwing a huge

number in front of a jury is prejudicial, it has got all

kinds of problems associated with it under Federal Circuit

law in terms of skewing the damages horizon, and the Unilock

case.  It's prejudicial under Rule 403.  It has all sorts of

problems.  They know that what they are supposed to have

done is link their costs under the statute.  Unjust

enrichment has to be caused by the misappropriation.

Avoided development costs cannot be costs for an entire

company.  They cannot be costs to develop patents that are

made public.

Importantly, Your Honor, they cannot be costs

associated with trade secrets that they have explicitly

withdrawn from the case.  They know they have this

foundational relevance problem, and that's why we're

addressing Chandramouli now, because they are coming back

and saying, we can fix that at trial in real-time.  Don't

worry about it, Your Honor.  They will all see what happens

here, the calculation, the methodology, the answers to

interrogatories we should have gotten long ago.  They'll see

that all in real-time at trial and Mr. Chandramouli will be

right out in front of it.  But as it turns out, that can't

happen in terms of the relevance foundation for

Kleinrichert.  This is a preview, sure, of a different

1   issue, but nevertheless, for Kleinrichert, as the relevance

2   foundation, this should not be permitted given what he has

3   testified to already.

4           The same thing applies even with more force with

5   Mr. Cassidy, Your Honor.  And if we could, if the Court

6   wishes to --

7           THE COURT:  I understand.

8           MR. WILLIAMSON:  I will summarize.  We went

9   through the trade secret disclosure one by one and what he

10  told us was, sure, we could take these costs for this trade

11  secret.  We could trace it back through our ledgers.  I

12  would have to go and talk with our head of R&D, have to

13  figure out what tests we did.  I will have to go back to the

14  general ledgers and offline R&D statements.  We could trace

15  it all the way back and we could give you a number

16  associated with just that data for each of the trade

17  secrets.  That is his testimony.  Have you done it?  No, I

18  have not done it.  I have not done it.  And it's based on

19  unproduced information.  Offline R&D budgets and ledgers

20  that we don't have.  They didn't go back and fill that in.

21          In an interrogatory answer -- we have an

22  interrogatory answer number 10 on costs, Your Honor.  We

23  moved to compel twice on that interrogatory answer and Judge

24  Fallon granted our motion to compel twice on that

25  interrogatory answer.  They did not go back and say,

1   okay.  We're going to go ahead and tell you what the costs

2   are for the trade secrets.  They've never done that.  In

3   fact, today, what that interrogatory answer says is, see

4   Rule 33(d).  If you would like information on costs, search

5   our document production for the word, quote unquote, "cost."

6   It yields over -- there are different ways to search, but

7   it yields around or over 10,000 results of which this

8   handful of spreadsheets that now they say are central to

9   their case are buried in there, buried in there among 10,000

10  documents.

11          So they never called out the data to us.  The

12  witnesses, who they were compelled to give us, -- the

13  witnesses they were compelled to give us didn't know

14  anything about the trade secrets or the costs of developing

15  the trade secrets.  This entire argument that the

16  foundational problem, which they recognized, the

17  foundational problem for Mr. Kleinrichert can be somehow

18  fixed on the fly at trial?  That just, against this record,

19  Your Honor, should not work, against this record.

20          And I do appreciate much of this is a forecast

21  of arguments to come on evidentiary issues as part of the

22  pretrial, but, nevertheless, we have what we believe to be

23  very strong corporate testimony that they should not be able

24  to deviate from on these very points.

25          Your Honor, I did want to address generally this

1    jury instruction and the Third Circuit's --

2              THE COURT:  Yes.  We're not going to deal with

3    that right now.

4              MR. WILLIAMSON:  If I may just briefly note the

5    standard of comparison, what has been disclosed, a Third

6    Circuit case, the standard of comparison does not involve

7    the plaintiff's costs at all.  It does not involve the

8    plaintiff's costs at all.  The International Industries

9    versus Petroleum --

10             THE COURT:  Yes.  I got it.  I said we could

11   deal with it later.

12             MR. WILLIAMSON:  Thank you, Your Honor.  Can I

13   address any other specific --

14             THE COURT:  No.

15             MR. WILLIAMSON:  Thank you, Your Honor.

16             MR. MacGILL:  Just very briefly Your Honor.

17   Returning to the sequence of the litigated events here, if

18   we could go back to costs of development slide.

19             Judge Fallon, as Mr. Williamson just reviewed,

20   Judge Fallon, the costs of development issue was litigated

21   and it was expressly before your Magistrate Judge.

22             On December 10th, Mr. Ivey referenced

23   specifically the cost of development in his argument with

24   Judge Fallon.  You've now seen and heard in the courtroom

25   here what Judge Fallon ruled and how this was going to go

1    forward on the subject of a, one, an initial disclosure.

2    Counsel just reviewed that with you.

3              Two, we filed a supplemental interrogatory on

4    December 19th, 2019 -- I'm sorry, '18, consistent, Your

5    Honor, with what Judge Fallon directed.  And we indicated

6    that the methods, in that interrogatory pursuant to the

7    litigated result, the methods of calculating damages and the

8    times of damages included, in pertinent part, the cost of

9    development the defendants avoided by misappropriating

10   AgroFresh's technology in an amount to be determined by

11   expert testimony.

12             Seven days prior after this December 10th

13   litigated result, we got the third party documents from Dow,

14   and they were produced on December 12th, 2018, as you can

15   see.

16             Now, two other quick points.  You saw reference

17   to Mr. Chandramouli about the AgroFresh, to repeat,

18   AgroFresh costs of development.  Mr. Chandramouli knows

19   about the Dow cost of development.  That's his testimony.

20   The AgroFresh, we acquired the company and the technology

21   and the rights in 2015.  Cost of development for that

22   period, 15 to time today or slightly before today, is

23   Cassidy.  Cassidy is going to confirm those details.

24             Now, one other thing, and I didn't have the

25   answer when you asked me the question when I stood up

1    initially.  Did you ever disclose the cost of development

2    number?  And I didn't have an answer.

3              THE COURT:  No.  I asked if you disclosed the

4    unjust enrichment number that you're going to be seeking at

5    trial.

6              MR. MacGILL:  Fair correction, of course.

7    250 million.  On December 19th, 2018, after this litigated

8    result that you just referred to, Judge Fallon told us --

9              THE COURT:  Is that the total damages you're

10   seeking or just unjust enrichment, that 250 million?

11             MR. MacGILL:  Defendants avoided by

12   misappropriating AgroFresh's technology in an amount to be

13   determined by the expert testimony and we referenced the

14   $250 million number.

15             THE COURT:  Read me the whole sentence there

16   without you saying that we referenced it.

17             MR. MacGILL:  Okay.

18             THE COURT:  Tell me what it says.

19             MR. MacGILL:  Yes.  And these, Your Honor, are

20   the interrogatories of December 19th.  The supplemental

21   answer as directed as a result, as a result of this process

22   that you now heard about.

23             Supplemental answer.  The entirety is as

24   follows:  By further response, by way of further response,

25   AgroFresh incorporates by reference its responses to Decco

1    Interrogatories 2, 5 through 8 and 10 through 12, and

2    initial disclosures (along with the supplementation of both

3    the interrogatories and the initial disclosures).

4              Continuing with the quotation, Your Honor, the

5    methods of calculating damages and the type of damages

6    include compensatory damages, punitive and exemplary

7    damages, treble damages, attorney's fees and costs,

8    reasonable royalty damages, lost profits, including lost

9    profits due to price erosion, diminution in enterprise value

10   and the cost of development that defendants avoided by

11   misappropriating AgroFresh's technology in an amount to be

12   determined by expert testimony.  Persons with knowledge of

13   the damages, of the damage includes Scott Harker, Alice

14   stare hill and John Cassidy.

15             AgroFresh incorporates by reference the

16   deposition testimony given by these witnesses.  In addition,

17   any, almost any person at AgroFresh at the postharvest or in

18   the postharvest industry including customers likely are

19   aware of the immense damage to AgroFresh caused by the Decco

20   defendants.

21             Continuing, Your Honor.  The amount of damages

22   to AgroFresh from Decco defendants' wrongdoing is in excess

23   of $250 million, which will be confirmed through expert

24   testimony.

25             Then, Your Honor, with respect to the opinion,

1     price erosion, that came pursuant to the expert disclosure

2     in the amount that we discussed generally, around 14, 12

3     million, $14 million with interest.  And then the data here,

4     the data from Cassidy and the data from the Dow employee

5     that I mentioned through the 90211 submission.  So that was

6     the result.

7                    THE COURT:  But two of the witnesses that you've

8     just told me you're going to rely on for unjust enrichment,

9     whose names, unfortunately, I don't remember, Dr. Beaulieu

10    and Dr., not Cassidy, but the other person, weren't listed

11    in your interrogatory answer there.

12                   MR. MacGILL:  Well --

13                   THE COURT:  Is that right?

14                   MR. MacGILL:  No, ma'am.  I think they were,

15    Your Honor.  Mr. Harker, who testified on December 6th --

16                   THE COURT:  But people that you've told me you

17    were going to call, witnesses 1, 2 and 3, Beaulieu was

18    three.

19                   MR. MacGILL:  Cassidy, Beaulieu and perhaps Dr.

20    Zettler, the prior head of research and development.

21                   THE COURT:  And Dr. Beaulieu wasn't listed

22    though.

23                   MR. MacGILL:  No.

24                   THE COURT:  I don't know if it's Dr., Mr., Ms.

25    Zettler.  Was that person listed?

1                     MR. MacGILL:  Was Dr. Zettler listed?

2                     THE COURT:  In the interrogatory that you just

3      read?

4                     MR. MacGILL:  On cost development?  No.

5                     THE COURT:  On anything relating to damages?

6                     MR. MacGILL:  Well, yes.  I mean, Dr. Beaulieu

7      is an expert in the case, as you know.

8                     THE COURT:  I just asked you, was Dr. Beaulieu

9      listed in the interrogatory response you just listed?  The

10     answer is no.  Right?

11                    MR. MacGILL:  The answer is no.

12                    THE COURT:  And what about -- I don't know if

13     it's Ms. Zettler, Mr. Zettler, Dr. Zettler.  Was that person

14     listed in the interrogatory response?

15                    MR. MacGILL:  Not in the --

16                    THE COURT:  That you just read to me?

17                    MR. MacGILL:  Not in the cost interrogatory, no,

18     but they are the trade secret witnesses that we have

19     referred to.

20                    So the trade secret relationship between the

21     cost is what they will refer to, is what they will testify

22     to, with respect to those details.

23                    Now, with respect to the final point that we

24     wanted to make as to the foundational arguments that are

25     being made with respect to these costs of development, cost

1    of development has been litigated and understood for a long,

2    long time.

3            THE COURT:  You know what, this is the subject

4    of an evidentiary motion that's not in front of me.

5            MR. MacGILL:  Understood.

6            THE COURT:  No need to cover that.

7            Okay.  I am going to consider the arguments that

8    have been raised here and will get you something on the

9    Daubert motion in due course.

10           Next, I would like to discuss the motions for

11   summary judgment.  The omnibus motion includes eight motions

12   denoted SJ 1 through SJ 8.  I think I've already addressed

13   SJ 5 and SJ 8 in my May order, which I denied those in light

14   of the stay relating to the '216 patent, which needs to

15   refile.

16           One question I had for plaintiffs, Summary

17   Judgment 4 seeks summary judgment on reported criminal

18   penalties, and AgroFresh stated in its papers that it wasn't

19   current in attempting to seek criminal penalties or

20   something like that.  But Summary Judgment 4 was listed in

21   your chart up on the screen.

22           So are you or are you not intending to seek

23   criminal penalties at this trial?

24           MR. MacGILL:  Your Honor, the answer is the

25   economic espionage that's involved in this case is an

element of our substantive legal claim, intentional

interference.  So it is not separately, we're not going to

ask you to give a jury instruction penalized for this

because it's a crime.  That is an element of our proof that

we will present to you and to the Court in evidence.  That

is economic espionage occurred, which means there was no

justification for the conduct, and furthermore, it is

wrongful conduct because it was criminal conduct.  We're not

asking for a penalty because of the criminal violation.

We're asking for punitive damages under substantive law.

            THE COURT:  So the motion asks that AgroFresh,

says AgroFresh cannot seek criminal penalties for the claim.

You agree you are not seeking criminal penalties for the

claim?

            MR. MacGILL:  We are not seeking criminal

penalties for the claim.

            THE COURT:  So based on that representation,

AgroFresh will not be allowed to seek criminal penalties at

trial.  I understand there may be some overlapping issues

of evidence, but you will not be seeking criminal penalties

at trial, and so I'm going to deny that motion as moot.

            MR. MacGILL:  Understood.

            THE COURT:  Okay.  The remaining motions relate

to trade secret misuse, conversion claim and assertion of

the two dated patents, both of which are expired, are

1    invalid for written description, and that actually reminds

2    me.  Can somebody explain to me where the patents fit into

3    this case, because everything I've read seems to focus on

4    trade secrets and the '216 patent, but we have these two

5    expired patents.  And as I understand it, you're also

6    asserting them against, in the Hazel case where you have now

7    included Decco in that litigation.

8                   So, plaintiff, what are we doing here?

9                   MR. STOVER:  Sure, you Your Honor.  Chad Stover.

10   I can address that.

11                  So the Daly patent claims are two patents, the

12   '849 patent, the '068 patent, and they have been a part of

13   this case from the very beginning as an infringement

14   argument with price erosion damages.

15                  THE COURT:  Separate from the other damages?

16                  MR. STOVER:  Yes.  It is a separate -- there

17   could be -- yes.  To answer your question, yes.  And we

18   have a report, damages report on those patent damages from

19   FTI.

20                  And so, and you also mentioned the Hazel case.

21   That case involves a different product.  So in this case

22   we're talking about the TruPick product.  In that case, we

23   were talking about a different product from Hazel.

24                  THE COURT:  Great.  Okay.

25                  MR. STOVER:  Thank you.

1              THE COURT:  Okay.  So I would like to take the

2     summary judgment motions a little bit out of order and I

3     want to start with number seven, which is the '068 patent

4     being invalid for lack of written description.  And the

5     arguments that are presented by both sides don't really

6     address written description.  Instead they seem to focus on

7     whether I should correct the claim in some way to address

8     the '110 issue.

9              So, defendant?  Mr. Ivey?

10              MR. IVEY:  Your Honor, with the Court's

11     permission, Mr. Gupta will address that issue.

12              THE COURT:  Okay.  Sure.  Mr. Gupta.  So tell

13     me, what is this argument that you are making?  Let's say

14     that I agree with you and I'm not correcting the claim.

15     What do you want me to do, because it all seemed to me you

16     were saying there's no written description support if you

17     changed it to N14, but I didn't see anything about no

18     written description if it's left where it is with N16.

19              MR. GUPTA:  Yes.  So to answer that question,

20     question directly, Your Honor, N is written in the claim as

21     one percent.

22              THE COURT:  I get it.  My question is, assume I

23     leave it just like that.

24              MR. GUPTA:  Then it is undisputed, it is

25     undisputed that there is no description of any compound

1    which has N is equal to 5 through 10.  Those just do not

2    exist as per the plaintiff's admissions, so there is

3    absolutely no description whatsoever for the compounds from

4    N is equal to 5 through 10.  So that is just dispositive of

5    that issue.

6              THE COURT:  It's other than in the

7    specification, it says 1 to 10 multiple times.

8              MR. GUPTA:  That is correct, Your Honor, but

9    just the fact that that claim language is repeated in the

10   specification does not provide description sufficient to

11   show of one of ordinary skill that the inventors here were

12   in possession of a compound with N is equal to 5 through 10.

13   It just does not.  And the mere fact that those words from

14   the claim are repeated in the specification does not cure

15   that deficiency.

16             THE COURT:  Okay.

17             MR. GUPTA:  And as far as, if Your Honor would

18   like me to address the fact about why this correction cannot

19   be made by the Court, I am happy to do that.

20             THE COURT:  No.

21             MR. GUPTA:  That is the fundamental thing.  The

22   plaintiffs admit that they do not exist and therefore there

23   cannot be any written description for that range.

24             THE COURT:  Okay.  Let me hear from the

25   plaintiff.

1          MR. STOVER:  Chad Stover on behalf of AgroFresh,

2     Your Honor.

3          So, Your Honor, you hit on the point that we

4     made in our briefing, which is that you have a title here

5     that says, lack of written description is the title of their

6     argument, but when you look at what they are actually

7     arguing and the cases, the two cases, the Rembrandt case and

8     the Nuvo decision that they cite, those are indefiniteness

9     decisions and don't say anything about lack of written

10    description, and so there's really no argument that they've

11    made, and certainly no case law that they've cited, no case

12    law that we're aware of that would find a lack of written

13    description in a context like this, where they claim that

14    the claims appear to cover nonexistent classes of compounds.

15    And I think for just that reason, the motion should be

16    denied.

17         And if you were going to reach the other issue

18    of whether or not to correct the claims, and I believe we

19    have an argument we could make on that, but I don't really

20    think that's properly before Your Honor under the motion as

21    it was stated.

22         THE COURT:  So is the issue of correcting the

23    claims going to be something that comes up or not?  I mean,

24    I'm just trying to figure out, is this a claim construction

25    issue and it wasn't previously raised or is this something

1        that I don't need to address?

2                    MR. STOVER:  I don't think it's before you and

3        so I don't think you need to address it.

4                    THE COURT:  Okay.  But I just want to make sure

5        it's not going to come before me the first day of trial.

6        I want to make sure we're all good with claims saying 1

7        to 10, or are we not?  Are you going to say, no, no, No,

8        Judge?

9                    MR. STOVER:  From AgroFresh's position, we're

10       not going to say you need to fix it.  I can't speak for them

11       obviously.

12                   THE COURT:  Mr. Gupta?

13                   MR. GUPTA:  Your Honor, I mean, this is a

14       situation where they're not asking for the claims to be

15       fixed during the trial, but then they keep arguing that the

16       claim is properly written.

17                   THE COURT:  So are you going to ask me to fix

18       it?  I don't think so based on what you told me that I can't

19       fix it.

20                   MR. GUPTA:  Right.

21                   THE COURT:  So I just want to make sure I'm not

22       going to have some surprise here, where there's another

23       judge, you've got a claim construction issue you need to

24       deal with in the middle of trial.

25                   So they told me they're not seeking to have the

1   claim corrected or changed.  Is defendant?

2          MR. GUPTA:  So, Your Honor, if AgroFresh is not

3   seeking to have this claim corrected, that means the claim

4   language is as it's written.

5          THE COURT:  I'm just asking you a question.  You

6   are not asking it.  Okay?  If they're not asking to have the

7   claim corrected, are you?

8          MR. GUPTA:  No, we're not, Your Honor.

9          THE COURT:  Okay.

10         MR. GUPTA:  And the claim as written then

11  therefore is inoperative and cannot stand as properly

12  disclosed or enabled under Section 112, paragraph 1.

13         THE COURT:  Okay.  So I will take that under --

14  oh, one question I did have for plaintiff, Mr. Stover.  So

15  you said that you are not seeking to have it corrected, but

16  just so that I understand.  In the papers it sort of seemed

17  like you were, but I wasn't sure what you were asking for.

18  So I just want to make sure.  Maybe I shouldn't even open

19  this door.

20         So --

21         MR. STOVER:  I think our primary argument, Your

22  Honor, is that the focus of their motion was lack of written

23  description and there's no support for that argument.

24  Therefore, it should be denied.

25         THE COURT:  Even for N equals 1 through 10?

1          MR. STOVER:  Correct.

2          THE COURT:  Okay.  Got it.  Thank you.

3          MR. STOVER:  Thank you.

4          THE COURT:  Okay.  So let's go to summary

5    judgment number 6, which seeks summary judgment, the Daly

6    patents are invalid for lack of written description.  And I

7    guess my first question is for both sides.

8          Mr. Gupta, is there any dispute that the term

9    cyclodextrin when broader in the claims, not limited to

10   alpha cyclodextrin, that that term encompasses cyclodextrin

11   other than alpha cyclodextrin?

12         MR. GUPTA:  We believe we do not have a dispute

13   on that.  I think it's undisputed that cyclodextrin is

14   broad enough to encompass three types of cyclodextrin's,

15   alpha, beta and gamma.  And the specification only provides

16   support --

17         THE COURT:  No, I understand.

18         MR. GUPTA:  Yes.

19         THE COURT:  I'm just taking one question at a

20   time here.

21         And, plaintiff, who is dealing with this?

22   Mr. Stover?

23         MR. STOVER:  Yes, Your Honor.

24         THE COURT:  Do you agree there's no dispute here

25   that the term cyclodextrin encompasses cyclodextrin other

1    than alpha cyclodextrin?

2              MR. STOVER:  That's correct.

3              THE COURT:  Okay.

4              MR. STOVER:  It includes beta and gamma.

5              THE COURT:  And does it also include things

6    other than alpha, beta and gamma?  In your papers you showed

7    me where it was defined, and then you kept saying, including

8    alpha, beta and gamma, but I wasn't sure if you were saying

9    including only or including but not limited to?

10             MR. STOVER:  To my knowledge, it's just alpha,

11   beta and gamma.

12             THE COURT:  And what's defendants' position on

13   that?

14             MR. GUPTA:  There are just the three unmodified

15   forms of cyclodextrin, which are alpha, beta and gamma.

16   There's a whole different class of compounds called modified

17   cyclodextrins, and in terms of the motion that is in front

18   of the Court, the briefing relates to beta and gamma as not

19   being adequately described.

20             THE COURT:  Right.  So the issue here is whether

21   there's support in the specification for cyclodextrin, beta

22   cyclodextrin and gamma cyclodextrin?

23             MR. GUPTA:  Yes.  More properly, whether there's

24   support for a complex form by 1-MCP and the different, other

25   different forms of cyclodextrins.  Namely, beta and gamma.

1          THE COURT:  Okay.

2          MR. GUPTA:  Not just whether beta and gamma are

3    described in the specification.  Whether a complex can be

4    formed and whether that is what the invention was directed

5    to and whether the inventors here were in possession of any

6    complex forms between 1-MCP and beta and gamma and whether

7    those were actual compounds or complexes that the inventors

8    actually invented as per the Ariad case, which is required

9    for the inventors to show in order to get a patent broad

10   enough to encompass those.

11          THE COURT:  All right.  Any response on that

12   one?

13          MR. STOVER:  Chad Stover, Your Honor.

14          Were you looking for a response just on that

15   question or on this issue?

16          THE COURT:  No.  Just on the issue.

17          MR. STOVER:  On the issue in general.

18          Yes.  If I could bring up -- here we go.

19          So the fact that the specification of the two

20   patents focuses on alpha cyclodextrin is not dispositive of

21   this issue, and I think the main case that we rely on for

22   that is the Centrak case cited in our briefing.  There's

23   also another decision from the Federal Circuit called, I

24   believe it's Scriptpro.  It's cited in the Centrak decision.

25   That's a very recent, February of 2019 decision from the

1    Federal Circuit.

2              And it says, and the Scriptpro case says as well

3    the specifications focus on one specific embodiment or

4    purpose, cannot limit the described invention where that

5    specification expressly contemplates other embodiments for

6    purposes.

7              And here, and on this slide, I quoted three

8    paragraphs from column 11 of the '849 patent, the same

9    specification is also present in the '068 patent, that talks

10   specifically about beta and gamma-cyclodextrin and the

11   complexing of those cyclodextrins with the 1 FCP in the

12   patent, which is what the patent is talking about.

13             So we have a case here where there's actual

14   express disclosure in the patent, which is different than

15   any of the decisions that were cited to you by defendants.

16             And then another thing that I would like to

17   note.  In addition to the express disclosure, there is also

18   disclosure of cyclodextrins in general, and then specifying

19   those as including alpha cyclodextrins, so cyclodextrins

20   being broader than the alpha cyclodextrin throughout the

21   specification and also throughout the original claims that

22   were part of the specification that were filed.

23             We have an expert, AgroFresh's expert, Dr.

24   Thompson, who looked at the Daly patents, including these

25   specific portions, and he came to the conclusion that he

1    believed there was no written description problem.  And he

2    also noted an issue that their expert, Dr. Dinka had, that

3    was in the obvious context.

4              Dr. Dinka took a look at prior art that included

5    cyclodextrins in general, beta, gamma cyclodextrin, and said

6    that it would be obvious to combine that with 1-MCP, but

7    then when he came to the written description portion of his

8    report, he sang a different tune.  And so we believe Dr.

9    Thompson has opined.  We believes that that contradiction

10   further supports there's no written description problem

11   here.

12             They focus on the deposition testimony of

13   another expert of AgroFresh's, Dr. Walton, and Dr. Walton is

14   not AgroFresh's expert on the validity of the daily patent.

15   Dr. Thompson is.

16             And, second, if you look at the deposition

17   testimony that they quote and cite from here, they're

18   overstating what she said.  What she said was merely that

19   the specification focused on the alpha cyclodextrin

20   embodiment, which is not something that is disputed, and

21   under the Centrak case is not something that means that

22   there's a lack of written description, especially in light

23   of the express indefinite description that is present in

24   column 11 and throughout the two Daly patents.

25             They also cite to the '216 patent and a

1    statement in the '216 patent that says, a stable complex has

2    not been formed in beta or gamma with 1-MCP.  That's

3    irrelevant first because it's outside the four corners of

4    the patent and the Ariad decision, Centrak.  A bunch of

5    Federal Circuit decisions say you are supposed to focus on

6    the four corners of the specification read in light of one

7    of a person of ordinary skill in the art.  And plus the

8    statement in the '216 patent is relevant, if anything, only

9    to enablement and not to lack of written description, and

10   they have not brought a motion on lack of enablement.

11            Unless Your Honor has any questions, that's all

12   I have on that.

13            THE COURT:  Thank you.

14            MR. STOVER:  Thank you.

15            THE COURT:  So, Mr. Gupta, why isn't this what

16   you are suggesting really, especially in light of the

17   Centrak case, why isn't it more an issue of enablement,

18   which is not the subject of the motion?

19            MR. GUPTA:  Yes, Your Honor.  I will take those

20   two things separately and say that first the Centrak case,

21   the plaintiff pointed to.

22            So the Centrak case factors are actually quite

23   different, and the reason why the Centrak case factors are

24   different is there, what was at issue, there was a detailed

25   embodiment that dealt with infrared technology, and then

1    there was a short description of how that would work for

2    ultrasound technology.

3             THE COURT:  Right.  But there was no specifics

4    on how you would change the technology in order to make it

5    appropriate for ultrasound?

6             MR. GUPTA:  So there were certain components

7    that were disclosed, but not all the components that were

8    disclosed, and that was the issue that was raised there.

9    But what the specification there, the Centrak case seemed to

10   disclose, was that the inventors were in possession.  That

11   they actually had invented something that was with

12   ultrasound technology.  It's just that they hadn't provided

13   all of the details.  And that is the critical decision.

14            THE COURT:  I'm not sure that's consistent with

15   the facts though.  I thought there was some issue with folks

16   knowing they had never made an ultrasound.

17            MR. GUPTA:  But in the specification, they had

18   provided enough detail.

19            THE COURT:  But in the specification here, they

20   refer to alpha, beta and gamma.

21            MR. GUPTA:  Correct, they do, and we're not

22   disputing that the specification does not list those three

23   forms of cyclodextrin as the molecular encapsulation agent

24   generally.  So if I may, I think it might be helpful to the

25   Court if we see what are the differences and why that

1    difference is significant and why that leads us to believe

2    that the inventors here cannot have been in possession of a

3    complex that is formed with beta and gamma.

4              So with the Court's indulgence, if I may just

5    very briefly.

6              Here, this is the passage that the plaintiff is

7    pointing to, saying that, yes, there are three forms of

8    cyclodextrin that is disclosed here, and those are alpha,

9    beta and gamma.  Where they specifically differ is, because

10   alpha is limited to only six members in that ring, you go to

11   the next line, that's 7 and 8.

12             And why is this different, important?  This

13   difference is important because that leads to a much larger

14   opening size for the other two cyclodextrins, namely the

15   beta and the gamma.  And why that matters here is because

16   you're trying to encapsulate a 1-MCP molecule.  This is a

17   very small --

18             THE COURT:  You don't think this is something to

19   me that there might be some factual issues that need to be

20   resolved?

21             MR. GUPTA:  Because --

22             THE COURT:  I mean, you're giving me a lot of

23   specifics here that are based on attorney argument.

24             MR. GUPTA:  But I think the important thing to

25   focus on is to go back on the, to the specification, and in

1    the specification, the only disclosure that relates to beta

2    and gamma cyclodextrin are in the form of, these are

3    cyclodextrin forms.  These are molecular encapsulation

4    agents that can be used.  And this is where the

5    specification is lacking, because as in another recent case

6    that came out, Nuvo Pharmaceuticals case, also there was a

7    similar issue.  And the Court recognized there, and I'm

8    quoting, in light of the fact that the specification

9    provides nothing more than a mere claim that, in that case

10   it was uncoated PPI, in this case it would be beta and gamma

11   cyclodextrin, might work.  Even though persons of ordinary

12   skill in the art would not have thought it would work, the

13   specification is fatally flawed.  And this is citation 923

14   F3d. 1368 at page, at pin cite 1381.

15          And similarly, in Ariad itself, there is also an

16   example given where just the fact that you may have a metal

17   compound, which is analogous to the alpha cyclodextrin

18   compound, it does not mean that the inventor is in

19   possession of a compound with butyl or propyl, which would

20   be the equivalent of going to higher ordered compounds like

21   beta and gamma.  These are just mere wishes for somebody to

22   say that these might work, but there is no evidence in the

23   specification which is where the inquiry is limited to that

24   the inventors actually invented a complex with beta and

25   gamma.  All they did was list, here are the number of

molecular encapsulation agents as classes of compounds that

they want to try.  But that's just a mere wish or a plan

under Ariad.  That's not sufficient to say the inventors

actually invented that complex with 1-MCP and anything other

than alpha cyclodextrin, because that is just not present in

the specification.  There is no discussion, and the

plaintiff has not pointed to any disclosure where there is a

complex being formed with beta and gamma cyclodextrin.  It

is only limited to cyclodextrins can have multiple forms,

and we're not disputing that cyclodextrins can have multiple

forms.

          THE COURT:  Okay.

          MR. GUPTA:  Thank you, Your Honor.

          THE COURT:  Thank you.

      So I want to talk about the remaining summary

judgment motions, but I want to take a short break first.

          (Short recess taken.)

             -  -  -

          (Proceedings resumed after the short recess.)

          THE COURT:  Okay.  Please be seated.

      So next I would like to talk about summary

judgment number two, which seeks summary judgment that the

alleged trade secrets in the '216 patent fail as a matter of

law because they were not communicated to the defendants.

As I understand it, the issue is whether the statute

1   requires communication.  Is that right?

2              MR. IVEY:  That's one of the issues I believe

3   they raised, Your Honor.  We believe that the law requires

4   the communication element.

5              THE COURT:  Correct.  But the statute itself

6   doesn't say that.  Right?

7              MR. IVEY:  Correct, Your Honor.  That has been

8   interpreted that way.  Yes, the Court is correct.

9              THE COURT:  Okay.  Now, there is discussion in

10  the papers about Pennsylvania versus Delaware Uniform Trade

11  Secret Act.  It seems to focus on Pennsylvania, but then

12  there's some suggestion that Delaware is similar, it

13  wouldn't make a difference.

14             So I guess my question first:  Is there really a

15  dispute over what law applies?

16             MR. IVEY:  I don't believe there is, Your Honor,

17  under the statutes, and the law that's being applied here is

18  the same.

19             THE COURT:  Plaintiff, is that right?

20             MR. MacGILL:  I didn't hear.  Mr. Ivey, you said

21  Pennsylvania?

22             MR. IVEY:  I believe she said Pennsylvania and

23  Delaware.  Right, Your Honor?

24             THE COURT:  That's my understanding.  I just

25  want to make sure there's not some conflict of law issue

1    that needs to be addressed that no one has asked me to

2    address.

3              MR. IVEY:  There was no conflict of law issue

4    raised, Your Honor.

5              THE COURT:  So are we in agreement that we are

6    using Pennsylvania Uniform Trade Secret act or what?

7              MR. MacGILL:  Plaintiff agrees.

8              THE COURT:  And you agree?

9              MR. IVEY:  Yes, Your Honor.

10             THE COURT:  Okay.  Okay.  So, Mr. Ivey, the

11   cases that you cite when you say, you know, communication is

12   required all reference a Third Circuit case from prior to

13   the enactment of the Pennsylvania Uniform Trade Secret Act.

14   And when I look at the language of the statute, it does not

15   require the communication, it includes other criteria.

16             So what am I supposed to do with the language of

17   the statute?

18             MR. IVEY:  Your Honor, we believe that the law

19   with regard to the Pennsylvania Uniform Trade Secret Act and

20   the Third Circuit in other courts in Pennsylvania that have

21   applied the law have consistently and repeatedly recited the

22   communication requirement.  We believe that's the

23   controlling law with regard to this and we believe that's

24   the law that was also applied with regard to this particular

25   element under the case of Dow v. HRD Corporation, 909

1    F.Supp. 2d, 340, 349, 2012.

2              So basically, Your Honor, what happens is the

3    Court in Dow, understanding the statutory issue and applying

4    the law as the Third Circuit in the Pennsylvania courts have

5    applied it and as we note in our reply brief, it has been

6    used that way without any cases cited by the plaintiff in

7    this case, not one single case rejecting that communication

8    requirement.  That requirement actually is dealt with and

9    analyzed in a very closely analogous fact pattern in the Dow

10   case.  Essentially, what it takes there is the first element

11   of this, which is whether there's a trade secret as the

12   first element of the misappropriation analysis.  And it then

13   goes on to lay out the guidelines with regard to precisely

14   how this works.

15             There must be the existence of the trade secret.

16   We're assuming that as arguendo in this matter.  And there

17   has to be the communication element pursuant to the

18   confidential relationship.

19             Under Dow, which I just referred to, Your Honor,

20   AgroFresh has failed with respect to its claims to precisely

21   meet these requirements because it was not the source of the

22   trade secret communicated under the confidential

23   relationship.

24             Now, the word I use here, source, Your Honor, is

25   essentially a functional shorthand for what the Court

actually does do in this case, which is talk about the party

that has possession of, in fact, the invention, the inventor

of the technology, communicating to a party within that

confidential relationship.

And so what the Court does in HRD, in the HRD

case, Dow, it goes through the second element of

misappropriation here and shows that that is what HRD in

that case, which was in the same position as AgroFresh was

claiming.

And the first assertion that HRD made in that

case was that it had, in fact, communicated a trade secret

to Dow.  The Court found that that was entirely unsupported

in the evidence and, in fact, it's not even argued in this

particular situation.

So what we have is the close parallel, and we

believe that Dow also is effective in avoiding the

conflation between the breach of conflict action, which is

essentially what they are complaining about with regard to

Dr. Mir and what actually happened here with regard to Dr.

Mir's invention and the fact that that would have been the

source of the communication that he was not.

What we have here specifically is the trade

secret as defined by AgroFresh is specific to the '216

patent and TruPick.  The operative admission, and if we

could have, Mr Lee, DI 300 at page 2 and 3, we'll show very

1    briefly what this is.

2            There is the statement here -- toward the

3    bottom.  Yes, there you go.

4            The first are trade secrets arising out of the

5    development of the '216 and TruPick.  AgroFresh goes on to

6    state that these secrets were not disclosed to the

7    defendants by AgroFresh.  Rather, as AgroFresh has explained

8    and the Decco defendants acknowledge, these technical trade

9    secrets were developed by Mr. Mir, who then went on to

10   breach his agreement to disclose them to AgroFresh and

11   disclosed them to the Decco defendants instead.  In other

12   words, they are admitting here that the source was Dr. Mir

13   and not AgroFresh itself.

14           This is also verified in the statements of

15   material facts asserted in this case, No. 28, where

16   AgroFresh specifically admits that it did not become aware

17   of that technology, i.e., the technology in the '216 patent

18   and TruPick until Mir, again Dr. Mir's meeting with Dr.

19   Zettler in June of 2016.  AgroFresh was not aware of TruPick

20   until defendants issued a press release announcing it.  That

21   is statement of material fact number 28.

22           So what we have here is very concisely, Your

23   Honor, a situation where the trade secret is not as required

24   in the Dow analysis from the source communicated in a

25   confidential relationship.  And as the Court goes on to

1    point out in Dow at 349, it may be factually true that Dow

2    had the obligation to keep the intellectual property

3    developments of the joint defense agreement project

4    confidential, and in this situation, Dow stands in the shoes

5    of Dr. Mir.  But the Court then goes on to hit the operative

6    point.  This does not alter the legal requirement that a

7    trade secret must be communicated from the plaintiff, i.e.,

8    the source to the defendant.  The source must communicate

9    it, and that did not happen in this particular situation.

10            Now, material facts are not in dispute in this

11   regard, Your Honor, because of what we've shown you with

12   regard to the representations of DI 300.  The development

13   was by Mir.  Our opening brief, DI 451, discusses this at

14   page 14, and we have shown the quote here.  And AgroFresh

15   also admitted that it did not know about this trade secret

16   for this invention until it was informed of that sometime

17   later.  In other words, the source is Dr. Mir.

18            Now --

19            THE COURT:  But their position is that they

20   technically owned it even though they didn't know about it

21   because of the contract.  Right?

22            MR. IVEY:  Yes, Your Honor.  That issue is also

23   dealt with in the Dow case for the same type of reason, and

24   that is there's no reason to and no analytical support for

25   conflating the I.D. of the source communicating the trade

1    secret to another party with the issue of whether it had a

2    duty to hold confidential and/or assign or take other action

3    with regard to that technology.

4            And so as the Court in Dow points out, again,

5    349, it is true that Dow had a contractual obligation to

6    keep information related to Dow's research and development a

7    secret, but the breach of the obligation should arise to a

8    contract claim, not a misappropriation of a trade secret

9    claim.  And because HRD had failed to show that it was the

10   source that it had communicated anti-trade secrets to Dow,

11   HRD's misappropriation of trade secrets fails.

12           We submit the analysis is the same here, and for

13   the same reason, Your Honor, AgroFresh's argument with

14   respect to misappropriation on this count of the summary

15   judgment should also fail.

16           The cases which were cited by the plaintiff in

17   this matter to try to avoid the on-point analysis from Dow

18   are essentially off message because they don't deal with a

19   source communicating the information, and in each of these

20   instances, the plaintiff did actually serve the source and

21   it communicated to someone.  AgroFresh can't stand in those

22   shoes because it didn't own or develop the technology.  It

23   has admitted that was done by Dr. Mir.

24           THE COURT:  Well, it hasn't admitted that the

25   technology wasn't owned by AgroFresh.

1          MR. IVEY:  Correct, Your Honor.  The issue of

2   ownership, the issue of contractual obligation is not what

3   we're disputing at this point.  It's the matter of under

4   the elements of the trade secret misappropriation law

5   whether the secret had been communicated to another party.

6   And the secret in the analysis here must be communicated

7   from the source to that other party, the source being the

8   inventor.

9          THE COURT:  My concern about this, this motion,

10   is when I look at the statute and the part that you say is

11   missing and thus we can't have a claim is not in the

12   statute.  And much of the law that was developed where those

13   elements were set forth in the Third Circuit case that they

14   referred to, Moore, or something like that, it begins with

15   an "M," that was before at least the Pennsylvania Uniform

16   Trade Secret Act.

17          So I understand what you're saying, but no one

18   has gone through and said, despite the fact that the law,

19   the statute says this, there is still a requirement of a

20   communication, because the statute certainly would allow the

21   misappropriation to come into play.  The plain language of

22   the statute would allow for misappropriation to come into

23   play absent a miscommunication.  If there was some knowledge

24   on the part of the person being accused, the trade secrets

25   were misappropriated, that they were stolen, that they were

1    taken, something like that.

2             So I'm just not sure I understand how -- I

3    understand what you are saying, that the cases say, oh,

4    here's the four-part test, but are you aware of anything

5    that suggests why that test, which was the test used prior

6    to the institution of the enactment of the statute, is

7    still -- that I should still read that test into the statute

8    that seems to have different language?

9             MR. IVEY:  Yes, Your Honor.  Since the enactment

10   of the statute, the cases have consistently continued to

11   apply that same law.

12            THE COURT:  Right.  But nobody has ever -- I

13   mean, a lot of the cases, Dow is different, because Dow does

14   refer, at least in the case it cites to the statute, but

15   most of the other cases in the Eastern District of

16   Pennsylvania, the Western District of Pennsylvania, they

17   cite to the Third Circuit case from 2003, which is before

18   the Pennsylvania Uniform Trade Secrets Act.  And I'm just

19   wondering, did anyone actually go through the analysis and

20   say, as a matter of statutory interpretation, this test

21   still remains valid?

22            MR. IVEY:  Aside from the Dow case, I don't

23   think any Court has hit it that directly, Your Honor.

24            THE COURT:  And even the Dow case didn't hit it

25   that directly.  All they did say was, we understand there's

1    a statute involved?

2              MR. IVEY:   And that the requirement is there.

3    So it lays out the same test the Court has acknowledged and

4    noticed.

5              What we're saying here, Your Honor, is that

6    since the enactment of the statute, the cases have continued

7    to apply the law in the same way, and so we have more recent

8    cases since the statute's enactment, since the earlier case

9    the Court referred to, which continue to repeatedly recite

10   the communication requirement with the analysis as provided

11   by Dow, and we cited Kenset Corporation versus Ilanjian, 600

12   F, APPX 827, 831, Third Circuit 2015, and PharMerica

13   Corporation v. Sturgeon.   That's 218, 2018 Westlaw, 1367,

14   339 at *4, and there are some other citations which are also

15   included in our reply brief, Your Honor, document 491 at

16   pages 9 and 10.

17             THE COURT:   So let me ask you a question.   If

18   Decco just went and broke into AgroFresh's offices and took

19   their trade secrets documents, are you suggesting that is

20   not actionable under the Pennsylvania Uniform Trade Secrets

21   Act?

22             MR. IVEY:   That might be actionable under other

23   remedies that might be available to them, including such

24   things as theft and breaking in and entering or so forth.

25   It would not necessarily be what this misappropriation

1    statute is designed to deal with.  And so what we would have

2    in those other hypotheticals situations where there would be

3    other remedies available to the parties.  What we're

4    launching here, Your Honor, is an effort to make sure that

5    the elements in the misappropriation claims aren't allowed

6    to morph into things that didn't exist from people who can't

7    identify who had what at that time and then that turns into

8    a misappropriation case which is thrown to the jury with no

9    particular recourse as to how to deal with that in terms of

10   prejudice and confusion.

11            What Dow does in that regard is give quick

12   clarity with regard to the fact as to where the source is,

13   where the information must emanate from, where it has to go,

14   and then that there must be some use of that information for

15   purposes that actually complete the statutory elements of

16   misappropriation.

17            THE COURT:  Okay.  Thank you.

18            MR. MacGILL:  Your Honor, Rob MacGill for

19   AgroFresh for plaintiff.

20            Just to bring into focus the statutory

21   realities, the Pennsylvania Uniform Trade Secret Act

22   controls.  It does not require communication.  The Federal

23   Act does not require communication as an element.  We have

24   put those authorities before the Court as you have seen.

25            There are a couple of other things worthy of

1    note.  We heard a lot about 1913 decision that was

2    incorporated into some language from some Court decisions,

3    but that 1913 decision, of course, was decades before the

4    enactment of these two statutes, and I don't think that 1913

5    decision can be imported or utilized in any way that's

6    legally appropriate.

7             To be precise about the statutory requirement

8    here, whether it's Pennsylvania law or the federal law, it

9    bars disclosure or use of a trade secret and does not make

10   an element of communication a part of the process.

11            We cited cases that have been referenced in the

12   argument to aid earlier in response to Mr. Ivey's response

13   that we've got Western and Eastern District of Pennsylvania

14   decisions that make it clear that our position, disclosure

15   and use is the point of focus.

16            And then as a practical matter, much like the

17   example that you used with respect to the break-in, another

18   example might be if communication were a requirement,

19   whether if the Coke formula is stolen by somebody, the

20   suggestion is that if it's stolen by somebody, it wasn't

21   communicated, but it was taken out of a safe at Coca-Cola

22   company, it somehow would escape the remedy of trade secret

23   misappropriation.

24            These realities are clear from the statute.  The

25   statute should be the basis for the Court's determination

1    and the Court's ultimate jury instructions on this point.

2    Thank you.

3              THE COURT:  So how do you address the Kenset

4    case that defendant just raised?  The Third Circuit said it

5    was misappropriation of trade secrets.  It said, to an

6    injunction for misappropriation of trade secrets under the

7    Pennsylvania Uniform Trade Secrets Act, Kenset had to show,

8    and then it lists the four things, including communication

9    pursuant to the confidential relationship, and it cites to

10   the statute, and that's the Third Circuit law.

11             So how is that not binding on me?

12             MR. MacGILL:  I don't think -- I don't think

13   that the clarity of the drafting in that particular opinion

14   is instructive, especially when you have express statutory

15   mandates and requirements that are provided.

16             And with respect to being sure that the parties,

17   all parties are comfortable, a jury ultimately is properly

18   instructed, and that a summary judgment is resolved

19   according to the appropriate legal standard.  The reference

20   point is the statute and the reference point is what the

21   statute says and what it doesn't say.  And with respect to

22   the -- that's true with respect to, Your Honor, to the

23   Pennsylvania statute.  It's also true with respect to the

24   federal statute.

25             And how does law get written or how do words get

1      included?  We all know as practicing lawyers, or from the

2      bench, that sometimes there's a carry forward on precedent

3      that may not be perfectly justified or appropriate based on

4      subsequent legal developments.  But what we have is a

5      comfort zone here from the standpoint of the legal

6      requirements, thereby statute, and the legal requirements

7      that are properly analyzed are clear.

8                   To impose, notwithstanding what the statute says

9      in Pennsylvania, and to impose notwithstanding what the

10     federal statute says, a new element in our view would be

11     legally inappropriate and just simply not correct.

12                  But we understand how some of this language has

13     been imported in.  We've read with a lot of care two things.

14     We read the 1913 decision and we were curious for purposes

15     of preparing for today, how did some of the words of 1913

16     longitudinally get incorporated in different decisions?  And

17     it did, they did.  But that doesn't overwrite the statutory

18     law and it doesn't overwrite the statutory requirements.

19                  So for those reasons, Your Honor, we would ask

20     that the summary judgment two be denied on the legal basis

21     that we have identified.

22                  THE COURT:  Okay.

23                  MR. IVEY:  Very briefly, Your Honor.  First, we

24     would submit that the analysis does not stop with the 1913

25     case.  The Dow case is from 2012 and the Kenset case that

```
 1        the Court referred to was from 2015.  So we're in the

 2        correct century and we're in the correct area with regard

 3        to --

 4                  THE COURT:  Right.  The Kenset case cites the

 5        statute as well as the 2003 case that is sort of the seminal

 6        case more that everybody seems to cite for those

 7        requirements.

 8                  MR. IVEY:  Yes, Your Honor.

 9                  THE COURT:  So I take your point that in 2015,

10        it does cite the statute, but it also kind of harkens back

11        to that earlier case that it was pre-statute.

12                  MR. IVEY:  Actually, that doesn't help

13        AgroFresh's argument in this regard, Your Honor.  The longer

14        something stays on the books without somebody actually

15        correcting it or criticizing it suggests that that is the

16        way the law ought to be interpreted now.  We do believe that

17        there is the controlling effect that the Court has referred

18        to in that regard.

19                  Now, I also mentioned, Your Honor, going back to

20        the fact that AgroFresh has failed to cite a single case,

21        not one, rejecting the communication requirement that we've

22        talked about from Kenset and from Dow.

23                  And the Third Circuit therefore has credited the

24        analysis that the Dow Court used.  This isn't an antiquated

25        ruling.
```

1              And with regard to other types of trade secret

2      scenarios such as might be involved with, for example, a

3      Coca-Cola, let's leave aside the fact we can all acknowledge

4      that Coca-Cola's trade secret formula is recognized as the

5      trade secret and we don't have the kind of, assuming

6      arguendo, issues we have with regard to the kind of

7      migration of trade secret disclosures that we've had.

8              The fact of the matter is when, and it has

9      happened on occasion, very rarely, but it has happened,

10     someone attempts to steal part of that formula, Coca-Cola

11     essentially knows immediately what it was somebody tried to

12     take and who tried to take it.  So there isn't the problem

13     of something being absconded with where the party that

14     actually owns the trade secret has no way of knowing what's

15     going on in that regard.

16             What we have here is a situation which is

17     delicate, which has to do with this idea of communicating

18     trade secrets and the trade secrets having to emanate from

19     the source -- i.e., in this case, the inventor, Dr. Mir and

20     not from the ownership arguments that are being made with

21     regard to Dr. Mir vis-a-vis AgroFresh, which could very well

22     mean that there is a cause of action here and a right to

23     pursue action on grounds of a breach of contract action.

24     But as the Court noted, in the Dow case, the fact that you

25     have a contract claim does not give rise to nor support the

misappropriation of trade secrets claim, and in that regard,

as was true in the Dow case, it is true here as well,

AgroFresh has failed to make out the elements.  It has

failed to meet its burden at this summary judgment stage.

THE COURT:  Okay.  I'm going to take that one

under consideration and go back and review the cases.

Summary judgment number three, it is similar

with respect to the conversion claim and the assertion by

defendants that it requires a communication.

Plaintiff, I was curious about, from the

response is, were you talking here about a claim for

conversion of trade secrets or a claim for conversion of

something else?

MR. MacGILL:  Your Honor, Rob MacGill once

again.

I think with respect to conversion, the

definition of what the property is is broader than what just

might be a trade secret, so it's not -- what's subject to

our conversion claim is broader than what would be perhaps a

trade secret.  So for that reason, we have to say that we're

not comparing an apple to an apple in this particular

context as to what is subject to conversion in terms of the

property.

The second thing just to point out quickly, with

respect to conversion, I don't think the Court needs to hear

from us very much about whether intangible intellectual
property such as patents or trade secrets or other property
is subject to a conversion remedy.  It is, and we've cited
quite a different, quite a series of cases on the point that
property of the nature that we're talking about,
intellectual property ideas, those kinds of things, are
subject to a conversion remedy.

And then finally, Your Honor, with respect to
defendants' own tentative authority to the Court, we would
say their own authorities confirm this same basic
fundamental legal point.

THE COURT:  So, but I just want to make sure in
the complaint.  We went back and looked, and the complaint
says conversion of information, and then there was some
reference in the papers to conversion of confidential
information or procuring information by improper means.

Are you asserting conversion of trade secrets?

MR. MacGILL:  We are.

THE COURT:  And as I read the cases with respect
to conversion, there is an issue for a conversion of trade
secrets, though perhaps not conversion of confidential
information of a communication requirement.

MR. MacGILL:  I'm sorry.  Could you please
repeat the last portion of what you said, Your Honor?

THE COURT:  As I understand it from the cases

1    addressing conversion of trade secrets, there is a

2    communication requirement.  So is there a communication or

3    are there factual issues about a communication of a trade

4    secret here?

5            MR. MacGILL:  No.  And for purposes of

6    conversion, the focus is again on unauthorized control,

7    dominion of control, of property owned by another party.

8    And so for that reason, Your Honor, I don't think we're back

9    to the similar analysis that I think we've already covered

10   with respect to the legal issue on the '216 patent trade

11   secrets.  That is, do they exercise dominion or control and

12   make it hard for use of our property, more broadly defined

13   in trade secrets?

14           THE COURT:  I just want to check.  Was this the

15   Teva case?  I thought it was the Teva case where the Court

16   found that there could not be a conversion claim for trade

17   secrets because there was no communication and there was no

18   confidential relationship between Teva and the defendant,

19   but there could be a claim for conversion of other

20   confidential information.

21           MR. MacGILL:  Yes.  Going to your third point

22   first, I think that with respect to the aspect of the

23   decision relating to our burden of proof on conversion, we

24   would focus on use and disclosure, but also, and that we did

25   submit this in relation to summary judgment number two.  We

1    showed the Court, and we'll talk about this later, the

2    various communications of studies, biologic test results,

3    sampling techniques.  We did communicate those particular

4    things, so whether we get to the point of making arguments

5    to you or to the jury on conversion, we would say that this

6    may be a legal distinction without a difference on our

7    conversion claim.

8                    THE COURT:  You communicated them to who?  Dr.

9    Mir?

10                   MR. MacGILL:  Dr. Mir, who in turn communicated

11   them to Dr. Oakes.  So we'll talk about this in a minute,

12   but in summary judgment two, we tried to give you exemplars,

13   frankly, for all purposes, but on this conversion claim, we

14   would intend to bring that evidence forward to say at the

15   end, subject to the Court's discretions, this is all

16   conversion and we communicated our biologic trials to him.

17   He communicated them to Decco and UPL.

18                   THE COURT:  All right.  But isn't that what

19   happened in Teva and the Court said, with respect to the

20   conversion of trade secrets aspect, that there was no

21   communication pursuant to a confidential relationship

22   because Teva and the defendant, I don't remember if it was

23   Apotex or someone, were not in a confidential relationship.

24   They were competitors.  And isn't that what we have here,

25   where you're saying it went through someone?

1          MR. MacGILL:  Yes.

2          THE COURT:  And in that case, I think it went

3    through a former employee.  But ultimately, when the Court

4    said you can't have a conversion of trade secrets claim, it

5    was, there was no communication pursuant to a confidential

6    relationship because the ultimate two parties, Teva and

7    Apotex, were not in a confidential relationship.  They were

8    competitors.

9          MR. MacGILL:  Okay.  We're speaking the same

10   language on that case.  Here's how we distinguish it.  We

11   were in a confidential relationship and we had a

12   confidential relationship through our confidentiality

13   agreements with Dr. Mir and his company, protected us in

14   every particular way.

15          So --

16          THE COURT:  But isn't that the same as in Teva,

17   where it was a confidentiality, confidential relationship

18   between Teva and the employee.  The employee then went to

19   Apotex.  So the ultimate issue that the Court was looking at

20   is, if you are going to go after Apotex for conversion of

21   trade secrets, you can't do that because there's no

22   confidential relationship between Teva and Apotex?

23          What I'm trying to understand is why isn't

24   that -- why isn't that the situation that we have here with

25   respect to the trade secret conversion, not with respect to

1      other confidential information, which apparently is

2      different than Teva, treated differently in the Teva case?

3                   MR. MacGILL:  So we have two levels of

4      confidential relationships here.  Our company, Your Honor,

5      and Dr. Mir, and we have our former employee, 20-year

6      employee, Dr. Oakes, who also had a confidentiality

7      agreement.  Okay.

8                   THE COURT:  Need a confidentiality agreement

9      between AgroFresh and the folks that you are asserting as to

10     this claim.  That's what it seems to me the Teva case is

11     saying with respect to conversion of trade secrets.

12                  MR. MacGILL:  Right.  Correct.  And so, again, I

13     can share with you how we read it in our facts.  How we read

14     it in our facts is that particular rationale, I would say,

15     of that decision is not equitable to us because, one, we

16     have confidential relationships of two types that I've

17     mentioned and a third type.

18                  The third type, Your Honor, is the UPL, the

19     folks here in your courtroom today, promised us in

20     connection with an acquisition they wouldn't use any

21     information that they had in relation to the acquisition

22     against us, and they offered $400 million for our company --

23     pardon me.  They wanted to buy our company, so UPL signs the

24     third confidentiality agreement and says, we promise,

25     AgroFresh, or Dow, we will not use any of your information.

1    We won't hire your consultants, we won't hire your

2    employees.  We promise.  Give us your stuff.  Okay.

3              So we did.  They offered $400 million for our

4    company and we said, no, you're not even close.

5              THE COURT:  I know.  I read that.

6              MR. MacGILL:  Okay.  So back to your inquiry on

7    this third level of analysis on this case.

8              So WHEN we look at Teva, we say we have three

9    forms of confidentiality protections and we have

10   communication, and we can prove it.

11             So what we would say, Your Honor, in terms of

12   our analysis, for better or worse, is this.  That piece of

13   Teva doesn't apply to our facts because everybody, UPL,

14   Oakes and Mir, are buttoned down by confidentiality

15   undertaking in written contracts.

16             Number two, we have -- we'll talk about this in

17   relation to the summary judgment.  We have factually, in

18   fact, communications of biologic trials by all -- all kinds

19   of dimensions from Mir, from us to Mir first, and we'll show

20   you that, and then we show them what to do on guest

21   sampling.  On biological trials, we tell them what to do.

22   We have e-mails.

23             He then communicates to Oakes.  So we have, as

24   we get to the factual issues associated with these other

25   trade secrets, we're talking about conversion now.  What I

1   will say in the conversion context is, we have all of that

2   tied up by e-mail communications in those three technical

3   levels at least.  Biological trials, gas sampling

4   techniques, two prominent examples, and then dosing by

5   fruit.

6           So, again, I hope that's responsive to your

7   inquiry, Your Honor, but that's how we read that portion of

8   Teva as we looked at it for purposes of the analysis that we

9   make here today.

10          THE COURT:  Okay.

11          MR. MacGILL:  Thank you.

12          THE COURT:  Mr. Ivey, what about the issue

13  that was just raised, which is purported confidentiality

14  between UPL and AgroFresh based on the attempt to acquire

15  AgroFresh?

16          MR. IVEY:  I think it's conflating issues that

17  have nothing to do with each other, Your Honor.  We could

18  spend a lot of time arguing about what other people that he

19  mentioned might have known or done or had in the future or

20  the past.

21          THE COURT:  Are any of the alleged trade secrets

22  misappropriated, asserted to have been misappropriated by

23  the breach of that agreement of confidentiality?

24          MR. IVEY:  No, Your Honor, I don't believe they

25  are.  Basically, what we have here is that AgroFresh has not

1    met its burden of showing at the summary judgment stage the

2    conversion of an intangible property as disclosed in the

3    '216 patent.

4              We've discussed this at some length in our brief

5    at DI 451, so I won't go back through all of that, Your

6    Honor, but we do point out that the issue here that

7    AgroFresh seeks recovery of the technology of the '216

8    patent, which is plainly in tangible property and it is not

9    connected with physical property, and therefore it's not

10   encompassed under the Pennsylvania conversion doctrine.

11             We cited two cases which are on point with

12   regard to this, which are Apparel Business systems v. Tom

13   James, and that's 2008, Westlaw --

14             THE COURT:  Yes, I have that one.

15             MR. IVEY:  All right.  The other case that we

16   cited for the Court is Vavro v. Albers.  That one is 2006

17   Westlaw, 2547350, Western District of Pennsylvania, 2006.

18             And so essentially, there are numerous courts

19   that have held similar to what we're arguing for in this

20   particular case, and we believe that is the standard which

21   applies.

22             Going to the second point that the Court focused

23   in on, and here the Court went specifically and squarely to

24   the issue, there is a similar requirement for

25   misappropriation of claims in this regard, and it is stated

1    in our brief at 451 on page 18, and I quote.  "To state a

2    claim for conversion of trade secrets, a plaintiff must

3    allege that, number one, it owns the trade secret and,

4    number two," and this is the operative one that the Court

5    was focusing in on, "the trade secret was communicated to

6    the defendant within a confidential relationship."

7              And the case cited there, as the Court referred

8    to, is the Teva Pharmaceutical case.  I won't give the cite

9    unless the Court actually needs it.

10             THE COURT:  No.  I have that.

11             MR. IVEY:  All right.  And the fact of the

12   matter is, Your Honor, and it's undisputed here that

13   AgroFresh never communicated the trade secret pursuant to a

14   confidential relationship with any defendant, neither Dr.

15   Mir nor the defendant, and that's because the technological

16   information and trade secret was developed by Dr. Mir and

17   not by AgroFresh.

18             So the communication that they're talking about

19   pursuant to the confidential relationship is off the mark in

20   addition to the fact we think they're wrong on the facts.

21             THE COURT:  What about, so your motion is just

22   going to conversion of the trade secrets, but their

23   assertion is that it's not just trade secrets that they're

24   arguing conversion of, but other confidential information.

25   And as I read the Teva case, that type of claim was not

1    subject to the same communication.  Is that right?

2             MR. IVEY:  I believe the Court's reading on that

3    is correct.  We have the same issue we sometimes have had on

4    a recurring basis in this case with regard to what precisely

5    it is that they're defining as the trade secret that they're

6    going after.  Sometimes it's several generic categories.

7    Sometimes those categories move.  Sometimes they're

8    withdrawn.  Sometimes they're brought back, and sometimes we

9    wind up talking about confidential information.

10            This Court was absolutely correct, that there

11   can be all kinds of confidential information that do not

12   constitute as a matter of law trade secrets, and so we have

13   some issues there, but I think some of those are for a later

14   day.

15            THE COURT:  And they're not the subject of your

16   motion?

17            MR. IVEY:  They are not the subject of this

18   motion, Your Honor, respectfully.

19            THE COURT:  Okay.  Thank you.  I will take that

20   one under advisement.

21            And I think that brings us to summary judgment

22   number one, about the unsupported trade secrets, including

23   testing protocols, biological trials, et cetera.  I will

24   hear from the defendants on that motion.

25            MR. IVEY:  I just want to make sure I've got my

1    arguments lined up, Your Honor.

2                    THE COURT:  I did take it out of order.

3                    MR. IVEY:  And I didn't mean that in any way as

4    a criticism or an observation in that regard.  It was more a

5    matter of my inadequacy, not the Court.

6                    The issue with regard to the first summary

7    judgment category as we brief it at document number 451 at

8    pages 12 through 16 and in our reply brief document 491 at

9    pages 9 through 12, is an issue of law.  It's a

10   straightforward question with regard to several categories.

11                   The issue as a matter of law is whether there

12   had been misappropriation under the Defend Trade Secrets Act

13   or the Pennsylvania Uniform Trade Secrets Act, DTSP and

14   PUTSA, and the facts in this regard, Your Honor, are not in

15   dispute.

16                   The trade secret as defined by AgroFresh is

17   specific to the '216 patent in TruPick.  We already showed

18   the Court the DI 300 reference, so I won't put that up

19   again.

20                   But just to bring the Court back in terms of

21   orientation on that --

22                   THE COURT:  Isn't this the one we just

23   discussed?  This is number two.  I was talking about number

24   one.

25                   MR. IVEY:  I apologize, Your Honor.  I think I

1    may have gone back.

2              THE COURT:  I think number one had the gas and

3    the treatment tests.

4              MR. IVEY:  Those are the four categories, Your

5    Honor.

6              So the brief addressed DI 451, pages 4 through

7    12, and DI 491 at pages 1 through 8.

8              Now, the four categories that we have identified

9    in this regard are the so-called testing protocol, the

10   centralized room gas sampling and 1-MCP dosing systems, the

11   1-MCP application equipment, and the fourth category is

12   various biological trials and confidential information,

13   numerous fruits and vegetables and other things.

14             Now, at the outset, the summary judgment

15   standard is also set out in a case we relied on for the

16   second motion, which is Dow v. HRD 909 F.Supp. 2d, 340 at

17   346.  And basically what it does is, it lays out very

18   succinctly, and, again, the facts are closely aligned with

19   ours, that the first element had to be the existence of a

20   trade secret, and once you have that, we then go to the next

21   point, and that is that to meet the element, whether there's

22   a trade secret, there must be identification of those trade

23   secrets with specific particularity to actually allow the

24   Court to evaluate at the summary judgment stage that there

25   are, in fact, trade secrets.

1              Here, to meet that first element as the Court in

2    Dow pointed out, HRD standing in the position of this case

3    of AgroFresh must show the existence of a trade secret with

4    a reasonable degree of precision and specificity such that a

5    reasonable jury could find that the plaintiff established

6    each statutory element of a trade secret.  That

7    identification, the Court went on to say, must be particular

8    enough as to separate trade secrets from matters of general

9    knowledge in a trade or of special knowledge of persons of

10   skill in the trade.

11             The identification must clearly refer to the

12   trade secret, and as the Court pointed out there, and,

13   again, it's appropriate that I point that out in this case

14   as well because it's an issue that continues to hover over

15   everything we do.  This is not a discovery motion.  It's a

16   summary judgment motion and it seeks to determine whether

17   the party in that case had sufficient facts to support its

18   claims.  And in that case, the Court found that HRD standing

19   in the shoes of AgroFresh in this case, had the burden to

20   establish those facts, and it could not meet those burdens

21   on the categories that were reviewed.

22             Now, additionally, we in our reply, Your Honor,

23   because it came up as part of the briefing for this

24   particular motion, specifically addressed and alerted the

25   Court to the resurrection of previously withdrawn

1      allegations regarding manufacturing, purification and

2      measurements, and I would like to return to these if we have

3      time briefly at the end of the argument.

4              THE COURT:  Just so I'm clear, the manufacturing

5      that was withdrawn, what product was that for?

6              MR. IVEY:  That was for the TruPick and the '216

7      patent.

8              THE COURT:  It was for the TruPick?

9              MR. IVEY:  Yes, Your Honor.

10             THE COURT:  Okay.

11             MR. IVEY:  One more fundamental point, Your

12     Honor.  Despite their burden, we note that AgroFresh did not

13     identify or submit an expert in this case and it did not

14     submit with that expert an opening report on trade secrets

15     as it is indicated under Federal Rule of Evidence 702 and

16     Federal Rule of Civil Procedure 26(a)(2)(B).

17             So turning to the four categories, AgroFresh

18     failed to meet its burden with each of these.

19             The first is the testing protocol I will go to,

20     and here what we received, Your Honor, what you see in the

21     briefing and what has been apparent during the entire course

22     of discovery in this case is generic statements of

23     techniques for measuring ethylene, starch and acid, and that

24     kind of generic referencing simply fails to meet the burden

25     of particularity.

1              Now, Dr. Zettler, who was referred to during

2   these proceedings, was the Rule 30(b)(6) witness on trade

3   secrets.  He was their corporate representative.  And he

4   failed to explain how, if at all, AgroFresh met the

5   different publicly known method for this kind of measuring

6   of these ethylene starches and acids.  And that testimony is

7   actually cited in conjunction with our briefing papers.  I

8   believe it's Exhibit 6 at 52, lines 11 through 14.

9              Now, there was no clear identification with

10  regard to the testing protocols.  There was no description

11  of these testing protocols, and there's no separation of

12  what might have been included in these testing protocols

13  that is a departure from, perhaps even an improvement over

14  what was publicly known or readily available to people of

15  skill in the art.

16             And in this regard, Your Honor, one of the

17  things that we have happening, and it occurs again

18  throughout this situation, is we sometimes move for what was

19  supposedly a specific designation, even if somewhat

20  nebulous, to other types of combinations of trade secrets.

21  And we submit, Your Honor, that when, in fact, they've tried

22  to say that there are aggregated trade secrets wherever they

23  may be, each of those elements also still needs to be

24  identified with the same kind of particularity with regard

25  to why it is a trade secret, whether it's individually or

1  taken together with other elements in combination so that

2  you have a trade secret.

3  So in this case, Your Honor, we then also didn't

4  rest on that.  We actually had the testimony of Dr. Beaudry

5  on behalf of UPL and Decco, who analyzed what was available

6  from the information disclosed throughout discovery by

7  AgroFresh.

8  And on this particular issue with regard to

9  testing protocols, Dr. Beaudry attached several publications

10  of publicly known measuring techniques.  That occurs at

11  Exhibit 2 and in paragraph 84.  He's very explicit with

12  regard to all of these types of protocols.

13  So I won't go through all of them here, but he

14  actually lays out in some detail that there are many known

15  published techniques for measuring ethylene, starch and

16  acid, and he goes on to identify what each of those are.

17  Without giving an exhaustive list, it's certainly a very

18  long list.

19  If response to that, there was silence.  Dr.

20  Beaudry's verified opinions are unrebutted in this matter,

21  and as a result, AgroFresh's claim with regard to the

22  testing protocols fails as a matter of law at this stage.

23  The second category has to do with the

24  treatment, Your Honor.  Here, Dr. Zettler was the Rule

25  30(b)(6) witness speaking on behalf of the company AgroFresh

1    for its trade secrets, and he made a fatal admission, and

2    that was that he was not aware of any trade secrets

3    regarding the treatment tents that had generally been

4    described by AgroFresh in this case.

5              By contrast, we had Dr. Beaudry look into this

6    and he provided a wealth of examples of use and publication

7    from 1998 through the 2015 with regard to treatment tents,

8    how they're developed, what they look like, what their

9    parameters, configurations and measurements are, et cetera.

10             Dr. Beaulieu then came in on behalf of AgroFresh

11   and failed to cure the admission by Dr. Zettler for his

12   concessions because she did not address any of Dr. Beaudry's

13   disclosures, and she did not review any of the public

14   literature available with regard to treatment tent to

15   actually be able to identify and articulate what was

16   different with regard to the treatment tent in the trade

17   secrets of AgroFresh versus what was already known publicly.

18             So here again we had the admission that the

19   person who was put up by the corporation was unaware of

20   where the trade secrets were with regard to treatment tent

21   measured against the specific and verified opinions of Dr.

22   Beaudry, who showed that there was no trade secret that was

23   identified in any of the materials he reviewed on behalf of

24   UPL and Decco, responding to what AgroFresh has generically

25   thrown out.  That testimony remains unrebutted.

We then have a third category, Your Honor,

centralized room, gas sampling and 1-MCP dosing system.

Here again we received only generic statements about

purportedly proprietary sampling method.

Dr. Zettler conceded that the identified slide

that was put in front of him during deposition did not

contain any trade secrets.  AgroFresh has provided no

information on purported time points or algorithms for gas

sampling.

Dr. Beaulieu on behalf of AgroFresh gave no

specifics on timing or algorithms.  Measured against this,

Dr. Beaudry again analyzed what was there to be seen and

would have been produced and he was able to conclude that

AgroFresh has not shown any trade secrets regarding 1-MCP

sampling.  We discussed that further in our brief at page 8,

and we also have in Dr. Beaudry's report a number of

paragraphs that go through this from 160 to 164, 175 by

201.

Ultimately, his conclusion in paragraph 2 01 --

THE COURT:  Dr. Beaudry is defendants' expert?

MR. IVEY:  Yes, Your Honor.  He's on behalf of

UPL and Decco from the University -- Michigan State

University.  He would be very irritated if I got Ann Arbor

and Michigan messed up.  But Michigan State University is

where he's an expert with 1-MCP, and he has been retained

1    and has given a report on this, which is what caused some of

2    the reactions to our testimony in our analysis of the

3    opinions even though there was no opening report on behalf

4    of AgroFresh with regard to trade secrets and its

5    technologies.  And so he concluded that AgroFresh has not

6    shown that it has any trade secrets related to gas sampling

7    and 1-MCP and or ethylene.

8              THE COURT:  Whether something is a trade

9    secret is an issue of fact.  You agree with me on that

10   one.  Right?

11             MR. IVEY:  It is, provided, Your Honor, that

12   there has been at this stage sufficient identification of

13   that so that we can actually see that we've gone beyond

14   generic statements, vague references, or other types of

15   explosions of words that basically do not in any way

16   identify precisely what we're talking about.

17             So with regard to gas sampling, yes, you could

18   have trade secrets in that regard, but there has been no

19   information regarding the time points or the algorithms.

20   Algorithms can be produced if, in fact, they do exist and if

21   it impacts, they are a trade secret.  Had they been

22   produced, we would have had the opportunity to see whether

23   those algorithms were anything that people didn't already

24   know about within the field.

25             So the problem at the summary judgment stage,

1    Your Honor, as opposed to the discovery stage is that while

2    they may give me a general idea where they're going with

3    their trade secrets so I can pursue that with 30(b)(6)

4    witnesses and with their experts and their responses in the

5    contention interrogatories, once we get to this stage, the

6    question is, is there sufficient information to present the

7    matter to the jury on the idea that there is a trade secret,

8    it has been articulated with sufficient particularity that

9    has been something we can identify and say is distinct from

10   what would otherwise be publicly available or generally

11   known to people in the field.

12           And that's the other problem when you don't

13   actually put people to the proof with regard to the

14   articulation of the time points or the algorithms for gas

15   sampling, and it's simply just the idea that you are saying

16   I've got secrets.  I've got secrets and they involve

17   methodology.  They involve testing.  They involve analysis.

18   They involve algorithms.  I'm not going to show you what

19   they are or tell you what they are, but I've got them

20   somewhere.  That simply at this stage is insufficient.

21           And since Dr. Beaudry has gone through and could

22   not find anything specific with regard to the centralized

23   room gas sampling and 1-MCP dosing systems, he came to the

24   conclusion, again, in a verified opinion and it's

25   unrebutted, that there has been no trade secret that has

been disclosed here.

So the category, yes.  The technology, yes.  You could very well have trade secrets here, but at some point, this viewing point, they have to cross that threshold and tell us what is that is.  Once they've told us, we can agree or disagree whether that's publicly known.  You have to get over that first hurdle now.  Disclose what it is with sufficient particularity that we know where we're going and what it go we're arguing about.  Without that, they have failed to meet the threshold burden for supplying this information to a jury for it to make a determination beyond what we've given at this point, which brings me to the final category, Your Honor, and that has to do with biological trial.  And if ever there was an explosion of this series of words without there being any specificity to it, this was the category, among others.

Dr. Beaulieu was the person who was used for the disclosure of AgroFresh's presentation and the sum and substance of what she talked about is apparently what they're claiming to be the biological trial trade secrets. Her conclusory references in this regard to trade secrets on fruits and vegetables is simply inadequate to meet the burden of clearly identifying the trade secrets.  We recount the inadequacies and the lack of awareness at the opening, our opening brief at page 11, so we go through that in some

1    detail and we also reiterate it in our reply brief at 8.   So

2    I won't keep going through the fact that they simply didn't

3    say anything other than we've got biological trials, but

4    that's effectively where we wind up.

5            So in sum, Your Honor, what we have here is at

6    each juncture AgroFresh's generic statements and unspecific

7    conclusory identification of trade secrets more or less by

8    category as opposed to specific, particularly described

9    items, capabilities and methodologies, and algorithms is

10   where we are at the summary judgment stage.   And on each of

11   the four categories that we brief, they have failed to show

12   that there is a fact in dispute and that there is, in fact,

13   information which merits going through the next step, which

14   is to put the information before the jury.   In each of these

15   categories, AgroFresh's claims fail as a matter of law for

16   the trade secrets.

17           We've cited again the Dow case because it was

18   such a close analogy not only on the matter of the

19   transmission of trade secrets, but also on the

20   identification of trade secrets as well.   And we believe

21   it's controlling and let's say instructive with regard to

22   the issues that we've raised this afternoon with the Court.

23           And I think I can submit on that.   We do have,

24   as I mentioned, I'm anxious to get to the other point, but I

25   don't want to get ahead of the Court in this regard.   The

1    Court did on August 23rd send an oral order requiring more

2    particularity for trade secret identification, and we did,

3    in fact, file a brief, pocket brief in response to that

4    objecting to a number of those categories which we think are

5    beginning to percolate back into the case and continue to

6    create the same kind of problems we've had the entire way.

7              But with regard to those four categories, those

8    were the reasons and the reason why we sought summary

9    judgment that have not been articulated with reasonable

10   clarity and specificity in each of those to survive the

11   motion for summary judgment.

12             THE COURT:  All right.

13             MR. WILLIAMSON:  Your Honor, before we yield the

14   podium, may I just make one point just to amplify an answer

15   to that question you had about manufacturing and withdrawn

16   trade secrets?

17             Mr Lee, if we could pull up, please, the

18   withdrawal is at DI 300, Note 1 one, and what it says is

19   AgroFresh has decided not to pursue claims for

20   misappropriation of its 1-MCP manufacturing process,

21   including purification and stabilization steps, and the

22   manufacturing process for SmartFresh technology.

23             Given the way, the nature of these claims are

24   where AgroFresh is claiming that TruPick is its

25   manufacturing process and its product, what this basically

1    means is, the entire scope of manufacturing has been

2    withdrawn, not just the TruPick product, but also expressly

3    for the SmartFresh, which is their product, so it's the

4    whole scope of manufacturing.  As a result of this

5    withdrawal, the parties stood down on discovery as to

6    manufacturing across the board.  We've gotten none as to

7    any, any aspect of TruPick, SmartFresh or any manufacturing

8    at this stage.

9              Thank you, Your Honor.

10             MR. MacGILL:  So, Your Honor, coming back to, if

11   we could, just the counts before the Court on summary

12   judgment.

13             So we have summarized for the Court what remains

14   before the Court on the summary judgment.  If we may take a

15   look at the right-hand side, trade secret number 9, which is

16   our testing protocols, and they have challenged this in four

17   respects.

18             They've challenged our application technology,

19   our treatment tent technology and AgroFresh gas sampling

20   technology.  That's their challenge.  I would like to

21   address the evidence associated with each of these

22   components that we've designated and give highlights of the

23   designation so that we have clear descriptions of what has

24   actually occurred.

25             These protocols are our testing protocols for a

1    specific point in time.  These are our testing protocols for

2    the treatment of fruit, the treatment of fruit.  The

3    separate protocol for manufacturing 1-MCP is different in

4    time and different in context.

5              Manufacturing 1-MCP and -- manufacturing 1-MCP

6    and testing for its impurities is entirely distinct from

7    what we're talking about here.

8              Mr. Ivey was incorrect when he stated to the

9    Court just a few minutes ago that, in answer to the

10   manufacturing question, that it included SmartFresh and

11   TruPick.  Incorrect.  And Mr. Williamson's clarifications

12   also did not clarify anything.

13             That is what they have challenged.  They have

14   challenged the context of our gas sampling, our testing

15   protocols in the treatment of fruit context.

16             Now, relative to that process, if we could go to

17   the --

18             THE COURT:  I'm sorry.  So did you or did

19   you not withdraw manufacturing for your product and

20   TruPick's?

21             MR. MacGILL:  Well, if I may, may I hand up

22   another series of exhibits, Your Honor?

23             THE COURT:  I just want the answer, please.

24             MR. MacGILL:  Okay.  No.  What we did --

25             THE COURT:  So what did that mean, the footnote

1    that Mr. Williamson just put up there, because I've got to

2    tell you, after all the stuff with Mr. Kleinrichert where

3    1-MCP kind of stood for defendants' product, I, too, was

4    thinking that that is what it meant.

5              MR. MacGILL:  Your Honor, in the separate in

6    time and separate in context manufacturing process of 1-MCP,

7    what we do is we use gas chromatography, I'm stumbling on

8    the words, to quantify 1-MCP using a Cpack Method 1.  In

9    that context, that's the first thing we do.

10             In that context, the second thing we do is we

11   use the same GC to measure 1-MC impurities, and we use Cpack

12   Method Number 2.  That is what we do in the context of the

13   manufacturing process of 1-MCP, the active ingredient.

14   That's exactly what we talked about in the footnote,

15   exactly.

16             The context we're here in court today, and we're

17   not claiming that to be a trade secret, we're not claiming

18   that to be a trade secret.  We've said that all along

19   consistently in the footnote, in the court here today.  We

20   are not claiming that, and they understand that.

21             Now --

22             THE COURT:  But you are claiming the

23   manufacturing process for TruPick?

24             MR. MacGILL:  We are claiming the gas sampling

25   technology in the context, Your Honor, that has two

1     components.  And if I may put up one more slide, if I may

2     show this slide.

3               With respect to what's in front of the Court,

4     you can see on this slide, when we treat fruit, we have two

5     stages -- the first 24 hours, which is represented in green.

6     We identify issues in the atmosphere of the treatment room.

7     In the atmosphere of the treatment room, we look for 1-MCP,

8     ethylene, carbon dioxide, oxygen, and that has all been

9     confirmed in the documents that we produced in the case.

10    All right.  We've told them what the method is and the

11    equipment.

12              In the treatment context, that's the first

13    24 hours.  Separately, for the next six to eight months, we

14    have an ongoing fruit metabolism analysis where we test for

15    hundreds of different molecules.  That is entirely distinct

16    from the manufacture of 1-MCP.  This is fruit treatment and

17    the separate process of manufacturing 1-MCP and testing for

18    its impurities is entirely distinct from that.

19              THE COURT:  Are you asserting the manufacturing

20    process of TruPick?  I'm not understanding what you are

21    telling me is the answer to that question.  I have your

22    method disclosure here.

23              MR. MacGILL:  Right.

24              THE COURT:  It says your disclosure, and it

25    says, your disclosure includes the manufacturing process for

1    NT 7815, which is TruPick.

2              So are you asserting that or are you not

3    asserting that?

4              MR. MacGILL:  We own that.  Yes.  We own that.

5              THE COURT:  But how is that not withdrawn?

6              MR. MacGILL:  We withdrew one thing,

7    manufacturing process for 1-MCP.

8              Now, can we show the other example, the

9    side-by-side example?  We withdraw -- what we withdrew --

10   let me cull this up real quickly.

11             If you look at the left-hand column, what we

12   withdrew is what's on the left-hand side, the manufacturing

13   process, the 1-MCP manufacturing process and these specific

14   details.

15             One, how we quantify 1-MCP through that method

16   number one and how we measure impurity in the 1-MCP.  That's

17   different, that's different science.  It's different

18   technology.  We withdrew that.  We withdrew that in the

19   footnote that we just, that Mr. Williamson just referenced.

20   We withdrew that in the document 300.  Specifically, we

21   withdrew it.

22             The AgroFresh gas sampling is entirely distinct

23   in time and science.  Okay.  What are we testing for?

24   Scientifically, it's for the first 24 hours we're looking at

25   a series of volatiles to make sure the dose has been applied

1      in the room.  Okay.

2             Then, second, what we do for the next six to

3      eight months through our proprietary technology is we test

4      for hundreds of volatiles, to see what's happening inside

5      the room after the application.  And all of our science, all

6      of our biologic trials relate to this.  What happens in the

7      treatment room?

8             So --

9             THE COURT:  That's not a manufacturing process.

10     Right?  I'm getting confused because I keep asking about

11     manufacturing process and you're going to treatment rooms.

12            Is manufacturing process done in the treatment

13     room?

14            MR. MacGILL:  No.

15            THE COURT:  All right.  So let's stop with the

16     treatment room and stick with manufacturing process.  You

17     have withdrawn the manufacturing process for making the

18     1-MCP.

19            MR. MacGILL:  Yes.

20            THE COURT:  And SmartFresh, but you're saying

21     you never withdrew the manufacturing process for TruPick?

22            MR. MacGILL:  Right.  We own, we own TruPick.

23            THE COURT:  I get it.  I understand.

24            MR. MacGILL:  Okay.

25            THE COURT:  I get it.  I just want to make sure

1    I understand what's at issue and what's not at issue.

2              MR. MacGILL:   Okay.   If I may say it one last

3    time, we are not, we are not -- we said it in writing.   I've

4    said it to the Court in an April hearing.   I'm saying it

5    today in open court.   We are not pursuing the AgroFresh

6    1-MCP manufacturing process and we are not complaining with

7    respect to that category of technology, Your Honor, a Method

8    1 and Method 2 with respect to that process.   Withdrawn in

9    writing, and I said the same thing to the Court in April.

10   Okay.

11             Now, in my remaining time I'd like to cover

12   three or four quick things.

13             THE COURT:   You have four minutes, so I will

14   give you a couple extra minutes, but go ahead.

15             MR. MacGILL:   All right.   Let's go to the

16   statutory overview.

17             Your Honor, so if you look at what happens in

18   the treatment tent in terms of how we test these volatiles

19   in the first 24 hours and how we test these volatiles for

20   six to eight months, that's the core of our trade secrets.

21   That is a core of our trade secrets.

22             If we go to the statutory overview, please,

23   trade secret, as this Court knows, includes lots of things,

24   including, third line, a process.

25             Our testing is a process, Your Honor, and

1    specifically, this testing protocol is part, is a core trade

2    secret.  Let's go to the next slide.

3              Specifically, this testing protocol is our trade

4    secret.  We heard pieces and parts of different testimony.

5    Here is the reality.  Mr. Zettler confirmed in his

6    deposition on December 17th, 2018:  Are there other

7    AgroFresh trade secrets related to testing protocols?  I

8    think, other than what you've, you've noted, I think

9    collectively the combination provides the information that

10   we say is good know-how.

11             Well, this was amplified by the next slide.

12   When we told you a minute ago about process, what is the

13   testing protocol process?  How many elements does it have?

14   Several.  I'd like to talk about five.

15             Application technology, treatment technology --

16   treatment tent technology, gas sampling technology,

17   measurement of these compounds and know-how associated with

18   conducting tests.

19             We go to the next slide.  This was litigated in

20   case one.  Judge Robinson said with respect to the

21   protocols, here's what she found.  She said specifically

22   that the defendants relied on Mir to do the following:

23   "Prepare the protocols, train/conduct the applications,

24   evaluations, troubleshooting, et cetera."  Finding of this

25   Court previously.

1          Next slide.  With respect to the first component

2     of application of 1-MCP, Dr. Oakes, our former employee, now

3     the lead on Decco, what he says, during my time at

4     AgroFresh, it was clear that the synthesis of 1-MCP is not

5     straightforward, and very few, if any, 1-MCP producers

6     besides AgroFresh were able to produce truly high purity

7     1-MCP.

8          If we go to the next slide.  If we go one more

9     slide, please.

10         With respect to their, the steps that UPL took,

11    they had to get into the architecture of our trade secrets

12    through the acquisition process that they didn't succeed in,

13    but here's what they did.  They hired Dr. Oakes, and then he

14    says a lot of things about the specific trade secrets.  He

15    admits the essential nature of our testing protocol.

16         Here's what he says to the head of R&D at Decco.

17    Mr. Akhter:  You just as an FYI, Nazir has an understanding

18    of the air sampling procedure used by AgroFresh using

19    GC/FID, and then later he says the testing seems essential.

20         That's exactly our point with respect.  With

21    respect to the testing protocol and the gas sampling

22    component of it, he says he knows it and we're going to get

23    it.

24         Next slide.

25         With respect to sampling technology, in the

1    context, the separate context of what we've identified, what

2    do we do to treat fruit?  Here's what Mir had.  This is one

3    of our lead people writing to Dr. Mir and others and he says

4    the following, and he's referring to MCP sampling.  I've had

5    the parts ordered to transition an apple room gas sampling

6    manifold to a banana pellet sampler.  I need to know how

7    much gas you would like to sample or how big your Tedlar

8    sample bags are?  He's writing this to Dr. Mir.

9              The device will be built to pull a sample from

10   four different locations.  You will start with the PLC.  The

11   timer will reach two hours and fill four bags from four

12   locations, exactly the kind of trade secrets and technology

13   that we are addressing in this lawsuit from us to him and

14   from him to UPL/AgroFresh.

15             We turn the page.  Our former employee, Dr.

16   Oakes.  Here's what he says about the challenges they

17   overcome.  We spent many months and years to understand how

18   to successfully conduct trials with 1-MCP with a long

19   learning curve to understand how to treat fruit with a gas

20   which easily escapes.  Again, context, Your Honor.  Our

21   treatment of fruit.

22             He continues.  So as you see, 1-MCP can be a

23   challenge unless you understand some of the basics of

24   securing 1-MCP in an airtight tent.

25             Continuing, AgroFresh uses treatment tents and

1    plastic bottom sheet which are impermeable to 1-MCP.  This

2    film is specially made for AgroFresh.

3              And then notwithstanding what you just heard --

4              THE COURT:  But that's not very specific.  I

5    mean, it's saying the film especially made for AgroFresh, so

6    that's not disclosing a specific.  Right?  You need to get

7    more specific than that for a trade secret.  Right?

8              MR. MacGILL:  Here we are.  Decco now has access

9    to AgroFresh type of tents.  Okay.  That's exactly what they

10   did.  And so when we get to treatment tents, this is what

11   they look for.

12             Then, continuing to the next acknowledgments --

13             THE COURT:  Were treatment tents raised in the

14   disclosures?

15             MR. MacGILL:  Yes, they are.  And for --

16             THE COURT:  Not the ones that I just got, the

17   ones that defendant objected to.  I got something that said

18   treatment tents were never mentioned.  I don't know if

19   that's true or not.

20             MR. MacGILL:  May I answer that question before

21   continuing?

22             THE COURT:  Yes.  I don't think we need to go

23   through all of the specifics.

24             MR. MacGILL:  Okay.  I've got it.

25             So let's -- two quick things.  On biologic

```
 1    trials, if you --

 2                THE COURT:  Yes, I've got it.

 3                MR. MacGILL:  All right.  You don't need to hear

 4    from me on that.  All right.

 5                THE COURT:  My issue on this is not so much that

 6    there's not an issue of fact.  It's, I do have some concerns

 7    when I look at the trade secrets that are being asserted

 8    here, that as to the specificity and what is going to be put

 9    in front of the jury.  So I mean, you guys, I want you to go

10    back and talk to each other about stuff that is apparently

11    new and wasn't in the amended disclosures that Judge Fallon

12    allowed, because that's going to be the input.

13                If there's new stuff in what you submitted to

14    me, that's not come coming in.  The universe is what was in

15    the amended disclosures that AgroFresh was permitted to

16    make, but I can't make a determination as to what's new and

17    what's not.

18                But some of the things that did catch my

19    attention here are, you know, when you say defendants

20    appropriated these trade secrets with respect to the '216

21    patent and deprived AgroFresh of the right to continue to

22    maintain this data and other information, it's the kind of

23    references to other information.  What are you talking

24    about?  The '216, I understand you specify figures and

25    things like that.
```

1                    MR. MacGILL:  Right.

2                    THE COURT:  That's fine.  But some of this other

3        stuff, it doesn't seem like it could possibly meet a

4        particularity standard when you are talking about other

5        information or in talking about safety information, which

6        I'm not sure how that's a trade secret, but assuming it is.

7        You know, any revisions and supporting information.  You

8        identify certain things, but then it's kind of this

9        catchall, which doesn't really tell me at this very late

10       stage of the proceedings what you're planning to do.

11                   So my issue isn't so much with respect to the

12       motion for summary judgment, but in looking at it, it did

13       raise some questions about how much particularity there

14       really is here.

15                   MR. MacGILL:  Okay.

16                   THE COURT:  So what I'd like the parties to do

17       is to go back and discuss, because there were a number of

18       things where, you know, for example, the defendants said in

19       the accumulated knowledge that there were just new pages of

20       information.  If that's true, we should take those out.

21                   There are other places where I think you

22       probably want to be a little bit more specific and clarify

23       that you're not just relying on random undisclosed things,

24       but what you're going to be relying on for the trade

25       secrets.

1           MR. MacGILL:  Yes.  And if I may comment really

2   quickly, we understand, we will meet with them and do

3   exactly what you said.  The statements that the treatment

4   tent information is entirely new is just false, objectively

5   false.

6           THE COURT:  Okay.

7           MR. MacGILL:  All right.  We will show you that.

8           The statements that the, you know, when you sent

9   us that order, Your Honor, when we responded last week, we

10  cited record evidence.  This is not extemporaneous writing

11  by the lawyers on this side of the courtroom.  This is

12  record evidence that we cited to you.  Okay.

13          So when we look at the four corners of what we

14  sent, Mr. Ciulla, Ms. Lindemann and I, we didn't write

15  argument.  We wrote one summary paragraph in one place.  We

16  cited evidence and interrogatories.  So we will meet with

17  them as you directed, but I feel to be hit over the head the

18  other day, you didn't tell us this, you didn't tell us that,

19  we did.  And I could go through chapter and verse.  I've got

20  11 citations on treatment tents ready to go.  On this

21  accumulated knowledge, same thing.

22          THE COURT:  I'm not ruling on that at all.  I'm

23  just saying I can't tell from what's here.

24          MR. MacGILL:  Understood.

25          THE COURT:  And since I asked you all to do this

1    and they responded, I don't want to have an argument about

2    it because you guys have not talked about it.  There may be

3    some things you look at and you say, oh, okay, that's fair,

4    and there may be things that you point out to them, the

5    treatment tents thing and they say, okay, we drop it.

6              So I would just like you guys to discuss it to

7    the extent there are remaining issues.  You can use motions

8    in limine to address those, but that was sort of my thought

9    in looking the trade secrets.  And I just wanted to point

10   out to you, the reason I asked for it was because when I was

11   going through the papers, it did seem like there might be

12   some issue with respect to some of this in particular.

13             MR. MacGILL:  That's fair enough.  We need to

14   hand up the other -- yes.  Okay.  Your Honor, I made

15   reference to some documents.  Let me hand these up, too.

16             This is the four slides that I had made

17   reference to, or one of the four that I made reference to

18   (handing slides to the Court).

19             So, Your Honor, one last thing.  I want to thank

20   you for your time.  On biologic trials, we cited a chapter

21   and verse, so to speak, in terms of the transfer, where we

22   told Dr. Mir about specific biologic trials, and we said to

23   him, here they are, and we gave two examples in our

24   briefing.  We gave those trial references to him and we gave

25   specific detailed biologic trial data and information to

1    him.  That's in our brief, but the transfer of those trials,

2    and then we used some University of California data trials

3    that we have e-mails in the record, also showing we gave

4    him our trade secrets on those biological trials as to

5    examples.

6            Thank you for your time.

7            THE COURT:  Okay.  Very briefly.

8            MR. IVEY:  Your Honor, actually, I think the

9    display illustrated the point we were making, which is that

10    you hear a lot of words.  They're scientific words, but

11    they're categories and they're generalities.  There was no

12    disclosure of algorithms or other trade secrets here.

13            With regard to combinations, there was no

14    indication of where the trade secret combination information

15    was, what was the secret sauce versus what was the other

16    stuff that might have been added to it.

17            With regard to the treatment tents, just very

18    briefly.  One of the points we make in our papers and Dr.

19    Beaudry makes in his disclosure is that generally, some of

20    the airtight enclosures and the suitable treatment tents

21    were commercially available from at least two sources at the

22    time that's relevant here.  And so the point is, yes, they

23    may be saying they're using a specific type of treatment

24    tent, they didn't tell us which one it is or what it was,

25    but there were treatment tents available commercially.

1          Dr. Zettler never went beyond his inability to

2    say that he didn't find any trade secrets with regard to the

3    treatment tents and the diagrams he was shown.  Dr. Beaulieu

4    also did not add a joinder specifically with regard to what

5    was missing in terms of specific articulation with

6    reasonable particularity and an explanation of how that

7    information, whatever it might be, was not already known and

8    accessible publicly.

9          So we have the same situation with regard to

10   each of those categories.  There was a lot put up with

11   regard to e-mail, what's here and there.  None of that

12   qualifies as trade secret threshold submission at this

13   point, Your Honor, and none of it, even to the extent that

14   it generically identified the category, explains how

15   whatever is in there is a departure from or improvement over

16   the trade secrets that were known, the technology that was

17   known at the time.

18         So we understand the Court wants us to go back

19   with regard to the submission and our recently noted

20   objections, and we will do that.  We respect the Court's

21   guidance in that regard and we'll get back to the Court on

22   that.

23         THE COURT:  Okay.  Thank you.

24         So one issue that I wanted to raise with the

25   parties is with respect to trial, we do have a limited

1      amount of time for the trial.  It will be the week of

2      whatever week in October it is.

3              In order to give you a little bit more time, I

4      am considering picking the jury the week before so that we

5      don't waste time on that first Monday of the trial.  So with

6      respect to that, there are two things to consider, and you

7      all can talk with your clients and then send me a joint

8      proposal or what you each would consent to do.  But my

9      preference, and I have not spoken to any of the Magistrate

10     Judges on this, would be that you consent to a Magistrate

11     Judge for jury selection only and then that could take place

12     on Friday and the Magistrate Judge would pick the jury, and

13     then on Monday morning we'd swear them in, give them

14     preliminary instructions and go forward.

15             The other alternative that we may have, though I

16     need to discuss with the Clerk's Office, is I could do it on

17     the Thursday, so we could pick the jury on Thursday and they

18     could come back.  It's a little bit more inconvenient for

19     the jurors, but it may be a possibility if either of you

20     don't consent to a Magistrate Judge or no Magistrate Judge

21     is available.

22             So those are things that I'd like you to

23     consider, and if you could get back to us by the end of the

24     day tomorrow so that we, if we have to call in the jury

25     early, we can do that.  I think we need a couple weeks to do

1    that.

2                 Any other issues that we should take up?

3                 MR. MacGILL:  Not from plaintiff, Your Honor.

4                 MR. WILLIAMSON:  Thank you, Your Honor.  I hope

5    I wrote this down in my notes correctly, but I believe that

6    you had ordered AgroFresh to provide cases on the issue of

7    unjust enrichment for avoided development costs of the

8    asserted trade secrets where the defendant is not in the

9    market, and I was wondering if that is something which the

10   Court would permit a reply or response of a page or two if a

11   response is warranted?

12                THE COURT:  Yes.  What I asked them to do was

13   just to provide me cases.  I believe Mr. MacGill said

14   argument.  I said just the cases.  And so if I want to

15   know -- when you submit, when plaintiff submits the cases,

16   we will read them, and if we want argument or we want to

17   know what the relevance is, we will ask.

18                MR. WILLIAMSON:  Thank you, Your Honor.

19                THE COURT:  Anything else?

20                MR. IVEY:  Nothing further from the defendants,

21   Your Honor.

22                THE COURT:  Okay.  Thank you.

23                MR. MacGILL:  Thank you.

24                (Hearing concluded at 12:45 p.m.)

25                         -  -  -