## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AGROFRESH INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 16-662-MN |
| | ) | |
| ESSENTIV LLC, DECCO U.S. POST- | ) | **REDACTED PUBLIC VERSION** |
| HARVEST, INC., CEREXAGRI, INC. d/b/a | ) | |
| DECCO POST-HARVEST, and UPL, LTD., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' OPPOSITION TO
## AGROFRESH'S MOTION FOR ENHANCED DAMAGES

*OF COUNSEL*

Gerald F. Ivey
John M. Williamson
Anand K. Sharma
Rajeev Gupta
Maximilienne Giannelli
Karthik Kumar
Daniel F. Roland
FINNEGAN, HENDERSON, FARABOW
GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001
(202) 408-4000
gerald.ivey@finnegan.com
john.williamson@finnegan.com
anand.sharma@finnegan.com
raj.gupta@finnegan.com
max.giannelli@finnegan.com
karthik.kumar@finnegan.com
daniel.roland@finnegan.com

Frederick L. Cottrell, III (#2555)
Jeffrey L. Moyer (#3309)
Nicole K. Pedi (#6236)
RICHARDS, LAYTON, & FINGER
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Cottrell@rlf.com
Moyer@rlf.com
Pedi@rlf.com

*Attorneys for Defendants*

Dated: November 22, 2019

## **Table of Contents**

I.   Factual Background ............................................................................................. 1

II.   Litigation Conduct ............................................................................................. 5

III.   Argument ............................................................................................................ 8

    A.   The Court should deny AgroFresh's request to treble the compensatory
    award for misappropriation of trade secrets............................................. 8

        1.   Defendants were not conscious of, or recklessly indifferent to,
        injury to AgroFresh resulting from misappropriation................................ 8

        2.   AgroFresh failed to show misappropriation that occurred for any
        meaningful duration ................................................................................. 11

        3.   Defendants never engaged in a cover-up ................................................ 12

        4.   Defendants need not be punished to be deterred ...................................... 13

    B.   The Court should deny AgroFresh's request to treble the compensatory
    award for patent infringement................................................................. 14

        1.   Defendants did not deliberately copy the '849 patent invention ............. 15

        2.   Defendants had a good-faith belief of their right to practice ................... 15

        3.   Defendants' litigation behavior does not favor enhancement................... 16

        4.   Defendants' size and financial condition do not merit weight ................ 17

        5.   AgroFresh wrongly contends that this case "was not close" ................... 17

        6.   The duration of infringement does not favor enhancement...................... 18

        7.   Defendants took prompt and effective remedial action ........................... 19

        8.   Defendants were not motivated to harm AgroFresh ................................ 20

        9.   Defendants did not attempt to conceal their infringement........................ 20

IV.   Conclusion ....................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Fluid Sys. v. Huber*,
   295 F. Supp. 3d 467 (M.D. Pa. 2018) ..............................................................................11, 12

*Astro-Med, Inc. v. Plant*,
   No. 06-533 ML, 2008 WL 2883769 (D.R.I. July 25, 2008).......................................................8

*B&B Microscopes v. Armgogida*,
   532 F. Supp. 2d 744 (W.D. Pa. 2007)........................................................................................12

*Beard Research, Inc. v. Kates*,
   8 A.3d 573 (Del. Ch. 2010)..........................................................................................................9

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
   No. 15-cv-152-RGA, 2019 WL 3322322 (D. Del. July 24, 2019) .............................17, 18, 20

*Bos. Sci. Corp. v. Cordis Corp.*,
   838 F. Supp. 2d 259 (D. Del. 2012)...........................................................................................19

*CleanCut, LLC v. Rug Doctor, Inc.*,
   No. 2:08-cv-836, 2013 WL 441209 (D. Utah Feb. 5, 2013)......................................................18

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
   136 S. Ct. 1923 (2016)................................................................................................................14

*Harris Corp. v. Fed. Express Corp.*,
   No. 6:07-cv-1819-Orl-28KRS, 2011 WL 13141674 (M.D. Fla. Feb. 28, 2011)....................18

*Idenix Pharm. LLC v. Gilead Scis., Inc.*,
   271 F. Supp. 3d 694 (D. Del. 2017)...........................................................................................17

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*,
   383 F.3d 1337 (Fed. Cir. 2004) (*en banc*) ...............................................................................15

*Merch. Transaction Sys. v. Nelcela, Inc.*,
   No. CV-02-1954-PHX-MHM, 2010 WL 1337711 (D. Ariz. Apr. 2, 2010)..............................8

*Nox Med. EHF v. Natus Neurology, Inc.*,
   No. 15-709-RGA, 2018 WL 4062626 (D. Del. Aug. 27, 2018) ..................................17, 18, 20

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
   762 F. Supp. 2d 710 (D. Del. 2011)...........................................................................................17

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l*,
No. 08-309-LPS, 2019 WL 3290369 (D. Del. July 22, 2019)................................................17

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
875 F.3d 1369 (Fed. Cir. 2017)........................................................................................14

*Read Corp. v. Portec, Inc.*,
970 F.2d 816 (Fed. Cir. 1992)..........................................................................................19

*Roton Barrier, Inc. v. Stanley Works*,
79 F.3d 1112 (Fed. Cir. 1996)..........................................................................................11

*In re Seagate Tech., LLC*,
497 F.3d 1360 (Fed. Cir. 2007) (*en banc*) .......................................................................19

*SRI Int'l, Inc. v. Cisco Sys.*,
918 F.3d 1368 (Fed. Cir. 2019)........................................................................................15

*State Contr. & Eng'g Corp. v. Condotte Am., Inc.*,
346 F.3d 1057 (Fed. Cir. 2003)........................................................................................18

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
538 U.S. 408 (2003)...........................................................................................................7

*TruePosition Inc. v. Andrew Corp.*,
568 F. Supp. 2d 500 (D. Del. 2008).................................................................................15

*Vectura Ltd. v. GlaxoSmithKline LLC*,
No. 16-638-RGA, 2019 WL 4346502 (D. Del. Sept. 12, 2019)..................................15, 19, 20

*Veracode, Inc. v. Appthority, Inc.*,
137 F. Supp. 3d 17 (D. Mass. 2015) ...............................................................................18

*WCM Indus., Inc. v. IPS Corp.*,
721 F. App'x 959 (Fed. Cir. 2018) ..................................................................................19

*WMS Gaming Inc. v. Int'l Game Tech.*,
184 F.3d 1339 (Fed. Cir. 1999)........................................................................................18

**Statutes**

35 U.S.C. § 298.....................................................................................................................15

**Rules**

Rule 26(a)................................................................................................................................5

iii

AgroFresh's motion is based on a false narrative. AgroFresh simply ignores Defendants' commercially responsible actions taken both before and during this litigation. Under the facts of this case, Defendants respectfully submit that no enhancement is warranted.

## I.     Factual Background

Over two decades ago, researchers at N.C. State were granted a key patent (the Sisler patent) covering the use of 1-MCP for fruits and vegetables. Tr. (McCaskey) 197:7-19; DTXb-563. AgroFresh acquired the rights to the Sisler patent, giving it a monopoly on the U.S. 1-MCP market until 2014, when the patent expired. Tr. (McCaskey) 246:8-13; Tr. (Beaulieu) 481:21-482:4; Tr. (Harker) 809:15-24. As AgroFresh expected, once the Sisler patent expired, competition sought to enter the 1-MCP market. *See, e.g.*, DTXb-410 at 12, 30; DTXb-262 at 46. Decco had long considered its options for entering the 1-MCP space, Tr. (Girin) 742:2-16, 758:15-759:10, so with the use of 1-MCP no longer blocked, Decco prioritized filling that gap in its portfolio. PTXb-606. This approach for 1-MCP, waiting for patents to expire, fit Defendants' established post-patent business model. Tr. (Kaushik) 1030:18-1032:13.

In the spring of 2014, Decco hired a recruiter to look for someone who could lead the effort to find a path to market. Tr. (Girin) 742:17-743:1. Decco offered Dr. Lynn Oakes the job in September and hired him in October. Tr. (Girin) 743:2-13. Although Oakes had worked at Dow and AgroFresh, his non-compete obligations had expired. Tr. (Oakes) 669:14-670:11; PTXa-48 at ¶ 4. Soon thereafter, in what seemed like a fortunate encounter at the time, Oakes reconnected with Nazir Mir at AgroFresh's booth at an industry trade show, where Mir proposed he and Decco do business together. Tr. (Oakes) 669:3-13. Like AgroFresh, Decco opted to partner with Mir because he was an expert, *see* Tr. (Oakes) 545:9-14, 593:24-594:6, 674:4-23; D.I. 544 at ¶ 1, and he presented Decco with several potential 1-MCP options, *see* DTXb-679 at 5. Meanwhile, in late October 2014, at the invitation of AgroFresh's then-parent company Dow, UPL submitted an

unsuccessful bid for AgroFresh the company.  Tr. (Girin) 753:16-754:5, 757:24-758:4.  During the bid process, as is typical in early the stages of an acquisition with multiple potential buyers, UPL received only a "general overview" of AgroFresh's business, which contained "very little information" Decco did not know.  Tr. (Girin) 755:13-757:23; PTXb-484.

Although Decco understood Mir had a consulting agreement with AgroFresh, Decco did not seek the agreement because it knew such contracts are usually private,[1] it understood the Mir-AgroFresh consulting relationship was limited to RipeLock, and it had "plenty of good faith reasons" to believe it could proceed with him.  Tr. (Oakes) 589:17-591:24, 647:20-25, 673:12-22; Tr. (Girin) 724:17-21; D.I. 544 at ¶ 3.  For example, Mir told Decco he was not exclusive to AgroFresh,[2] and Decco knew he had other "commercial ventures" outside of AgroFresh.  Tr. (Oakes) 594:11-14, 611:24-612:16, 671:7-16, 673:23-674:3; PTXb-326 at DECCO-00087421; Tr. (Mir) 560:17-561:4.  Because Decco believed Mir had "no restrictions to compete in main MCP areas," PTXb-326 at DECCO-00087421, they moved forward with him but excluded RipeLock from their dealings with Mir.  Tr. (Oakes) 675:17-676:6; Tr. (Girin) 751:8-16; DTXb-491 at § 3.1.

In proceeding with Mir, Decco took every precaution a reasonable company would under the circumstances.  At Decco's request, Mir provided "clear assurances" both verbally and in writing that the technology he was bringing to Decco was "free and clear" and that he could work with Decco on a 1-MCP project.  Tr. (Girin) 744:3-20, 745:1-16; DTXb-677; Tr. 746:7-14; DTXb-680.  In the parties' Letter of Intent, Decco agreed to obtain a legal opinion for the "Right to Practice" Mir's technology "in view of [the '849 patent]," and to pay Mir $250,000 if the Right to Practice was favorable.  DTXb-680.  Decco received an opinion from a "reputable US law firm,"

---

[1] That belief proved accurate.  *See* PTXa-83 at ¶ 25; Tr. (Mir) 562:1-5.

[2] Mir's contract shows the agreement was exclusive to MAP + 1-MCP, which Mir understood meant it was limited to RipeLock,  *See* PTXa-83 at ¶ 2.2; Tr. (Mir) 556:17-558:11.

*see* PTXb-326 at DECCO-00087421, and paid Mir the $250,000.  Tr. (Girin) 749:4-8; DTXb-493

at § 4.1(i).  Oakes, with a Ph.D. in crop and soil sciences and over thirty years of experience with

chemicals, also analyzed whether TruPick would infringe the Daly patents and concluded it would

not.  *See* Tr. (Oakes) 696:8-697:2, 698:24-699:13; PTXa-168 at MIR_0138044-46.

On June 30, 2016, Decco and Mir formalized their partnership, entering into agreements

that created a 50-50 joint venture (Essentiv), granted Essentiv an exclusive license to the '216

patent technology, and once again confirmed that Mir had free and clear title to the technology.

Tr. (Girin) 749:22-751:16; DTXb-491; 747:4-748:14; DTXb-0493.  Mir also represented that he

would not improperly use or disclose any third-party information, Tr. (Girin) 751:17-752:19;

PTXa-71, obligations he complied with from Defendants' perspective.  Tr. (Oakes) 699:18-25; Tr.

(Girin) 752:20-753:3.  Because of Mir's consistent representations, Decco's CEO (Francois Girin)

felt comfortable about the ability to work with Mir, Tr. (Girin) 753:8-15, 768:6-11, and there was

"[n]ever a moment" Oakes questioned that belief either.  Tr. (Oakes) 594:15-20, 614:1-6.

In parallel to their negotiations on the joint venture, Decco and Mir worked to get TruPick

registered by the EPA.  D.I. 544 at ¶¶ 5, 9.  While that involved their own studies, Tr. (Oakes)

581:1-7, 600:5-19, they also relied on AgroFresh's safety data, DTXb-86.  To meet its legal

obligations, Tr. (Jordan) 1238:9-21, Decco offered to compensate AgroFresh for using its data.

DTXb-86; DTXb-88 at 9; Tr. (Jordan) 1235:3-23.  Notwithstanding AgroFresh's assertion that

TruPick was "basically free"[3] (D.I. 588, "Mot." at 5), Defendants invested considerable money in

TruPick, ultimately spending "close to $5m."  Tr. (Girin) 762:25-763:5.  This figure is consistent

---

[3] At trial, AgroFresh mischaracterized an email as showing Defendants got TruPick for "free" without conducting trials.  *See* PTXa-324; Tr. 148:10-22, 150:5-9, 153:12-16, 1390:21-1391:3.  It continues to do so.  *See* Mot. at 5.  This email refers not to Decco's TruPick registration but to the registration of one component—magnesium-formate MOF—as an inert ingredient.  PTXa-324; Tr. (Oakes) 702:2-703:17; *see also* Tr. 654:1-3, 655:13-19, 656:19-657:7.

with AgroFresh's expectation that there would be "low costs" for competition to enter the market. DTXb-410 at 11; *see also* Tr. (Mulhern) 1197:12-1201:23.

Given AgroFresh "creat[ed] obstacles" to delay Pace's 1-MCP registration (DTXb-673 at 1; DTXb-425 at 1)—and likely recognizing AgroFresh's significant competitive-intelligence efforts, *see* Tr. (Beaulieu) 514:14-22; DTXb-339 at 4-9; DTXb-340 at 5; DTXb-319; DTXb-396 at 15; DTXb-941—Decco logically tried to keep its 1-MCP product confidential in such a "highly competitive environment." Tr. (Girin) 761:12-21. But once TruPick was fit for launch, Decco did not hide it or the relationship with Mir; instead, it publicly announced the partnership and declared they had a "novel" technology—the "first gel formulation" in water soluble pouches. PTXa-73.

AgroFresh responded to the press release by accusing Mir of wrongdoing and threatening Decco. *See* Tr. (McCaskey) 234:19-24. Although AgroFresh showed Decco the Mir-AgroFresh agreements, it evidently did not anticipate on resolving the dispute amicably, as it filed a 44-page complaint the next day. Tr. (Girin) 738:16-739:9; D.I. 2. After carefully assessing its options, and with Mir's many warranties in hand, Defendants initiated a soft launch of TruPick. *See, e.g.*, Tr. (Girin) 740:4-22; Tr. (Kaushik) 1044:5-17. By then, SmartFresh prices had already been declining, in part to competition from Pace's Fysium product. *See, e.g.*, DTXb-952; DTXb-262 at 46; Tr. (Cassidy) 921:3-922:5. Decco only sought a small portion of business from its existing customer base, growers with which it had well-established relationships. Tr. (Mowry) 1048:21-1050:1, 1058:7-11; 1060:14-22; DTXb-974; DTXb-984. In approaching the market, Decco considered discounting, but settled on a matching program to not undercut prices. *See* Tr. (Oakes) 619:23-620:5; Tr. (Mowry) 1061:1-1063:7; Tr. (Kaushik) 1044:5-17; DTXb-976; DTXb-977; DTXb-978. Decco only made about $0.5m in U.S. sales in 2016, and it turned no profits. Tr. (Girin) 761:22-762:4, 763:6-13; DTXb-512.

TruPick was on the market for only a brief time.  On June 30, 2017, the Court concluded that the relevant portions of the Mir-AgroFresh agreements were "unambiguous" and that Mir did not own the '216 patent technology.  D.I. 97; D.I. 544 at ¶¶ 11-12.  Realizing for the first time they had been misinformed by Mir and that their view of the Mir-AgroFresh agreements was incorrect, Tr. (Girin) 740:23-741:3, 762:9-16, Defendants immediately tried to remedy the problem.  They sought to dissolve the joint venture with Mir and promptly pulled TruPick from the market, never to sell it again.  Tr. (Girin) 762:5-24, 763:6-10.  After Defendants stopped selling TruPick, AgroFresh amended its complaint to allege trade secret misappropriation.  D.I. 106.

## II.     Litigation Conduct

In the guise of "facts," AgroFresh asserts that Defendants committed litigation misconduct by (1) "brazenly attempt[ing] to minimize Girin's role, stating that he was 'hands off' with respect to the facts of the case," (2) "attempt[ing] to hide Mr. Kaushik's role, stating that he was 'very, very far removed from the facts and circumstances of this case,'" and (3) "falsely claim[ing]" to have left the 1-MCP market.  Mot. at 6-7.  None of these arguments have merit.

The suggestion that Defendants tried to minimize or "hide" Girin and Kaushik is belied by the record.  Both were on Defendants' earliest Rule 26(a) disclosures for Decco and UPL, respectively (*see* Ex. 1; Ex. 2), both were document custodians, both were 30(b)(6) designees, and both testified at trial.  AgroFresh's arguments are based on mischaracterizations of oral arguments concerning whether Girin's deposition was necessary in Phase I (where the counts were only against Mir) and the appropriate location of Kaushik's deposition.[4]  And even if Defendants should have characterized things differently, there is no indication of bad faith.

_____

[4] Defendants stated Girin was "hands-off" in managing the Mir relationship, not "the facts of the case."  *See* Mot., Ex. 4 at 10:6-21.  They did not dispute he had relevant knowledge; they merely contended his knowledge *on the Phase-I issues* was not unique and that AgroFresh failed to show a special need for a Phase-I deposition of an apex witness.  *See id.* at 7:7-8, 11:7-12:17.

AgroFresh also misinterprets Defendants' testimony regarding their discontinuation of TruPick.  The record is clear that Defendants' last sales were in 2016 and that Defendants ceased even offering TruPick in 2017 once the Court determined AgroFresh owned the '216 patent.  *See, e.g.*, Tr. (Girin) 762:5-16, 763:6-10.  AgroFresh's own witnesses acknowledged as much.  Tr. (Thomas) 944:23-945:6, 1022:19-1023:4; Tr. (Cassidy) 910:20-911:5.  Despite the unambiguous record on this point, AgroFresh contends Decco tried to hide that it later sold Hazel's 1-MCP product because Tim Mowry arguably testified that Decco did not sell any 1-MCP products after 2016.  Mot. at 12-13.  But the record shows he merely stated "No" to one inelegantly worded question and another that immediately followed a review of TruPick sales.  *See* Tr. (Mowry) 1059:12-14; DTXb-512; 1066:13-15.   Given the context of the questions and the case, Mowry likely answered both in reference to TruPick or momentarily forgot about Hazel.[5]  More important, if AgroFresh believed Defendants were misleading the jury, it could have cross-examined Defendants' witnesses regarding Decco's relationship with Hazel, and Defendants knew that. After all, AgroFresh sought discovery on the issue and Decco provided it, producing documents (including the Decco-Hazel contract) and a 30(b)(6) witness on topics related to Hazel.  *See* Ex. 3; Ex. 4 at 10-11, 13; Ex. 5 at 2, 5; Ex. 6 at 161:4-163:15.  To forgo that opportunity at trial—which would have enabled Mowry to clarify any potential confusion—and then claim after the fact that Defendants somehow intended to mislead the jury is improper.

---

With Kaushik, AgroFresh omits a critical part of Defendants' description to the Court—that he was far removed "as far as day-to-day" is concerned.  Mot., Ex. 2 at 42:18-23.  AgroFresh also omitted the key phrase "day-to-day" when questioning Kaushik.  Mot., Ex. 3 at 231:24-232:19.

[5] AgroFresh also contends that Defendants again misstated that Decco did not sell any 1-MCP during closing.  Mot. at 13.  The cited statement, however, merely refers to the 1-MCP product launched in 2016 that Decco had on the market for one growing season—i.e., TruPick.

To the extent litigation misconduct occurred, it was by AgroFresh.[6]  Relevant here, at the

eleventh hour (D.I. 489, Ex. 11 at 2-3), AgroFresh decided to seek over $250m based on an

undisclosed unjust-enrichment theory, one it improperly advanced.  After submitting an irrelevant

expert opinion regarding $223m in costs (D.I. 448 at 4; D.I. 566), AgroFresh just got more

aggressive.  It replaced the expert with a lay witness, who proffered an even *bigger* number

($261m) despite being uninformed on AgroFresh's trade secrets and the specific costs of those

actually asserted.  Tr. (Cassidy) 861:16-862:8, 900:4-13, 906:3-21, 909:22-910:5.  Worse yet, he

admitted that, of the $261m in costs, $181m did not relate to the development of the trade secrets.

Tr. (Cassidy) 897:21-25; Tr. (Mulhern) 1202:6-10.  With no basis to do so, AgroFresh still asked

the jury to award all $261m.  Tr. 1345:18-25, 1348:2-7, 1391:1-3.  AgroFresh also told the jury it

"would be fair and just" to award up to 9x in punitives (Tr. 1391:15-19), knowing 1:1 is likely the

limit where, as here, the compensatory damages (if any) are substantial.  *See State Farm Mut. Auto.*

*Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003).  Now, even though the jury awarded punitives for

tort claims stemming from the same operative facts—working with Mir and commercializing

TruPick—AgroFresh is back at the well for more.  Its overreaching should be rejected.

---

[6]  For example, it disregarded the Court's orders in pursuing an ever-changing trade secrets case.  *See, e.g.*, D.I. 491 at 1-4; D.I. 559 at 2.  While almost none of the "trade secrets" AgroFresh presented to the jury were properly identified in its Court-ordered disclosures (*see* D.I. 336, Exs. A, B), more problematic was its misleading response to the Court's order that AgroFresh identify with "reasonable particularity" the trade secrets remaining for trial.  D.I. 503; D.I. 505.  AgroFresh identified a smokescreen of "trade secrets"—including new and ambiguous ones—that it apparently never intended to present at trial (e.g., its "Accumulated Knowledge" supported by 23 "studies" it did not even put on its exhibit list).  *Cf.* D.I. 505 *with* D.I. 578; *see also* D.I. 506.

III.     **Argument**[7]

A.     **The Court should deny AgroFresh's request to treble the compensatory award for misappropriation of trade secrets**

Even though courts have given jury findings weight in determining whether exemplary damages are appropriate, the cases AgroFresh cites show courts usually choose to independently confirm the jury's conclusion. *See Merch. Transaction Sys. v. Nelcela, Inc.*, No. CV-02-1954-PHX-MHM, 2010 WL 1337711, at *9 (D. Ariz. Apr. 2, 2010) ("The Court heard the same evidence and finds that the jury's conclusion was warranted."); *Astro-Med, Inc. v. Plant*, No. 06-533 ML, 2008 WL 2883769, at *3 (D.R.I. July 25, 2008) ("In concurrence with the jury's finding, this Court finds that the misappropriation was unquestionably willful and malicious."). So despite the jury's finding, the Court should deny AgroFresh's request, as an accurate review of the record reveals exemplary damages are not warranted here.

1.     **Defendants were not conscious of, or recklessly indifferent to, injury to AgroFresh resulting from misappropriation**

The record does not reveal Defendants intended to injure AgroFresh by misappropriation or were recklessly indifferent to AgroFresh's trade-secret rights.   AgroFresh relies on (1) "contemporaneous writings," (2) the Mir-AgroFresh agreements, and (3) "[s]pecific evidence" of misappropriation, but these arguments are flawed.  Regarding the first, the cited evidence does not show an intent "to injure AgroFresh" by misappropriating its trade secrets.  Mot. at 10.  For example, PTXa-324 relates to a regulatory milestone (EPA approval of Mg-formate as an inert

---

[7] Defendants disagree with many aspects of the jury's verdict.  D.I. 573.  In Defendants' view, AgroFresh identified no trade secret and, even if it did, there was no misappropriation, much less willful and malicious misappropriation.  Similarly, Defendants believe the '849 patent is invalid (on multiple grounds) and not infringed.  If the Court agrees with Defendants even in part, that may moot AgroFresh's motion.  Accordingly, the Court should decide this motion and Defendants' forthcoming renewed motion for JMOL concurrently, or delay deciding AgroFresh's request for enhanced damages until ruling on Defendants' JMOL motion.

ingredient), while the statements in PTXa-31, PTXb-305, and PTXb-320 relate to the launch and/or sale of TruPick.  PTXa-77 pertains to Mir's consulting arrangement.  PTXb-321 shows Decco sought to hire *former* AgroFresh personnel and seasonal workers with prior 1-MCP experience.  And PTXa-291 reveals that Oakes was excited about TruPick and wanted it to quickly be profitable.  *See* Tr. (Oakes) 658:22-25.  None of the cited statements are tied to AgroFresh's four "trade secrets."  So even if this evidence showed malice towards AgroFresh, "there is no evidence connecting this malice to Defendants' misappropriation."  *Beard Research, Inc. v. Kates*, 8 A.3d 573, 600-01 (Del. Ch. 2010) (concluding award of exemplary damages was not justified).

AgroFresh also argues that launching TruPick after receiving the "clear and unambiguous" Mir-AgroFresh agreements is "the greatest confirmation" of willful and malicious misappropriation.  Mot. at 10-11.  This argument is a red herring, for it ignores the Court did not determine the agreements were "clear and unambiguous" until June 30, 2017, long *after* TruPick's launch.  D.I. 97; D.I. 544 at ¶¶ 11-12.  It was not until then that Defendants realized they had been misinformed by Mir and that their view of the Mir-AgroFresh agreements was incorrect.[8]  Tr. (Girin) 740:23-741:3, 762:9-16.  More important, the Phase-I decision related to who owned the '216 patent technology, and the jury determined that the information in the '216 patent was *not* a trade secret.  D.I. 578.  So even assuming Defendants should not have launched TruPick, that decision cannot show willful or malicious *trade secret misappropriation*.

Nor does the "[s]pecific evidence" AgroFresh cites show willful and malicious misappropriation.  AgroFresh first mischaracterizes DTXb-556 to suggest Defendants "procured an AgroFresh gas generator and used it for training TruPick applicators."  Mot. at 11.  But as

---

[8] That day was also the first time Defendants learned that Mir had fraudulently induced AgroFresh into entering the Third Extension—an agreement that Mir thought would explicitly permit him to pursue his activities with Decco.  *See* D.I. 97 at 14-15, 34 & n.2.

AgroFresh's brief makes clear (Mot. at 3), this document merely shows Dr. Beaudry used a *photo* of AgroFresh's gas generator in a presentation to Decco.[9]  Tr. (Beaudry) 1090:1-8, 1112:7-17. Neither he nor Decco "procured" an actual generator, and Dr. Beaudry testified that he was an invited guest when he took the photo in 2002.  Tr. (Beaudry) 1113:23-1114:21.  And given that the alleged trade secret in the gas generator (the "air infusion mechanism") is shielded from public view, the photo itself shows nothing secret.  Tr. (Beaulieu) 453:19-25; DTXb-556 at 4.

Next, as with the gas generator, there is no evidence Defendants obtained an actual AgroFresh gas sampler, as opposed to taking photos of one in plain view at a mutual customer site. That Dr. Beaulieu did not personally authorize Defendants to obtain an AgroFresh gas sampler (Tr. 458:22-459:5) does not indicate they ever obtained one or even had "unauthorized access" to take a photo of one.  Mot. at 11.  Similarly, the email showing Mir understood AgroFresh's air-sampling procedure (which used "GC/FID," a long-known process, *see* DTXb-1361 at 164) does not show Decco incorporated any "secret" AgroFresh technique, much less did so willfully and maliciously.  Mot. at 11; PTXa-180.  If Defendants had intended to steal, Oakes would not have suggested that they "explore [non-GC] options" and Mir would not have been "brainstorming" ways Decco could sample—he would have just used AgroFresh's technique.  *See* PTXa-180. Defendants' reliance on Mir's technical expertise also does not, as AgroFresh argues (Mot. at 11), demonstrate willfulness or maliciousness; consultants are paid to provide expertise.  Finally, the evidence does not show Defendants "improperly obtained" or used the AgroFresh dosage chart in PTXa-54.  Mot. at 11.  While Oakes said it was "useful in some respects," that differs from saying he used it.  Tr. Oakes) 641:24-642:1.  In fact, Oakes testified he did not know it was marked

---

[9] Dr. Beaudry presented to Decco employees (not "TruPick applicators") and he provided background information (not "training").  *Cf.* Tr. (Beaudry) 1090:1-8, 1112:7-17 *with* Mot. at 11.

confidential until his deposition, he prepared his own dosage chart for TruPick months before, and he "didn't care to use" the AgroFresh chart.[10]  Tr. (Oakes) 635:17-636:22, 640:20-643:2.

This "[s]pecific evidence" is, at best, circumstantial proof of misappropriation—*none* of it shows willful and malicious behavior warranting punishment.  A case AgroFresh relies on is instructive here.  In *Advanced Fluid Sys. v. Huber*, the court found that defendant Huber, who was employed by AFS, worked tirelessly—using AFS's trade secrets—to help AFS's competitor Livingston.  *See* 295 F. Supp. 3d 467, 493-94 (M.D. Pa. 2018).  For their part, the Livingston defendants gave Huber access to Livingston's Dropbox, established a VPN on Huber's AFS computer, provided him a Livingston email address, and eagerly accepted AFS's confidential documents from him for nearly a year.  *Id.* at 484-85.  The court concluded there was "[n]o doubt" the Livingston defendants "knew their actions were wrong" and had "no justification" for their conduct.  *Id.* at 494.  But because "their motives were purely competitive," the court deemed they did not act willfully or maliciously and declined to award exemplary damages.  *Id.*

While Defendants' conduct pales in comparison, they too were motivated by competition (not malice) when they embarked on a plan to enter the 1-MCP market.  As in *Advanced Fluid*, an award of enhanced damages is not supportable here.  *See also Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1120-21 (Fed. Cir. 1996) (concluding court abused its discretion in awarding exemplary damages where defendant's actions were "motivated by competition," not malice).

## 2. AgroFresh failed to show misappropriation that occurred for any meaningful duration

AgroFresh points to no evidence of misappropriation for any meaningful period.  Because the evidence of misappropriation is so thin, AgroFresh instead relies on irrelevant events to portray a false timeline.  Mot. at 9.  AgroFresh begins with UPL's bid to buy AgroFresh in 2014 but fails

---

[10] AgroFresh dosage charts are also public.  *See* DTXb-1361 at 11-12; DTXb-573 at 8-9.

to explain why it is relevant or how it shows misappropriation. None of the bid documents were identified as trade secrets in discovery, and AgroFresh presented nothing to the jury showing any of its asserted trade secrets was shared during the bid process. Girin also confirmed UPL received only a "general overview" of AgroFresh's business, which contained "very little information" Decco did not know. Tr. (Girin) 755:13-757:23; PTXb-484. Ignoring the record, AgroFresh argued that, through the bid process, UPL "learned all of our trade secret and intellectual property, architecture, they got it all" and "they used it" and then hired Oakes and Mir. Tr. 1320:21-1321:7. While that mischaracterization may have influenced the jury, it should not persuade the Court here.

Even accepting AgroFresh's view of the evidence regarding the four trade secrets (Mot. at 11), there is no indication that any misappropriation was more than a one-time occurrence. AgroFresh does not point to a treatment protocol, treatment parameter, dosage chart, gas sampler, or gas generator Decco actually used with TruPick as evidence of trade secret theft, indicating that TruPick's time on the market should not count as a period of misappropriation.[11] And now that the jury trial is over, AgroFresh speculates that Decco's misappropriation "likely continued" because it distributed Hazel's product while "armed with" AgroFresh's trade secrets. Mot. at 7, 9. However, AgroFresh had its opportunity to present this position to the jury and chose not to, so it should not benefit now with enhanced damages based on unfounded and irrelevant insinuations.

### 3.    Defendants never engaged in a cover-up

The record shows no cover-up, either before or during the litigation. As noted, AgroFresh's assertions of litigation misconduct lack merit. *See supra* § II. And the other evidence AgroFresh

---

[11] AgroFresh cases do not help its position. Mot. at 9. In *Advanced Fluid*, the court found defendant Huber's actions supported enhancement where he "siphoned" trade secrets to another defendant "for almost an entire year." 295 F. Supp. 3d at 493. And in *B&B Microscopes v. Armgogida*, defendant spent "months" misleading his employer, using its "name, reputation, contacts and resources" to develop a secret before resigning and taking it with him. 532 F. Supp. 2d 744, 756-57 (W.D. Pa. 2007). AgroFresh identifies no such continuous misappropriation here.

proffered similarly fails to show a cover-up. Mot. at 12. AgroFresh criticizes Oakes for not asking to see the Mir-AgroFresh agreement, but the evidence proves Oakes correctly presumed the agreement was confidential and that Oakes had good-faith reasons to believe Mir was free to work with Decco. *See supra* § I at 2. While Decco tried to keep its relationship with Mir and the TruPick product confidential, that logically stemmed in part from the "highly competitive" market, Tr. (Girin) 761:12-21, one where AgroFresh has a track record of trying to block competition, DTXb-673 at 1; DTXb-425 at 1. Once TruPick was ready to launch, though, Decco did not hide its product or its ties to Mir, publicly announcing both in a press release. PTXa-73.

Contrary to AgroFresh's characterization that Decco was worried about its "liability exposure," the cited emails tell another story. Mot. at 12. Because Mir was not bound to let Decco use his alternative 1-MCP technology until the joint venture was formed, Mir was free to "walk away." PTXa-26. That possibility put Decco "at risk" of having no 1-MCP product if AgroFresh learned of Mir's alternative technology and persuaded him with "significant financial incentives" to bring it to AgroFresh. *See* PTXa-23; PTXa-26; Tr. (Oakes) 646:7-17. As for the concern about Mir's exposure, Oakes explained that he "want[ed] to be fair to Nazir" that if the Decco-Mir joint venture did not materialize, Mir would still have options with AgroFresh. *See* PTXa-24. Those concerns do not show an attempt to conceal misappropriation.[12]

### 4.   Defendants need not be punished to be deterred

Defendants tried to avoid violating AgroFresh's intellectual-property rights and promptly pulled TruPick once the Court ruled that the technology they licensed belonged to AgroFresh.

---

[12] Because Decco engaged in no cover-up, the cases AgroFresh relies on are irrelevant for this point. Mot. at 13. But even if the Court construes Defendants' conduct differently, the cited cases are still distinguishable because they involved much worse behavior, including destroying evidence (*Advanced Fluid*, *Hallmark Cards*, *Paz Sys.*), creating false evidence (*Learning Curve*), and concealing misconduct after settling with plaintiff on the same issues years earlier (*Acrylicon*).

Nothing AgroFresh cites indicates otherwise. The *Hazel* litigation is a patent-infringement case involving a separate product, Mot., Ex. 5 at 301:16-302:4, 303:15-19, one Defendants understood to be proprietary and different from SmartFresh, Ex. 3 at ¶¶ 2(b), 7.1(b). AgroFresh is also wrong that Defendants are "distributing" the Hazel product. Mot. at 13. Decco stopped distributing product for Hazel and made no sales of the Hazel product in the 2019 season—a fact AgroFresh undoubtedly knew before filing its brief. And although AgroFresh suggests the "verdict did not stop UPL and Decco," it points to nothing suggesting Defendants intend to disregard the verdict. Mot. at 14. The press release does not say as much, and it should be no surprise that a non-litigious company like UPL would disagree with and challenge the verdict against it. *See* Mot., Ex. 1.

On balance, even if the record supported the jury's finding of willful and malicious misappropriation, it does not show behavior warranting punishment beyond some appropriate measure of punitive damages for AgroFresh's tort claims. Accordingly, as courts often do, this Court should decline to award exemplary damages.

## B. The Court should deny AgroFresh's request to treble the compensatory award for patent infringement

An award of enhanced damages does not necessarily flow from a willfulness finding. *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932-34 (2016); *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1382 (Fed. Cir. 2017). In determining whether enhanced damages are appropriate, courts should consider the overall circumstances of the case. *Halo*, 136 S. Ct. at 1933. Although this Court is "not required to discuss the *Read* factors," as shown below, consideration of those nine factors establishes that "the present case was a 'garden-variety' hard-fought patent case" and that Defendants' conduct was not "sufficiently egregious to warrant enhanced damages." *Presidio*, 875 F.3d at 1382; *Halo*, 136 S. Ct. at 1932 ("[E]nhanced damage awards . . . are *not* to be meted out in a typical infringement case.") (Emphasis added).

14

### 1.    Defendants did not deliberately copy the '849 patent invention

At trial, AgroFresh did not advance a literal-infringement theory, Tr. 1299:23-1300:1, and it contended that TruPick was based on the '216 patent (Tr. 233:3-234:1) and that the '216 patent is novel and a trade secret. *See, e.g.*, Tr. 1341:25-1344:3, Tr. 1389:18-24; Mot. at 11, n.2 (noting TruPick was marked with the '216 patent). To now suggest TruPick is a "copycat" of the '849 patent contradicts its positions at trial and is improper. The record also points away from copying. Defendants turned to Mir because he had independently developed (Tr. (Zettler) 1071:9-24) an alternative, patentable 1-MCP technology that would enable Decco to avoid AgroFresh's patents. *See* PTXb-326 at DECCO-00087419, 421; PTXa-449 (citing '849 patent). Lest there be any doubt on this point, SmartFresh uses alpha-cyclodextrin and comes in powder form, Tr. (McCaskey) 195:6-9; Tr. (Beaulieu) 448:3-5, whereas TruPick incorporated a MOF and was a gel, Tr. (Dinca) 1174:13-17; PTXa-73; Tr. (Oakes) 586:1-6. This factor disfavors enhancement. *TruePosition Inc. v. Andrew Corp.*, 568 F. Supp. 2d 500, 527 (D. Del. 2008) (finding factor favored no enhanced damages where defendant did its own R&D for accused product); *Vectura Ltd. v. GlaxoSmithKline LLC*, No. 16-638-RGA, 2019 WL 4346502, at *3 (D. Del. Sept. 12, 2019) (weighing against enhanced damages where evidence pointed away from deliberate copying).

### 2.    Defendants had a good-faith belief of their right to practice

AgroFresh's arguments are both legally and factually incorrect. Regarding the former, it cannot be inferred that Decco received an unfavorable right-to-practice opinion from Defendants' decision not to produce it. *See Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1341 (Fed. Cir. 2004) (*en banc*); *SRI Int'l, Inc. v. Cisco Sys.*, 918 F.3d 1368, 1381 (Fed. Cir. 2019) ("Cisco's decision not to seek an advice-of-counsel defense is legally irrelevant under 35 U.S.C. § 298."). On the facts, as AgroFresh acknowledges (Mot. at 16), Defendants investigated the issue and obtained an opinion of counsel. The jury saw that, under the Letter of

Intent, Decco was to pay Mir $250,000 if the "Right to Practice" assessment was favorable, and that Decco did pay Mir that money. *See* DTXb-680; Tr. (Girin) 749:4-8; DTXb-493 at § 4.1(i). The evidence also showed that a "reputable US law firm" confirmed Mir's patents "do not infringe on AF." *See* PTXb-326 at DECCO-00087421. The jury could not reasonably infer from the evidence that Decco received an unfavorable opinion. Oakes also performed his own analysis and concluded TruPick did not infringe. *See* Tr. (Oakes) 696:8-697:2, 698:24-699:13; PTXa-168 at MIR_0138044-46. And the record is replete with other evidence indicating Decco believed TruPick *not* equivalent to the technology in the '849 patent. PTXb-321 at DECCO-00087471 (showing strategy to license "non-infringing technology"); PTXb-326 at DECCO-00087419, 421 (pursuing "alternative MCP technology than the one patented by AF"); PTXa-73 ("novel" technology); PTXa-142 ("novel carrier"). This factor does not support enhancement.

### 3.     Defendants' litigation behavior does not favor enhancement

As noted, Defendants did not hide Girin's involvement. *See supra* § II at 5. Defendants also did not try to "hide its infringement" with the Sisler patent. Mot. at 17. Proffering facts relating to its expiration is neither misconduct nor deceitful. Contrary to AgroFresh's argument, expiration of the Sisler patent *did* open the market for other entrants, like Pace. *See* DTXb-288 at 14. AgroFresh's own documents and witnesses confirmed that AgroFresh expected the patent's expiration to usher in competition. *See, e.g.*, Tr. (Harker) 810:2-16, 815:2-10; DTXb-952; Tr. (Cassidy) 915:1-7; DTXb-410 at 12, 30; DTXb-262 at 46. And the assertion that Defendants acted improperly by asserting "12 invalidity arguments during discovery" but only anticipation and indefiniteness at trial is equally baseless. Mot. at 17. In a timed trial like this one, Defendants' decision to narrow their positions was reasonable and certainly not done in bad faith.[13]

---

[13] During discovery, the Court denied as premature AgroFresh's motion to limit Defendants' contentions. *See* Ex. 7 at 82:7-92:22; D.I. 180 at 3-4. Defendants had offered to

AgroFresh's argument is also hypocritical given it originally asserted multiple claims from two patents but only pursued one claim from one patent at trial. Mot., Ex. 6 at 2; D.I. 560. Narrowing issues for trial should be endorsed by the Court, not punished. This factor does not favor enhancement. *See Nox Med. EHF v. Natus Neurology, Inc.*, No. 15-709-RGA, 2018 WL 4062626, at *4 (D. Del. Aug. 27, 2018) (finding factor neutral and rejecting argument that defendant tried to spend plaintiff under table); *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 15-cv-152-RGA, 2019 WL 3322322, at *8, *10-11 (D. Del. July 24, 2019) (weighing against enhancement where protective-order violation was not done in bad faith); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 762 F. Supp. 2d 710, 721-22 (D. Del. 2011) (finding factor neutral where record did not reveal "flagrant behavior").

### 4.      Defendants' size and financial condition do not merit weight

This factor often weighs *against* enhancement where the other *Read* factors strongly support it but the infringer is "in such perilous financial condition" that such an award might end its business. *Idenix Pharm. LLC v. Gilead Scis., Inc.*, 271 F. Supp. 3d 694, 701 (D. Del. 2017). Although Defendants may be financially healthy, their condition does not provide a reason to enhance damages. This factor is neutral. *Id.*; *Power Integrations, Inc. v. Fairchild Semiconductor Int'l*, No. 08-309-LPS, 2019 WL 3290369, at *9 (D. Del. July 22, 2019).

### 5.      AgroFresh wrongly contends that this case "was not close"

AgroFresh did not seek summary judgment of infringement, it only asserted one claim at trial, and it did not even pursue a literal-infringement theory. On the other hand, Defendants had many sound invalidity defenses based on obviousness, indefiniteness, and anticipation. *See* Mot., Ex. 6 at 4-9, 18-31. They even moved for summary judgment of invalidity, albeit unsuccessfully.

---

narrow after *Markman* (D.I. 182 at 4) and did. If AgroFresh believed Defendants' narrowed number of positions was still too high, it should have re-raised the issue. *See* Ex. 7:92:13-93:14.

D.I. 505 at 5-6.  Dr. Dinca's testimony shows Defendants had a solid non-infringement position and that the scope of claim 1 was indefinite.  *See* Tr. (Dinca) 1170:25-1175:13, 1179:10-1180:20. While AgroFresh argues that Defendants "ignored" Dr. Walton's testimony that "MOFs are equivalent to zeolites" (Mot. at 17-18), it overlooks that she also testified zeolites *do not* have a lock and key structure, as required by claim 1.  Tr. (Walton) 361:20-23; D.I. 375 at 1.  Not only was Dr. Dinca confused by Dr. Walton's testimony, Tr. (Dinca) 1180:2-7, but AgroFresh's other technical expert also disagreed with it, Tr. (Thompson) 1259:5-1260:1.

AgroFresh likely confused the jury further when it asserted that a skilled artisan would not have considered the *Janz* reference because of its field of endeavor, Tr. (Thompson) 1246:5-21, even though that is irrelevant for anticipation.  *State Contr. & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1068 (Fed. Cir. 2003).  The evidence shows *Janz* discloses each element of claim 1. DTXb-0562 at 21:50-51, 22:8-15; Tr. (Thompson) 1260:3-1261:10; Tr. (Dinca) 1177:23-1179:9. Although the jury sided with AgroFresh, the record does not indicate a one-sided case.  Factor five weighs against enhancement.  *See Bio-Rad Labs.*, 2019 WL 3322322, at *8 (disfavoring enhancement where plaintiff only prevailed on DoE theory); *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1354-55 (Fed. Cir. 1999) ("avoidance of literal infringement" should factor into willfulness determination); *Nox Med.*, 2018 WL 4062626, at *5 (weighing against enhancement where no claim element "nakedly absent" from prior art).

### 6.    The duration of infringement does not favor enhancement

Courts have taken varying views on this factor, with some considering infringement starting from "the date of direct notice of infringement" and others considering only whether it continued after "a judicial finding of infringement."  *Veracode, Inc. v. Appthority, Inc.*, 137 F. Supp. 3d 17, 86 n.47 (D. Mass. 2015); *Harris Corp. v. Fed. Express Corp.*, No. 6:07-cv-1819-Orl-28KRS, 2011 WL 13141674, at *7 (M.D. Fla. Feb. 28, 2011); *CleanCut, LLC v. Rug Doctor, Inc.*,

No. 2:08-cv-836, 2013 WL 441209, at *3 (D. Utah Feb. 4, 2013).  By any measure, this factor does not favor enhancement.  If the Court takes the latter view, it clearly disfavors enhancement because Defendants voluntarily pulled TruPick from the market over two years *before* the jury's finding of infringement.  Tr. (Girin) 762:5-16; Tr. (Thomas) 944:23-945:6.  Even under the alternative approach, because TruPick was on the market for less than a year after the complaint was filed, this factor is at worst neutral.[14]  *See Bos. Sci. Corp. v. Cordis Corp.*, 838 F. Supp. 2d 259, 280 (D. Del. 2012) (finding 2.5 years neutral).

### 7.    Defendants took prompt and effective remedial action

In *Read*, the Federal Circuit noted that the decision to "voluntarily cease[]" sales of infringing products during the litigation can mitigate against enhancement.  *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992) (citation omitted); *see also WCM Indus., Inc. v. IPS Corp.*, 721 F. App'x 959, 973 (Fed. Cir. 2018) (noting factor may weigh slightly against enhancement where infringer took *ineffective* remedial action).  Here, without being ordered to do so, and before the patent-infringement phase even began, Defendants promptly ceased selling TruPick and sought dissolution of Essentiv when they learned AgroFresh owned the '216 patent.  Tr. (Girin) 762:5-24; Tr. (Thomas) 944:23-945:6.  But even had Defendants taken no remedial action, "given the closeness of the case, and the fact that the jury's verdict has compensated [AgroFresh] for Defendants' post-litigation infringement," this factor should at worse "be neutral." *Vectura*, 2019 WL 4346502, at *5.  AgroFresh's argument that Defendants took no remedial action because, one year after pulling TruPick, they "started selling another infringing product from Hazel" is

---

[14] AgroFresh's arguments about tortious interference and the *Hazel* litigation are irrelevant to whether the duration of Defendants' infringement favors enhancement. Mot. at 18.  In addition, AgroFresh acknowledges TruPick launched *after* AgroFresh filed its complaint. Mot. 10-11. AgroFresh's failure to seek a preliminary injunction indicates it should not be awarded enhanced damages. *In re Seagate Tech., LLC*, 497 F.3d 1360, 1374 (Fed. Cir. 2007) (*en banc*).

misguided given the Hazel product is different from TruPick and SmartFresh, and there has been no determination of infringement in the *Hazel* case.

### 8. Defendants were not motivated to harm AgroFresh

AgroFresh cites nothing indicating Defendants intended to harm AgroFresh by infringing the '849 patent. The technology Defendants were accused of "taking" was the '216 patent, not the '849 patent. Latching on to internal proposals, AgroFresh also continues to mischaracterize Defendants' commercial efforts. Mot. at 19. The evidence, however, shows that when selling TruPick, Decco employed a matching program aimed at *not* undercutting prices and sought to sell TruPick to its existing customer base. *See* Tr. (Oakes) 619:23-620:5; Tr. (Mowry) 1048:21-1050:1, 1058:7-11; 1060:14-22, 1061:1-1063:7; DTXb-974; Tr. (Kaushik) 1044:5-17. Even if this conduct harmed AgroFresh economically, that harm was incidental to Defendants' commercial efforts and therefore does not support enhanced damages. *Nox Med.*, 2018 WL 4062626, at *6; *Bio-Rad Labs.*, 2019 WL 3322322, at *10.

### 9. Defendants did not attempt to conceal their infringement

As noted (*see supra* § III.A.3), AgroFresh cites nothing establishing an effort to conceal any misconduct, let alone *infringement*. Mot. at 19. Given Defendants publicly announced and openly sold TruPick (PTXa-73), this factor disfavors enhancement. *See Vectura* 2019 WL 4346502, at *5 (openly selling weighs against enhancement); *Bio-Rad Labs.*, 2019 WL 3322322, at *10 (same); *Nox Med.*, 2018 WL 4062626, at *6 (same).

Because AgroFresh failed to seek a preliminary injunction and the *Read* factors tip heavily in Defendants' favor, enhanced damages are not warranted.

## IV. Conclusion

For the foregoing reasons, Defendants respectfully request that the Court deny AgroFresh's request for enhanced damages.

*OF COUNSEL*

Gerald F. Ivey
John M. Williamson
Anand K. Sharma
Rajeev Gupta
Maximilienne Giannelli
Karthik Kumar
Daniel F. Roland
FINNEGAN, HENDERSON, FARABOW
GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001
(202) 408-4000
gerald.ivey@finnegan.com
john.williamson@finnegan.com
anand.sharma@finnegan.com
raj.gupta@finnegan.com
max.giannelli@finnegan.com
karthik.kumar@finnegan.com
daniel.roland@finnegan.com

Dated: November 22, 2019

*/s/ Frederick L. Cottrell, III*
Frederick L. Cottrell, III (#2555)
Jeffrey L. Moyer (#3309)
Nicole K. Pedi (#6236)
RICHARDS, LAYTON, & FINGER
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Cottrell@rlf.com
Moyer@rlf.com
Pedi@rlf.com

*Attorneys for Defendants*

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AGROFRESH INC., | |
| Plaintiff, | |
| v. | C.A. No. 16-662-SLR |
| MIRTECH, INC., NAZIR MIR, ESSENTIV LLC, DECCO U.S. POSTHARVEST, INC., and CEREXAGRI, INC. d/b/a DECCO POST-HARVEST, | |
| Defendants. | |

**INITIAL DISCLOSURES PURSUANT TO FED. R. CIV. P. 26(a)(1) OF DEFENDANTS
DECCO U.S. POST-HARVEST, INC AND CEREXAGRI, INC.**

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure and the Court's Scheduling Order of October 12, 2016, Defendants Decco U.S. Post-Harvest, Inc. ("Decco") and Cerexagri, Inc., ("Cerexagri") hereby make the following initial disclosures based upon information reasonably available to Decco and Cerexagri at the present time regarding Phase 1 of this proceeding, namely the liability claims of Counts I and IV of the Complaint.

As an initial matter, Cerexagri is a non-operating entity, with no information relevant to the claims or defenses of Phase 1.

Decco and Cerexagri reserve the right to supplement or modify these disclosures in general, and in particular relating to the remaining Counts at the appropriate time. *See* D.I. No. 26 (Granting Joint Motion to Bifurcate and Expedite Proceedings); D.I. No. 18. By making these disclosures related to Counts I and IV, Decco does not represent that it is identifying every document, tangible thing, or witness possibly relevant to this lawsuit. These disclosures represent a good faith effort to identify discoverable information Decco currently reasonably believes may be used to support its claims or defenses as required by Fed. R. Civ. P. 26(a)(1).

These disclosures do not include information that may be used solely for impeachment purposes.

Decco's disclosures regarding Counts I and IV are made without waiving, in any way: (1) any claim of privilege or work product; (2) the right to object on the grounds of competency, relevancy and materiality, hearsay, or any other proper ground, to the use of any such information, for any purpose, in whole or in part, in any subsequent proceeding in this action or any other action; and (3) the right to object on any and all grounds, at any time, to any other discovery request or proceeding involving or relating to the subject matter of these disclosures.

### A.    Identification of Individuals Likely to Have Discoverable Information Pursuant to Rule 26(a)(1)(A)(i)

Cerexagri is a non-operating entity, with no information relevant to the claims or defenses of Phase 1. Accordingly, there are no individuals to identify as having discoverable information that may support a claim or defense in Phase 1, unless used solely for impeachment.

Based upon information reasonably available to Decco at this time, Decco identifies the following individuals, and, if known, their address and telephone number, that are likely to have discoverable information that Decco may use to support its claims or defenses, unless used solely for impeachment. A brief identification of the subjects on which each listed individual may have such discoverable information is also provided. Further, the disclosure of names and subjects is not a representation or admission of the scope of any individual's actual knowledge of facts relating to this matter.

| Name and Last Known Address | Discoverable Information the Witness is Likely to Have |
| --- | --- |
| Francois Girin

Mr. Girin may be contacted through the | Information regarding Decco's relationship with Mir/MirTech prior to October 2015. |

| | |
|---|---|
| undersigned counsel at Finnegan Henderson 901 New York Ave, NW Washington, DC 20001 | |
| Lynn Oakes<br><br>Mr. Oakes may be contacted through the undersigned counsel at Finnegan Henderson 901 New York Ave, NW Washington, DC 20001 | Information regarding Decco's relationship with Mir/MirTech prior to October 2015. |
| Sohail Akhter<br><br>Mr. Akhter may be contacted through the undersigned counsel at Finnegan Henderson 901 New York Ave, NW Washington, DC 20001 | Information regarding Decco's relationship with Mir/MirTech prior to October 2015. |

Discovery, investigation, and analysis of these matters is ongoing and incomplete at this time, and future developments in this litigation may impact the identification of witnesses. Decco and Cerexagri reserve the right to supplement this information if additional information later becomes known and to designate and/or call additional witnesses at trial. Additionally, individuals identified by other parties in this litigation in their Rule 26(a)(1)(A)(i) disclosures may have information that Decco and Cerexagri may use to support its claims or defenses.

**B.     Description by Category of Documents, Data Compilations, And Tangible Things Pursuant to Rule 26(a)(1)(A)(ii)**

Cerexagri is an non-operating entity, with no information relevant to the claims or defenses of Phase 1. Accordingly, there are no documents, data compilations, and tangible things in the possession, custody, or control of Cerexagri that may support a claim or defense in Phase 1, unless used solely for impeachment.

Based on information reasonably available to Decco at this time, Decco describes below documents, data compilations, and tangible things in the possession, custody, or control of Decco that Decco may use to support its claims or defenses (excluding documents that may be used solely for impeachment).

| Description of Documents by Category | Location That Such Documents Will Be Made Available |
|---|---|
| Documents regarding Decco's relationship with Mir/MirTech prior to October 2015. | Finnegan Henderson<br>901 New York Ave NW<br>Washington, DC 20001 |

Decco and Cerexagri are still in the process of investigating its claims and defenses and reserve the right to identify additional documents in support of its claims and defenses, including, but not limited to, documents that Decco or Cerexagri may obtain from other parties in this litigation and/or third parties.

## C.     Statement as to Damages Pursuant to Rule 26(a)(1)(A)(iii)

Damages are not at issue in Phase 1 of the Bifurcated proceedings, and in any event, the amount of damages under applicable law is not yet known.  Notwithstanding, Decco and Cerexagri reserve the right to seek an award of their attorney fees, for example pursuant to 35 U.S.C. § 285, and costs of this suit.  The amount of those fees and costs is not yet known.

## D.     Statement as to Insurance Agreements Pursuant to Rule 26 (a)(1)(A)(iv)

Decco and Cerexagri are not aware of any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in this action or to indemnify or reimburse for payments made to satisfy the judgment.

*OF COUNSEL*

John M. Williamson
Anand K. Sharma
Rajeev Gupta
FINNEGAN, HENDERSON, FARABOW
GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001
Telephone:  (202) 408-4000
Facsimile:  (202) 408-4400
John.Williamson@finnegan.com
Anand.Sharma@finnegan.com
Raj.Gupta@finnegan.com


Dated: October 14, 2016

*/s/ Frederick L. Cottrell, III*
Frederick L. Cottrell, III (#2555)
Nicole K. Pedi (#6236)
RICHARDS, LAYTON, & FINGER
One Rodney Square
920 N. King Street
Wilmington, Delaware  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
Cottrell@rlf.com
Pedi@rlf.com

*Attorneys for Defendants*
*Decco U.S. Post-Harvest, Inc., Cerexagri,*
*Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2016, a true and correct copy of the foregoing document was served upon the following attorneys of record by electronic mail:

Chad S.C. Stover (No. 4919)
BARNES & THORNBURG LLP
1000 N. West Street, Suite 1500
Wilmington, DE 19801
Telephone: (302) 300-3474
Facsimile: (302) 300-3456
cstover@btlaw.com

Robert D. MacGill
Deborah Pollack-Milgate
Joseph T. Wendt
Jessica M. Lindemann
BARNES & THORNBURG LLP
II South Meridian Street
Indianapolis, Indiana 46204
Telephone: (317) 236-1313
Facsimile: (317) 231-7433
rmacgill@btlaw.com
dmilgate@btlaw.com
jwendt@btlaw.com
jessica.Lindemann@btlaw.com

*/s/ Nicole K. Pedi*
Nicole K. Pedi (#6236)
Pedi@rlf.com

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AGROFRESH INC., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 16-662-JFB-SRF |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| MIRTECH, INC., NAZIR MIR, ESSENTIV | ) | |
| LLC, DECCO U.S. POST-HARVEST, INC., | ) | |
| CEREXAGRI, INC. d/b/a DECCO POST- | ) | |
| HARVEST, and UPL LTD., | ) | |
| | ) | |
| Defendants. | ) | |

**INITIAL DISCLOSURES PURSUANT TO FED. R. CIV. P. 26(a)(1) OF
DEFENDANT UPL LTD.**

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure and the Court's

Scheduling Order of September 29, 2017, Defendant UPL Ltd. ("UPL") hereby makes the

following initial disclosures based upon information reasonably available to UPL at the present

time.

UPL reserves the right to supplement or modify these disclosures in general, and in

particular relating to the remaining Counts at the appropriate time. By making these

disclosures, UPL does not represent that it is identifying every document, tangible thing, or

witness possibly relevant to this lawsuit. These disclosures represent a good faith effort to

identify discoverable information UPL currently reasonably believes may be used to support its

claims or defenses as required by Fed. R. Civ. P. 26(a)(1). These disclosures do not include

information that may be used solely for impeachment purposes.

UPL's disclosures are made without waiving, in any way: (1) any claim of privilege or

work product; (2) the right to object on the grounds of competency, relevancy and materiality,

hearsay, or any other proper ground, to the use of any such information, for any purpose, in

whole or in part, in any subsequent proceeding in this action or any other action; and (3) the right to object on any and all grounds, at any time, to any other discovery request or proceeding involving or relating to the subject matter of these disclosures.

**A.    Identification of Individuals Likely to Have Discoverable Information Pursuant to Rule 26(a)(1)(A)(i)**

Based upon information reasonably available to UPL at this time, UPL identifies the following individuals, and, if known, their address and telephone number, that are likely to have discoverable information that UPL may use to support its claims or defenses, unless used solely for impeachment. A brief identification of the subjects on which each listed individual may have such discoverable information is also provided. Further, the disclosure of names and subjects is not a representation or admission of the scope of any individual's actual knowledge of facts relating to this matter.

| Name and Last Known Address | Discoverable Information the Witness is Likely to Have |
|---|---|
| Sagar Kaushik<br><br>Mr. Kaushik may be contacted through the undersigned counsel at Finnegan Henderson 901 New York Ave, NW Washington, DC 20001 | Information regarding UPL's relationship with Decco and Essentiv, and communications with Decco, Essentiv, and Mir/MirTech regarding the marketplace for 1-MCP products. |

Discovery, investigation, and analysis of these matters is ongoing and incomplete at this time, and future developments in this litigation may impact the identification of witnesses. UPL reserves the right to supplement this information if additional information later becomes known and to designate and/or call additional witnesses at trial. Additionally, individuals identified by other parties in this litigation in their Rule 26(a)(1)(A)(i) disclosures may have information that UPL may use to support its claims or defenses.

**B.      Description by Category of Documents, Data Compilations, And Tangible Things Pursuant to Rule 26(a)(1)(A)(ii)**

Based on information reasonably available to UPL at this time, UPL describes below documents, data compilations, and tangible things in the possession, custody, or control of UPL that UPL may use to support its claims or defenses (excluding documents that may be used solely for impeachment).

| Description of Documents by Category | Location That Such Documents Will Be Made Available |
|---|---|
| Documents regarding UPL's relationship with Decco and Essentiv, and communications with Decco, Essentiv, Mir/MirTech regarding the marketplace for 1-MCP products. | Finnegan Henderson<br>901 New York Ave NW<br>Washington, DC 20001 |

UPL is still in the process of investigating its claims and defenses and reserve the right to identify additional documents in support of its claims and defenses, including, but not limited to, documents that UPL may obtain from other parties in this litigation and/or third parties.

**C.      Statement as to Damages Pursuant to Rule 26(a)(1)(A)(iii)**

The amount of damages under applicable law is not yet known.  Notwithstanding, UPL reserves the right to seek an award of their attorney fees, for example pursuant to 35 U.S.C. § 285, and costs of this suit.  The amount of those fees and costs is not yet known.

**D.      Statement as to Insurance Agreements Pursuant to Rule 26 (a)(1)(A)(iv)**

UPL is not aware of any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in this action or to indemnify or reimburse for payments made to satisfy the judgment.

*OF COUNSEL*

John M. Williamson
Anand K. Sharma
Rajeev Gupta
FINNEGAN, HENDERSON, FARABOW
GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001
Telephone:  (202) 408-4000
Facsimile:  (202) 408-4400
John.Williamson@finnegan.com
Anand.Sharma@finnegan.com
Raj.Gupta@finnegan.com


Dated: November 1, 2017

*/s/ Frederick L. Cottrell, III*
Frederick L. Cottrell, III (#2555)
Nicole K. Pedi (#6236)
RICHARDS, LAYTON, & FINGER
One Rodney Square
920 N. King Street
Wilmington, Delaware  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
Cottrell@rlf.com
Pedi@rlf.com

*Attorneys for Defendant UPL, Ltd.*

-4-

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2017, a true and correct copy of the foregoing document was served upon the following attorneys of record by electronic mail:

Chad S.C. Stover (No. 4919)
BARNES & THORNBURG LLP
1000 N. West Street, Suite 1500
Wilmington, DE 19801
Telephone: (302) 300-3474
Facsimile: (302) 300-3456
cstover@btlaw.com

Robert D. MacGill
Deborah Pollack-Milgate
Joseph T. Wendt
Jessica M. Lindemann
BARNES & THORNBURG LLP
II South Meridian Street
Indianapolis, Indiana 46204
Telephone: (317) 236-1313
Facsimile: (317) 231-7433
rmacgill@btlaw.com
dmilgate@btlaw.com
jwendt@btlaw.com
jessica.Lindemann@btlaw.com

*/s/ Nicole K. Pedi*
Nicole K. Pedi (#6236)
Pedi@rlf.com

-5-

# EXHIBIT 3

## REDACTED IN ITS ENTIRETY

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AGROFRESH INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 16-662-MN-SRF |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| MIRTECH, INC., NAZIR MIR, ESSENTIV | ) | |
| LLC, DECCO U.S. POST-HARVEST, INC., | ) | |
| CEREXAGRI, INC. d/b/a DECCO POST- | ) | |
| HARVEST and UPL LTD., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S SIXTH SET OF REQUESTS FOR PRODUCTION TO DECCO
DEFENDANTS**

Plaintiff AgroFresh Inc. ("AgroFresh") requests that Defendants ESSENTIV LLC, Decco

U.S. Post-Harvest, Inc., and Cerexagri, Inc. d/b/a Decco Post-Harvest (collectively "Decco

Defendants") produce the following documents at the offices of Barnes & Thornburg, LLP, 1000

N. West Street, Suite 1500, Wilmington, Delaware 19801 within thirty (30) days from the date of

service hereof, or at such other time or place as the parties may agree or the Court may order,

pursuant to Rule 34 of the Federal Rules of Civil Procedure.

**INSTRUCTIONS AND DEFINITIONS**

1.      The definitions and instructions apply to each discovery request and are

incorporated by reference into each discovery request.  The discovery requests must be read in

light of these definitions and instructions, and Your responses must be responsive to the

discovery requests so defined.

2.      Each discovery request is propounded on each Defendant.  As such, each

Defendant should provide a response to each and every discovery request.

3.      If You object to a discovery request, or a subpart thereof, as calling for information that is beyond the scope of discovery (e.g., "work product;" "unduly burdensome;" etc.), or object on any other basis, You shall so state, including Your basis for the objection, in answer to the specific part of the request You found objectionable.   Your response must, nevertheless, answer the discovery request or subpart thereof to the extent that it is not objectionable.

4.      Unless otherwise specified in a request, each response should include all documents in existence at any time from June 30, 2009 until the present date.

5.      If any portion of a document is responsive to any request, the entire document must be produced.

6.      AgroFresh requests that You respond to each request based upon Your entire knowledge available from all sources, including all information in Your possession or that of Your agents, employees, attorneys, accountants, investigators, and/or other persons acting or purporting to act on Your behalf.

7.      If Your answer is in any way qualified, please state the exact nature and extent of the qualification.

8.      The "Litigation" refers to the case styled *AgroFresh, Inc. v. MirTech et al.* pending in the United States District Court for the District of Delaware.

9.      "Defendants," "You," and "Your" refer to Defendants MirTech, Inc., Nazir Mir, ESSENTIV LLC, Decco U.S. Post-Harvest, Inc., UPL, and Cerexagri, Inc. d/b/a Decco Post-Harvest (collectively or individually), and their respective successors or predecessors in interest, parents, subsidiaries, divisions and/or affiliates, directors, officers, agents, proprietors, partners,

employees, and/or independent contractors, and all persons (including, without limitation, their attorneys, accountants, and advisors) acting or purporting to act on their behalf.

10.     "The MirTech Defendants" refers to Defendants MirTech, Inc. and Nazir Mir (collectively or individually) and their respective successors or predecessors in interest, parents, subsidiaries, divisions and/or affiliates, directors, officers, agents, proprietors, partners, employees, and/or independent contractors, and all persons (including, without limitation, their attorneys, accountants, and advisors) acting or purporting to act on their behalf.

11.     "The Decco Defendants" refers to Defendants ESSENTIV LLC, Decco U.S. Post-Harvest, Inc., Cerexagri, Inc. d/b/a Decco Post-Harvest, and UPL (collectively or individually) and their respective successors or predecessors in interest, parents, subsidiaries, divisions and/or affiliates, directors, officers, agents, proprietors, partners, employees, and/or independent contractors, and all persons (including, without limitation, their attorneys, accountants, and advisors) acting or purporting to act on their behalf.

12.     "Mir" refers to Defendant Nazir Mir and any related affiliates or individuals acting or purporting to act on his behalf.

13.     "MirTech" refers to Defendant MirTech, Inc. and its successors or predecessors in interest, parents, subsidiaries, divisions and/or affiliates, directors, officers, agents, proprietors, partners, employees, and/or independent contractors, and all persons (including, without limitation, its attorneys, accountants, and advisors) acting or purporting to act on its behalf.

14.     ESSENTIV refers to Defendant ESSENTIV LLC and its successors or predecessors in interest, parents, subsidiaries, divisions and/or affiliates, directors, officers, agents, proprietors, partners, employees, and/or independent contractors, and all persons

(including, without limitation, its attorneys, accountants, and advisors) acting or purporting to act on its behalf.

15.     "Decco U.S. Post-Harvest" refers to Defendant Decco U.S. Post-Harvest, Inc. and its successors or predecessors in interest, parents, subsidiaries, divisions and/or affiliates, directors, officers, agents, proprietors, partners, employees, and/or independent contractors, and all persons (including, without limitation, its attorneys, accountants, and advisors) acting or purporting to act on its behalf.

16.     "Cerexagri" refers to Defendant Cerexagri, Inc. and its successors or predecessors in interest, parents, subsidiaries, divisions and/or affiliates, directors, officers, agents, proprietors, partners, employees, and/or independent contractors, and all persons (including, without limitation, its attorneys, accountants, and advisors) acting or purporting to act on its behalf.

17.     "UPL," refers to Defendant UPL, Ltd., and its respective successors or predecessors in interest, parents, subsidiaries, divisions and/or affiliates, directors, officers, agents, proprietors, partners, employees, and/or independent contractors, and all persons (including, without limitation, their attorneys, accountants, and advisors) acting or purporting to act on its behalf.

18.     "Plaintiff" or "AgroFresh" refers to AgroFresh Inc. and any and all of its predecessors, representatives, agents, attorneys, directors, officers, employees, or any other persons acting or purporting to act on its behalf.

19.     The "'216 Patent" refers to United States Patent No. 9,394,216, including all related United States, foreign, and international patents and patent applications.

20.     The "'620 Application" refers to U.S. Patent Publication Number 2014/0326620, including all related United States, foreign, and international patents and patent applications.

21. The "Consulting Services Agreement" refers to the Consulting Services Agreement effective January 1, 2010 between AgroFresh and Mir.

22. The "Commercial Agreement" refers to the Commercial Agreement effective January 1, 2011 between AgroFresh and MirTech.

23. The "Consulting Agreement" refers to the Consulting Agreement effective January 1, 2011 between AgroFresh and MirTech, as extended by the First and Second Extension thereto.

24. The "Amendment" refers to the Amendment to the Commercial Agreement between AgroFresh and MirTech purportedly effective as of October 28, 2015.

25. The "Third Extension" refers to the Third Extension to the Consultant Agreement between AgroFresh and MirTech purportedly effective as of October 28, 2015.

26. "1-MCP" refers to 1-methylcyclopropene and its analogs and homologs.

27. "SmartFresh" refers to any AgroFresh product that involves postharvest treatment of agricultural crops with 1-MCP, including without limitation all versions thereof such as SmartTabs, ProTabs, and InBox.

28. "TruPick" refers to any Defendant's product that involves the postharvest treatment of agricultural crops with 1-MCP, including without limitation all versions thereof and related products.

29. "Hazel CA" refers to Hazel Technologies, Inc.'s product that involves the postharvest treatment of agricultural crops with 1-MCP, including without limitation all versions thereof and related products.

30. "Hazel" refers to Hazel Technologies, Inc.

31.   "Concerning," "reflecting," "regarding," "relating to" or "referring to" means directly or indirectly relating to, referring to, reflecting, describing, evidencing, supporting, constituting, comprising, containing, setting forth, showing, disclosing, describing, explaining, summarizing, mentioning, including, or refuting.

32.   "Communication" means every manner of transmitting or receiving information (in the form of facts, ideas, inquiries, or otherwise), and includes both oral and written communications of any type or form (including typewritten or handwritten documents, teletype, wire, e-mail, internet, digital, and any other electronic communications).

33.   "Document" is used in a comprehensive sense as set forth in Rule 34(a) of the Federal Rules of Civil Procedure and includes, but is not limited to: any and all written, typewritten, printed, photographed, recorded, transcribed, punched, taped, filed, digital, electronic, or graphic matter of any kind or nature, however produced or reproduced, including the complete original or, where no original is available, a complete copy of the original, and each non-identical copy of the original (e.g., where different because of notes made on the copy); any form of collected data for use with electronic data processing equipment, and any mechanical, visual, or sound recordings in Your custody, possession, or control and any correspondence, e-mails, instant messages, text messages, telegrams, telegraphs, teletypes, memoranda, agendas, contracts, studies, statements, notes, reports, agreements, diaries, statistics, letters, date books, work papers, statements, tapes, discs, minutes, entries, books of account, inter-office and intra-office communications, notations of any sort of conversation, and lists.  The term also includes all information stored in a computer system although not yet printed, all information stored on computer disks or hard drives, all information stored on computer tape backups, and all information stored on CD-ROM or electronic media, including voicemail, e-mail, text messages,

or instant messages. In addition, the term "documents" means any metadata or other electronic information related to the foregoing enumerated items. For all documents as defined above of which You are aware are responsive to the following requests but are not produced, You should "identify" such documents. This specifically includes documents that are allegedly lost, stolen, misplaced, discarded, shredded, deleted or are not otherwise being produced for any reason.

34.    The terms "person" and "persons" include not only natural persons, but also firms, partnerships, corporations, limited liability companies, or other legal entities, as well as all divisions, departments, and other units thereof.

35.    All capitalized terms not otherwise defined shall have the meaning provided in the referenced document.

36.    Rules of Construction: (a) the singular shall include the plural and the plural shall include the singular; (b) a masculine, feminine, or neutral pronoun shall be construed to refer to all other gender pronouns; (c) "and" and "or" shall be construed conjunctively and disjunctively so as to bring within the scope of these Requests any information that might otherwise be construed to be outside their scope; and (d) "any" shall be understood to include and encompass one or more and "all."

37.    If You contend that You cannot comply with any request in full, You should comply to the extent possible and provide an explanation as to why full compliance is not possible.

38.    AgroFresh requests that you produce all documents described below whether they are drafts, outlines, final versions, or otherwise and/or whether they are or are not identical to any copy or copies thereof, by reason of alterations, notes, comments, initials, underscoring, indication of routing, or other material contained thereon or attached thereto. All such non-

identical copies are to be produced separately. In so doing, please furnish documents that are in the possession of Your directors, officers, employees, attorneys, accountants, representatives or agents, or that are otherwise subject to Your custody or control.

39. Please produce electronically stored information in single page TIFF format, unless it is necessary to produce these images in color to preserve information that would not be visible in a black and white image, with a DII or LFP import file (which is used for Summation, Concordance and other document management systems) and clearly defined document boundaries. Please name all documents by BegDoc#, and produce in a separate folder with a cross-reference file in delimited text format. The following metadata fields should be extracted and provided (availability depending on document type): BegDoc#, EndDoc#, Custodian, FileName, FilePath, FileExtension, From, To, BCC, CC, DateSent, TimeSent, DateReceived, TimeReceived, Subject (Email Topic), NumAttach, AttchIDs, AttchBegin, AttchEnd, DateCreated, DateModified, Title, Author, and FileSize. This list of fields does not create any obligation to create or manually code fields that are not automatically generated by the processing of the electronically stored information or that do not exist as part of the original metadata of the document. For all documents that are only readily usable in their native format, including but not limited to databases, Excel files, Powerpoint files, and .wav files please produce those documents natively with a corresponding placeholder Tiff image bearing the relevant bates stamp and cross-referenced in the cross-reference file noted above and assigned the same unique DocID number as the native file.

40. Wherever any discovery request calls for information, for the identification of a document, a thing, or an oral communication, or for the production of a document or thing, that You claim to be privileged or immune from discovery as work product or on any other ground,

Plaintiff requests, pursuant to Rule 26(b)(5) of the Federal Rules of Civil Procedure, that You provide within thirty (30) days of service of these discovery requests a list:

    a.    identifying each particular discovery request to which You object, and each specific ground for Your objection; and

    b.    specifying each withheld document or thing, or portion thereof as follows:

        i.    its date;

        ii.    the general nature of the document or thing (e.g., whether it is a letter, chart, pamphlet, memorandum, etc.);

        iii.    a summary of the contents or the general subject matter of the document or thing;

        iv.    the identity of each other document or other thing transmitted with or attached to that allegedly privileged or discovery-immune document or thing;

        v.    its present location and the identity of its current custodian;

        vi.    the identity of each person who authored, prepared, or signed the document or thing;

        vii.    a listing identifying each person, including but not limited to addressees and designated copy recipients, to whom either the original or a copy of the document or thing has been disclosed, including the date and means of such disclosure; and

        viii.    the nature of the privilege, immunity, or other rule of law relied upon to withhold the information, document, or thing, and the facts supporting Your asserted reliance.

9

Any purportedly privileged or discovery-immune information or document that contains matter that is not privileged or immune from discovery should be produced with the purportedly privileged or discovery-immune portion excised.

41.    You must supplement or correct Your responses to these Requests for Production without being requested to do so as to:

a.  Information hereinafter acquired that would be responsive to these discovery requests requesting the identification and location of persons having knowledge of discoverable matters and the identification of persons expected to be called as expert witnesses at the trial;

b.  Any response when it is discovered to have been incorrect when made or when it is discovered to be no longer true.

### REQUESTS FOR PRODUCTION

**REQUEST NO. 108:**    Any and all documents from January 1, 2016 to the present relating to internal calculations of expected, projected, or actual price erosion of any 1-MCP product, including, but not limited to, SmartFresh, TruPick, and Hazel CA.

**RESPONSE:**


**REQUEST NO. 109:**    Documents sufficient to show the cost of development of TruPick.

**RESPONSE:**


**REQUEST NO. 110:**    Documents sufficient to show the sales, including customers, dates, price, and amounts of Hazel CA or services involving the application of Hazel CA.

**RESPONSE:**

**REQUEST NO. 111:**     Any and all documents relating to a defense of advice of counsel to any claim in this case.

**RESPONSE:**

**REQUEST NO. 112:**     Any and all communications with Hazel.

**RESPONSE:**

**REQUEST NO. 113:** Any and all agreements between you and Hazel relating to the distribution of Hazel CA.

**RESPONSE:**

**REQUEST NO. 114:** Any and all documents relating to procedures, policies, steps taken, or communications related to protecting confidential information disclosed by Dow Chemical Company in connection with the solicitation of bids for AgroFresh.

**RESPONSE:**

**REQUEST NO. 115:** Any and all documents related to procedures, policies, steps taken, or communications related to ensuring compliance with the employee non-solicitation provisions of the Confidential Information Memorandum between you and/or UPL and Dow Chemical Company marked as Exhibit 315 during the deposition of Francois Girin.

**RESPONSE:**

11

**REQUEST NO. 116:** Any and all documents related to the decision to file the proceeding titled *UPL, Ltd. v. AgroFresh, Inc.*, Case No. IPR2017-01919 (Patent Trial and Appel Board).

**RESPONSE:**

**REQUEST NO. 117:** Any and all documents dated between (1) your receipt of the Commercial Agreement and Consulting Agreement between AgroFresh and Dr. Mir and/or MirTech and (2) October 1, 2016 relating to the decision to proceed with marketing TruPick.

**RESPONSE:**

**REQUEST NO. 118:** Any and all documents relating to any meetings between you and AgroFresh in July or August, 2016.

**RESPONSE:**

**REQUEST NO. 119:** Any and all documents prepared by Mr. Girin dated between July 1, 2016 and October 1, 2016, related to the price of TruPick.

**RESPONSE:**

**REQUEST NO. 120:** Any and all documents related to the decision not to market TruPick during the 2017 season.

**RESPONSE:**

**REQUEST NO. 121:** Any and all documents related to the decision to distribute Hazel

CA during the 2018 season.

Dated:  November 19, 2018                    BARNES & THORNBURG LLP

                                             /s/  Chad S.C. Stover
                                             Chad S.C. Stover (No. 4919)
                                             1000 N. West Street, Suite 1500
                                             Wilmington, DE 19801
                                             Telephone:  (302) 300-3474
                                             Facsimile:  (302) 300-3456
                                             E-mail: chad.stover@btlaw.com

                                             OF COUNSEL:

                                             Robert D. MacGill (admitted *pro hac vice*)
                                             Deborah Pollack-Milgate (admitted *pro hac vice*)
                                             Joseph T. Wendt (admitted *pro hac vice*)
                                             Jessica M. Lindemann (admitted *pro hac vice*)
                                             BARNES & THORNBURG LLP
                                             11 South Meridian Street
                                             Indianapolis, Indiana 46204
                                             Telephone:  (317) 236-1313
                                             Facsimile:  (317) 231-7433
                                             E-mail: rmacgill@btlaw.com
                                             E-mail: dmilgate@btlaw.com
                                             E-mail: jwendt@btlaw.com
                                             E-mail: jessica.lindemann@btlaw.com

                                             *Attorneys for AgroFresh Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on November 19, 2018 a copy of the foregoing was

served on the following in the manner indicated:

| | |
|---|---|
| Frederick L. Cottrell, III<br>Nicole K. Pedi (#6236)<br>Richards, Layton & Finger, P.A.<br>One Rodney Square<br>920 N. King Street<br>Wilmington, Delaware  19801 | *By Electronic Mail* |

| | |
|---|---|
| John M. Williamson<br>Anand K. Sharma<br>Rajeev Gupta<br>Daniel F. Roland<br>Karthik Kumar<br>Aidan Skoyles<br>Finnegan, Henderson, Farabow, Garrett<br>& Dunner, LLP<br>901 New York Avenue, NW<br>Washington, DC 20001 | *By Electronic Mail* |

*Attorneys for Defendants*
*Decco U.S. Post Harvest, Inc.,*
*Cerexagri, Inc., Essentiv LLC and UPL*
*Ltd.*

| | |
|---|---|
| Glenn A. Brown<br>Real World Law, P.C.<br>727 B N. Market Street, #4<br>Wilmington, DE 19801 | *By Electronic Mail* |

*Attorneys for Defendants*
*MirTech, Inc., Nazir Mir, and Essentiv*
*LLC*


/s/ Chad S.C. Stover
Chad S.C. Stover

DMS 13589202v1

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AGROFRESH INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 16-662-MN-SRF |
| v. | ) |
| | ) |
| MIRTECH, INC., NAZIR MIR, ESSENTIV | ) |
| LLC, DECCO U.S. POST-HARVEST, INC., | ) |
| CEREXAGRI, INC. d/b/a DECCO POST- | ) |
| HARVEST, and UPL, LTD., | ) |
| | ) |
| Defendants. | ) |

## NOTICE OF 30(B)(6) DEPOSITION OF DECCO U.S. POST-HARVEST, INC.

TO:   Decco U.S. Post-Harvest, Inc.
      c/o Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
      901 New York Avenue, NW
      Washington, DC 20001-4413

    PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil

Procedure, Plaintiff AgroFresh, Inc. ("Plaintiff"), by counsel, will take the deposition by oral

examination of Decco U.S. Post-Harvest, Inc. ("Decco"), in the above referenced action, on

December 12, 2018 at the offices of Finnegan, Henderson, Farabow, Garrett & Dunner, LLP,

901 New York Avenue, NW, Washington, DC 20001-4413.

    The deposition will commence at 9:00 am Eastern time, and will continue until

completed.

    The deposition will be transcribed by stenographic means and videotaped. Counsel is

invited to attend and cross-examine.

    Decco shall designate one or more officers, directors, managing agents, executive

officers, or other persons duly authorized and consenting to testify on its behalf to the following:

1. All actions, correspondence, directives, activities, and documents of Decco and its employees relative to

   a. Dr. Mir and/or MirTech, Inc. (collectively "MirTech");

   b. The product that ultimately became TruPick, including without limitation:

      i. The development of 1-MCP based products and technology by any Decco entity and/or MirTech, including without limitation the TruPick product(s); and

      ii. The marketing, manufacture, pricing of, and projections related to TruPick branded and/or other 1-MCP based products, including any communications by Decco directly with customers or potential customers for TruPick or other 1-MCP based products;

   c. The '216 patent and related technology, including Decco's knowledge of the '216 patent;

   d. The creation, operation, and negotiation of the joint venture that ultimately became Essentiv;

   e. The EPA registration of TruPick and/or other 1-MCP products;

   f. Competition with AgroFresh, Pace, or other companies marketing 1-MCP products including contacts with Hazel Technologies regarding 1-MCP based products and including the introduction by Hazel of a 1-MCP product in Washington State in 2018;

2. The capitalization of any and all Decco entities and policies and procedures for transfer(s) of cash and/or other assets to or from UPL and any and all Decco entities;

3. Financial projections for Decco, Essentiv, or any other UPL entity for the years 2014 and after which related to or included in any way the TruPick product and/or the '216 patent technology;

4. Advice of counsel given to Decco, Essentiv, or any UPL entity by any counsel in connection with the underlying bases for the claims alleged in AgroFresh's First Amended Complaint, including advice given in connection with the decision to launch the TruPick product before, during, and after July 2016 [D.I. 141];

5. All actions Decco took to comply with the restrictions and covenants of Plaintiff's Exhibit 315 or any other confidentiality obligation Decco or any of its affiliates, employees, agents, consultants, or contractors owed to AgroFresh;

6. All actions, analysis, and communications by Decco relative to the sale of AgroFresh;

7. All corporate compliance Codes of Conduct, Guidelines, policies, Statements, and procedures of UPL or Decco that relate to the avoidance of foreign corrupt practices, misappropriation of intellectual property, industrial espionage, or noncompetition and nondisclosure obligations of Decco employees to third parties including without limitation economic espionage, under the laws of the United States;

8. All indictments, criminal prosecutions, or civil proceedings filed against Decco or any of its affiliates associated with the Economic Espionage Act of 1996 or other misappropriation of business confidential information or trade secrets;

9. The decision to market TruPick for the 2016 season after having received copies of the Commercial Agreement and Consulting Agreement between AgroFresh and MirTech;

10. Any and all assistance or support provided by UPL to Decco and/or Essentiv related to manufacturing or selling TruPick;

11. Decco's costs of development for TruPick;

12. Market shares of competitors in the 1-MCP product market, including at least AgroFresh, Decco, and Pace/Janssen, from 2015 to the present;

13. Decco's and Essentiv's prices, sales volume or quantities, revenues, costs (including all categories), gross profits, and net profits related to TruPick, separately for the United States and Turkey;

14. Any and all differences between TruPick as sold in the United States and Mahaan as sold in Turkey;

15. Mr. Girin's and Dr. Oakes's performance reviews, compensation criteria decisions (including the quantitative and qualitative criteria as described on or around pages 30-45 of Mr. Girin's deposition), or other evaluations from 2014 to present;

4

16. Mr. Girin's and Dr. Oakes's salary and other compensation history (including annual salary, bonus or other variable or incentive compensation, stock options, and other benefits) from 2014 to present;

17. Decco's sales, including customers, dates, price, and amounts of Hazel CA or services involving the application of Hazel CA;

18. Decco's agreement(s) with Hazel Tehcnologies relating to the distribution of Hazel CA;

19. Procedures, policies, steps taken, or communications related to protecting confidential information disclosed by Dow Chemical Company in connection with the solicitation of bids for AgroFresh;

20. Procedures, policies, steps taken, or communications related to ensuring compliance with the employee non-solicitation provisions of the Confidential Information Memorandum between you and/or UPL and Dow Chemical Company marked as Exhibit 315;

21. The decision not to market TruPick during the 2017 season;

22. The decision to distribute Hazel CA during the 2018 season;

23. Any and all documents produced by Decco or any of its affiliates in this litigation;

24. The decisions to seek to dissolve Essentiv LLC and to file *Decco U.S. Post-Harvest, Inc. v. MirTech, Inc. and Essentiv LLC*, C.A. No. 2018-0100-JTL (Delaware Chancery Court); and.

25. Decco's knowledge of the terms of, and receipt of copies of, (1) the Commercial Agreement between AgroFresh and MirTech (PX 79 or PX 82) and (2) the Consulting Agreement between AgroFresh and MirTech (PX 83).

Pursuant to Fed. R. Civ. P. 30(b)(2), AgroFresh also requests Decco to bring the following documents to the deposition:

1. Communications in 2016 and/or 2017 by Decco directly with customers or potential customers for TruPick or other 1-MCP based products;

2. Communications with Hazel Technologies, Inc. ("Hazel") regarding 1-MCP based products and including the introduction by Hazel of a 1-MCP product in Washington State in 2018;

3. Annual financial statements from 2016 – present sufficient to show the capitalization of Decco and any written policies and procedures for transfer(s) of cash and/or other assets to or from UPL and any and all Decco entities;

4. Documents sufficient to show any and all actions Decco took to comply with the restrictions and covenants of Plaintiff's Exhibit 315 or any other confidentiality obligation Decco or any of its affiliates, employees, agents, consultants, or contractors owed to AgroFresh;

5. All corporate compliance Codes of Conduct, Guidelines, policies, Statements, and procedures of UPL or Decco that relate to the avoidance of foreign corrupt practices, misappropriation of intellectual property, industrial espionage, or noncompetition and nondisclosure obligations of Decco employees to third

parties including without limitation economic espionage, under the laws of the United States;

6.  All indictments, criminal prosecutions, or civil proceedings filed against Decco or any of its affiliates associated with the Economic Espionage Act of 1996 or other misappropriation of business confidential information or trade secrets;

7.  Any and all documents relating to the decision to market TruPick for the 2016 season after having received copies of the Commercial Agreement and Consulting Agreement between AgroFresh and MirTech;

8.  Any and all documents showing Decco's receipt of the Commercial Agreement and Consulting Agreement between AgroFresh and MirTech;

9.  Documents sufficient to show Decco's costs of development for TruPick;

10.  Any and all documents showing market shares of competitors in the 1-MCP product market in the United States, including at least AgroFresh, Decco, and Pace/Janssen, from 2015 to the present;

11.  To the extent not previously produced, documents sufficient to show Decco's and Essentiv's prices, sales volume or quantities, revenues, costs (including all categories), gross profits, and net profits related to TruPick, separately for the United States and Turkey;

12.  Documents sufficient to show any and all differences between TruPick as sold in the United States and Mahaan as sold in Turkey;

13. Mr. Girin's and Dr. Oakes's performance reviews, compensation criteria decisions (including the quantitative and qualitative criteria as described on or around pages 30-45 of Mr. Girin's deposition), or other evaluations from 2014 to present;

14. Documents sufficient to show Decco's sales, including customers, dates, price, and amounts of Hazel CA or services involving the application of Hazel CA;

15. Decco's agreement(s) with Hazel Tehcnologies relating to the distribution of Hazel CA;

16. Any and all documents relating to procedures, policies, steps taken, or communications related to protecting confidential information disclosed by Dow Chemical Company in connection with the solicitation of bids for AgroFresh;

17. Any and all documents relating to procedures, policies, steps taken, or communications related to ensuring compliance with the employee non-solicitation provisions of the Confidential Information Memorandum between you and/or UPL and Dow Chemical Company marked as Exhibit 315;

18. Any and all documents relating to the decision not to market TruPick during the 2017 season;

19. Any and all documents relating to the decision to distribute Hazel CA during the 2018 season;

20. Any and all documents relating to the decisions to seek to dissolve Essentiv LLC and to file *Decco U.S. Post-Harvest, Inc. v. MirTech, Inc. and Essentiv LLC,* C.A. No. 2018-0100-JTL (Delaware Chancery Court);

Dated: November 30, 2018

BARNES & THORNBURG LLP

*/s/ Chad S.C. Stover*
Chad S.C. Stover (No. 4919)
Regina S.E. Murphy (No. 5648)
1000 N. West Street, Suite 1500
Wilmington, DE 19801
Telephone: (302) 300-3474
Facsimile: (302) 300-3456
E-mail: chad.stover@btlaw.com
E-mail: gigi.murphy@btlaw.com

Of Counsel:

Robert D. MacGill (admitted *pro hac vice*)
Lynn C. Tyler (admitted *pro hac vice*)
Deborah Pollack-Milgate (admitted *pro hac vice*)
Joseph T. Wendt (admitted *pro hac vice*)
Jessica M. Lindemann (admitted *pro hac vice*)
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
Telephone: (317) 236-1313
Facsimile: (317) 231-7433
E-mail: rmacgill@btlaw.com
E-mail: lynn.tyler@btlaw.com
E-mail: dmilgate@btlaw.com
E-mail: jwendt@btlaw.com
E-mail: jessica.lindemann@btlaw.com

*Attorneys for AgroFresh, Inc.*

# EXHIBIT 6

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

AGROFRESH, INC.,                      :

        Plaintiff,           :   Civil Action No.:

        VS.                   :   16-662-MN-SRF

MIRTECH, INC., NAZIR MIR,      :
ESSENTIVE, LLC, DECCO U.S.
POST-HARVEST, INC., CEREXAGRI, :
INC., d/b/a DECCO POST-HARVEST,
and UPL, LTD.,                        :

        Defendants.          :   Page 1-168


- - -

Tuesday, December 18, 2018

- - -


Continued Videotaped Deposition of

FRANCOIS GIRIN taken at Finnegan, Henderson, Farabow,

Garrett & Dunner, LLP, 901 New York Avenue, NW,

Washington, DC 20001, commencing at 9:16 a.m. before

Sherry L. Brooks, Certified LiveNote Reporter and

Notary Public, in and for the District of Columbia.

- - -


MAGNA LEGAL SERVICES

WWW.MAGNALS.COM



Page 2

1  APPEARANCES:
2
3  BARNES & THORNBURG, LLP
   BY: ROBERT D. MACGILL, ESQUIRE
4     MATTHEW T. CIULLA, ESQUIRE
   11 South Meridian Street
5  Indianapolis, IN 46204
   (317) 236-1313
6  E-mail: Matthew.Ciulla@btlaw.com
   Representing the Plaintiff
7
8  FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
   BY: ANAND K. SHARMA, ESQUIRE
9  901 New York Avenue, NW
   Washington, DC 20001
10 (202) 408-4000
   E-mail: Anand.Sharma@Finnegan.com
11 Representing Defendants UPL and Decco
12
13 ALSO PRESENT:
14    Ellen Hebert, Videographer
15
16
17
18
19
20
21
22

Page 3

1            INDEX
2            - - -
3  TESTIMONY OF: Francois Girin
4  By Mr. MacGill                    6
5
6
7        EXHIBITS
8  EXHIBIT NUMBER   DESCRIPTION      PAGE MARKED
9  Exhibit 601    Memorandum Dated 5/26/16 to    6
10              James Sargent, et al.
11 Exhibit 602    Memorandum Dated 90/9/16 to    27
12              Francois Girin
13 Exhibit 603    Memorandum Dated 7/16/16 to    44
14              Francois Girin
15              District - Xfinity Live
16 Exhibit 604    Memorandum Dated 1/25/17 from   65
17              Francois Girin
18 Exhibit 605    Handwritten Notes       111
19              James Sargent, et al.
20
21            - - -
22

Page 4

1            PROCEEDINGS
2         THE VIDEOGRAPHER:  Good morning.  We are
3  now on the record.  This begins DVD Number 1, Volume
4  2, in the continued 30(b)(6) deposition of Decco US
5  Post-Harvest, Inc. given by Francois Girin In the
6  Matter of Agrofresh, Inc. and Mirtech, Inc. et al.,
7  in the United States District Court for the District
8  of Delaware, Civil Action Number 16-662-MN-SRF.
9         Today is Tuesday, December 18th, 2018.
10 The time is 9:16 a.m.
11        This deposition is being taken at
12 Finnegan, Henderson, Farabow, Garrett & Dunner at 901
13 New York Avenue, Northwest, Washington DC at the
14 request of Barnes & Thornburg.
15        The videographer is Ellen Hebert of Magna
16 Legal Services.  The court reporter is Sherry Brooks
17 of Magna Legal Services.
18        Will counsel and all parties present
19 please state your appearances and whom they
20 represent?
21        MR. MACGILL:  Rob MacGill and Matt Ciulla
22 representing the Plaintiff, Agrofresh.

Page 5

1         MR. SHARMA:  Anand Sharma from Finnegan
2  representing the UPL defendants and Decco defendants.
3         THE VIDEOGRAPHER:  Will the court reporter
4  please swear in the witness?
5            - - -
6  WHEREUPON,
7         FRANCOIS GIRIN
8         after having been first duly sworn, was
9         examined and testified as follows:
10           - - -
11        MR. SHARMA:  Counsel, before you start, we
12 had talked at the end of yesterday's deposition and
13 we talked about whether you wanted us to request that
14 Mr. Girin do any additional investigations on -- I
15 think there were some areas where he said at the time
16 he didn't have the granular details or whether he had
17 any knowledge as to whether there were quarterly or
18 monthly data or costs -- capitalization costs, as
19 well as granular details for the development costs.
20        He's done that investigation.  So if you'd
21 like to inquire, he's prepared to provide additional
22 information.



Page 158

1      A.   One last thing, purely confirmation.  I
2  confirmed that the document which had been shared
3  with me by Finnegan on Sunday related to
4  capitalization was the exhibit -- I can't remember
5  its number -- the one which was full with euros and
6  dollar values you questioned me on yesterday.
7      Q.   How did you find that out?
8      A.   By checking what I think is a reference
9  number at the bottom.
10     Q.   What did you compare that reference number
11 to?
12     A.   What was provided to me on Sunday versus
13 what was reviewed yesterday.
14     Q.   How did you know what had been provided to
15 you on Sunday?
16     A.   Because it had been provided to me.  I had
17 received it.
18     Q.   Well, I thought you said you just reviewed
19 it on your computer.  How did you -- how did you
20 verify this yesterday?
21     A.   Well, sorry.  It was -- it was sent by
22 email to me on Sunday.

Page 159

1      Q.   By whom?
2      A.   Either Raj Gupta or Anand Sharma.
3      Q.   And so you went back to your email last
4  night and compared it with what you remembered from
5  the exhibit, Exhibit 495?
6      A.   The number, I don't know.  I don't have it
7  in front of me, but the number, yes.  Remember, it
8  was a small open question from yesterday to make sure
9  this document was one and the same.
10     Q.   Okay.  Sir, after you got the commercial
11 and consulting agreements in July of 2016, did you
12 ask Dr. Mir for any documentation where he had signed
13 -- made certain patent assignments to Agrofresh?
14     A.   No, I do not remember asking Dr. Mir in
15 July of 2016 anything related to your question.
16     Q.   Did you ask as a matter of being careful
17 with the situation as it was evolving in July and
18 August of 2016 -- did you ask Dr. Mir in the month of
19 August 2016 if he had made any patent assignments to
20 Agrofresh?
21          Did you ask him in that month whether he
22 had made such assignments?

Page 160

1      A.   I do not recall.
2      Q.   Do you recall asking Dr. Mir or causing
3  anybody to ask Dr. Mir whether he'd made any patent
4  assignments to Agrofresh during the month of
5  September 2016?
6      A.   No, I do not recall.
7      Q.   So prior to the launch of the TruPick
8  product in the period of time from July 2016 to the
9  time of the launch of the TruPick product, you never
10 asked Dr. Mir about whether he had assigned certain
11 patents to Agrofresh, did you, sir?
12          MR. SHARMA:  Objection.  Form.
13     A.   No.  I do not recall.
14          BY MR. MACGILL:
15     Q.   And you didn't ask anybody at your company
16 after July of 2016 to verify whether Dr. Mir had
17 assigned patents to Agrofresh?
18     A.   No, I do not recall.
19     Q.   Don't recall doing so, right?
20     A.   I do not recall.
21     Q.   Okay.  So you didn't -- you don't recall
22 doing that yourself and you don't recall asking

Page 161

1  anybody to verify whether he had assigned patents to
2  Agrofresh?
3      A.   No.
4      Q.   Sir, just a couple final points.  On
5  Hazel, could you please tell us who the customers are
6  that you have sold Hazel product to?  This is topic
7  Number 17.
8      A.   I do not have the exhaustive list of the
9  few customers we have been selling to.
10     Q.   Who have you sold to?
11     A.   The main two accounts, one is called Apple
12 King and the other is Yakima Fruits.
13     Q.   And what's been -- what's the price of the
14 product that you're selling to Apple King?
15     A.   I do not have this detail mainly because
16 the sale season has not been finalized.
17     Q.   What agreements have you made with respect
18 to the distribution of Hazel product?
19     A.   I'm not sure I understand your question.
20 When you say agreement made, were you referring to a
21 legal document signed?
22     Q.   Yeah.  Do you have a contract?



Page 162

1    A.   Yes.  Decco has a contract with Hazel.
2    Q.   What does the contract say?
3         MR. SHARMA:  Objection.  Form.
4    A.   Decco signed a distribution contract with
5  Hazel.  What it says over the course of many pages, I
6  do not have the detail in my mind.
7         BY MR. MACGILL:
8    Q.   Why didn't you bring that contract with
9  you under topic 18, sir?  Can you tell the court why?
10        MR. SHARMA:  Objection.  The witness is
11 appearing subject to the objections already provided
12 to Agrofresh, to which Agrofresh has not replied.
13   A.   It is my general understanding numerous
14 documents have been provided, including this one.
15        BY MR. MACGILL:
16   Q.   Did you provide this -- did you provide
17 this distributorship agreement as a part of the
18 production in this case?
19   A.   I do not know the details of what has been
20 produced by our lawyers.
21   Q.   But you just said you did know the
22 details.  You just testified that this document --

Page 163

1  the distributorship agreement with Hazel has been
2  produced.  Now you're changing your mind?
3    A.   I just testified, and I believe I used the
4  words, I believe, this contract has been supplied.  I
5  do not know the detail of documents being produced.
6    Q.   So you believe it, but you don't have any
7  personal knowledge that this contract has been
8  supplied; is that right?
9    A.   I cannot confirm for sure.  I don't have
10 the details of documents produced.
11   Q.   Okay.  So you don't know -- just to
12 summarize this reality, you do not know if the
13 agreements with Hazel Technologies and your company
14 have been produced?
15   A.   Fair.  I don't know.
16        MR. MACGILL:  Sir, that's all I have.  I
17 thank you very much for all of your time.
18        MR. SHARMA:  We'll read and sign and no
19 questions here.  The deposition is closed.
20        MR. MACGILL:  And just for the record, I
21 will just state that we, of course, are reserving our
22 rights to resume this deposition once the documents

Page 164

1  are produced on December 26th that were withheld from
2  production, the three categories of documents that
3  have been ordered.
4         Once those documents are received and
5  reviewed, we will resume for sure this deposition on
6  a 30(b)(6) basis probably and certainly on an
7  individual basis once the court order is complied
8  with.
9         MR. SHARMA:  We can discuss that later
10 once that time comes.
11        MR. MACGILL:  Sir, thank you very much.
12        THE WITNESS:  Thank you.
13        THE VIDEOGRAPHER:  This concludes the --
14 Volume 2 of the continued 30(b)(6) deposition of
15 Decco US Post-Harvest, Inc. given by Francois Girin.
16        Going off the record.  The time is 14:28
17 p.m.
18        THE REPORTER:  Mr. Sharma, would you like
19 a copy of this deposition?
20        MR. SHARMA:  Yes.  Thank you.
21        (Signature having not been waived, the
22 continued deposition of Francois Girin was concluded

Page 165

1  at 2:28 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

**MAGNA**
**LEGAL SERVICES**

Page 166

```
 1          C E R T I F I C A T E
 2
 3          I do hereby certify that I am a Notary
     Public in good standing, that the aforesaid testimony
 4   was taken before me, pursuant to notice, at the time
     and place indicated; that said deponent was by me
 5   duly sworn to tell the truth, the whole truth, and
     nothing but the truth; that the testimony of said
 6   deponent was correctly recorded in machine shorthand
     by me and thereafter transcribed under my supervision
 7   with computer-aided transcription; that the
     deposition is a true and correct record of the
 8   testimony given by the witness; and that I am neither
     of counsel nor kin to any party in said action, nor
 9   interested in the outcome thereof.
10
11          WITNESS my hand and official seal this
12   _____ day of _____, 2018.
13
14
15   _____
16          Notary Public
17
18
19
20
21
22
```

Page 167

```
 1          INSTRUCTIONS TO WITNESS
 2          Please read your deposition over carefully
 3   and make any necessary corrections. You should state
 4   the reason in the appropriate space on the errata
 5   sheet for any corrections that are made.
 6          After doing so, please sign the errata
 7   sheet and date it.
 8          You are signing same subject to the
 9   changes you have noted on the errata sheet, which
10   will be attached to your deposition.
11          It is imperative that you return the
12   original errata sheet to the deposing attorney within
13   thirty (30) days of receipt of the deposition
14   transcript by you. If you fail to do so, the
15   deposition transcript may be deemed to be accurate
16   and may be used in court.
17
18
19
20
21
22
```

Page 168

```
 1          ---------
 2            E R R A T A
 3          ---------
 4   PAGE    LINE      CHANGE
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21
22   SIGNATURE            DATE
```



43 (Pages 166 to 168)

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

AGROFRESH INC.,         :
                        :
        Plaintiff,      :  No. 1:16-cv-00662-JFB-SRF
                        :
    v.                  :
                        :
ESSENTIV, LLC, et al.,  :
                        :
        Defendants.     :

Tuesday, May 15, 2018
11:00 a.m.

Teleconference
Chambers of Judge Sherry R. Fallon

844 King Street
Wilmington, Delaware

BEFORE:   THE HONORABLE Sherry R. Fallon,
          United States District Court Magistrate

APPEARANCES:

    BARNES & THORNBURG LLP
    BY: CHAD STOVER, ESQ.
    BY: ROBERT MacGILL, ESQ.
    BY: LYNN TYLER, ESQ.
    BY: JESSICA LINDEMANN, ESQ.

        On behalf of Plaintiff

---

APPEARANCES CONTINUED:

    REAL WORLD LAW, PC
    BY: GLENN BROWN, ESQ.

        On behalf of Mirtech Defendants

    RICHARDS, LAYTON & FINGER, P.A.
    BY: NICOLE PEDI, ESQ.

        -and-

    FINNEGAN HENDERSON
    BY: ANAND SHARMA, ESQ.
    BY: JOHN WILLIAMSON, ESQ.
    BY: RAJEEV GUPTA, ESQ.
    BY: KARTHIK KUMAR, ESQ.
    BY: DANIEL ROLAND, ESQ.

        On behalf of Decco Defendants

---

1  THE COURT: Good morning,
2  everyone. This is Magistrate Judge Sherry
3  Fallon and I am ready to proceed. Let's start
4  with appearances of counsel starting first with
5  AgroFresh.
6  MR. STOVER: Good morning, Your
7  Honor. This is Chad Stover from Barnes &
8  Thornburg. With me this morning are Robert
9  MacGill, Lynn Tyler and Jessica Lindemann, my
10 partners from Indianapolis.
11 THE COURT: Thank you. And who's
12 on for Defendants Essentiv and Decco?
13 MS. PEDI: Good afternoon, Your
14 Honor. For the Decco Defendants, this is Nicole
15 Pedi from Richards, Layton & Finger. And from
16 Finnegan on the line today is Anand Sharma, John
17 Williamson, Rajeev Gupta, Karthik Kumar and Dan
18 Roland.
19 THE COURT: And is anyone on the
20 line for Mir and Mirtech?
21 MR. BROWN: Good morning, Your
22 Honor, Glen Brown --
23 THE COURT: I'm sorry. I didn't
24 hear you at first, Mr. Brown. You're on for Mir

---

1  and Mirtech?
2  MR. BROWN: Correct.
3  THE COURT: Are there any other
4  counsel participating who have not yet entered
5  their appearance on the record?
6  Hearing none, let's start with the
7  privilege issues first. AgroFresh filed the
8  first submission so I will start with AgroFresh,
9  and then I'll hear from the Decco, Essentiv
10 Group.
11 MR. MacGILL: Thank you, Your
12 Honor. Good morning. It's Robert MacGill for
13 AgroFresh. The issues before the Court, Your
14 Honor, as you know initially concern four
15 categories of documents that have been withheld
16 we believe improperly by the Defendants Decco in
17 connection with the claim of privilege of common
18 interest.
19 In the lead up to this hearing,
20 Your Honor, there were four categories that I
21 just mentioned that have been disputed for more
22 than a year. And on Friday evening last week,
23 the fourth category of documents associated with
24 the dispute, Decco made the decision to relent

81

1  Mr. Tyler was referring to an earlier
2  circumstance. I believe that was the earlier
3  hearing before the Court. And what the dispute
4  was there is our compromise, how we were trying
5  to compromise with AgroFresh's counsel at that
6  time, they wanted us to take certain documents
7  and make them public.
8          And we said, they're not public
9  documents. They're internal documents of the
10  company, but we will make them confidential and
11  not object to use at the Patent Office once the
12  Patent Office has a protective order. So we've
13  tried to work with AgroFresh throughout the
14  proceedings, so that if there's information
15  that's relevant that they need to use, they can
16  use.
17          This prosecution bar, we tried to
18  make it narrow, we tried to make it focused and
19  we don't believe it is presenting any prejudice
20  or unfairness to AgroFresh, especially because
21  it's referring to alternative 1-MCP technology,
22  not that related to the Mir technology.
23          THE COURT: All right. Anything
24  else, Mr. Tyler?

82

1          MR. TYLER: No, thank you, Your
2  Honor.
3          THE COURT: All right. I will
4  also take this one under consideration. Thank
5  you for the succinct briefing on it and the
6  presentations today.
7          Let's turn to the last item that
8  was presenting for consideration by the Court
9  today. And this is AgroFresh's application to
10  put limits on the number of prior art references
11  and number of prior art combinations of Decco.
12          With respect to this application
13  and the limits, it wasn't clear to me in the
14  papers and perhaps AgroFresh can address it in
15  argument today, are these limitations sought to
16  be applied only with respect to obviousness
17  defenses or is this a limitation applicable to
18  any and all invalidity arguments that may be
19  raised by Decco?
20          MR. TYLER: Well, thank you, Your
21  Honor. This is Len Tyler again and I will be
22  addressing this issue as well. In response to
23  your question, yes, we want to limit both the
24  number of references they can assert and the

83

1  number of combinations for obviousness purposes.
2          This is a little background. Now,
3  there's three total patents in the suit. This
4  particular argument only applies to two of them.
5  This applies to the earlier two patents which
6  the first inventor's name is Daly. The third
7  patent we asserted is Dr. Mir's patent, and they
8  have only asserted a limited number of
9  references with respect to it, so it's not
10  really an issue. It's just the two Daly
11  patents.
12          On those two Daly patents, we are
13  asserting only two claims from each of them,
14  four total just to be clear. So we've already
15  limited ourselves to what we think is a
16  reasonable number. And further, those two pairs
17  of claims are merely identical. They're only
18  different with respect to one number, so that
19  references that invalidate two of them will
20  actually invalidate all four.
21          In response, their invalidity
22  contentions cite 39 references; 10 appear to be,
23  and I will use the term, primary references, and
24  then 29 secondary. They purport to reserve all

84

1  possible combinations of these 39 references.
2  So obviously, that's a huge number.
3          So we think it's appropriate to
4  limit that to something they might actually
5  present going forward at this point before
6  there's a big expenditure of the Court's time
7  and the parties' funds. And as they say in
8  their papers, really the only issue -- they're
9  willing to limit them. It's just a question of
10  when and then maybe a debate over the precise
11  limits.
12          We think it ought to happen now
13  before claim construction and they think it
14  should happen after. We cited some cases in our
15  letter of course to support the point it should
16  happen now. And they say in their response, in
17  all of AgroFresh's cited Delaware cases, the
18  court ordered narrowing of invalidity
19  contentions only after claim construction. And
20  that's not correct as I will explain in a
21  moment.
22          But perhaps more importantly, the
23  end of the section of their brief they say, more
24  recently this court ordered a two-phase

85

1  procedure for narrowing invalidity arguments.
2  The first phase after claim construction. And
3  then they cite your decision in late March in
4  Leo Pharma vs. Actavis Labs. I'm sorry to have
5  to say this but they are simply wrong about
6  that.
7  Your order which they cite as
8  Docket No. 287 was on March 29. In the first
9  phase, there's three steps, each of which takes
10  seven days, which means it would be concluded by
11  April 19th. The very same day you entered this
12  order, you rescheduled a Markman hearing on May
13  2nd. So not only was this narrowing of
14  invalidity contentions to be done before a
15  Markman order came out, it was to be done before
16  the Markman hearing was even held.
17  THE COURT: Mr. Tyler, I don't
18  often remember all of the facts of all of the
19  cases. But in this Leo Pharma ANDA case, I had
20  already held a Markman hearing with respect to
21  certain terms on certain patents, and the Phase
22  2 was coming afterwards as I recall.
23  I think my decision issued on the
24  first Markman hearing I held in the case some

86

1  time before the end of last year, so roughly
2  December of 2017, so a Markman did occur.
3  But in any event, putting that
4  aside for the moment, there's no one size fits
5  all certainly in these cases and I do try and
6  consider the practical aspects of case
7  management in each individual case on its
8  respective facts.
9  What efficiencies are saved here
10  if I did defer it until -- I'm not arguing that
11  you don't have traction in your argument, that
12  it's always good to try and reduce to a more
13  manageable limit of prior art references and
14  prior art combinations with respect to
15  obviousness.
16  But the timing of that, what
17  efficiencies are really going to be saved by
18  doing that before Markman as opposed to after?
19  Is that really going to affect the terms that
20  are being construed for purposes of Markman,
21  given what you've just described as Plaintiffs
22  having a total of four claims, two from each
23  patent?
24  MR. TYLER: Well, certainly, it

87

1  may. To decide what claim terms are going to be
2  construed, we're going to have to study these 39
3  references and see what impact they may have on
4  the claim construction we want for particular
5  terms.
6  In the years that I've been doing
7  this, I've never waited until the Markman order
8  came out to engage an expert and have them start
9  preparing, becoming familiar with the technology
10  and becoming familiar with the references and
11  disputes and everything else.
12  In addition to outside experts, we
13  also consult with our client to get an
14  understanding of the case and the merits and
15  what we think our odds are and whether it's
16  worth them continuing to invest in the case, et
17  cetera. So all of that work needs to be done on
18  an ongoing basis. And with 39 references, some
19  of which are lengthy, some of which are not as
20  lengthy, that's a lot of work.
21  THE COURT: I hear your point on
22  that. We have our Markman in this case on
23  September 11, and the decision on the Markman
24  claim construction is out on October 19th, and

88

1  then opening expert reports for those parties
2  bearing the burden of proof are due it looks
3  like January 23, 2019. So I'm just trying to
4  get a sense of the timing issues here as to when
5  it makes practical sense to consider reductions
6  of prior art references and combinations.
7  MR. TYLER: I believe tomorrow is
8  the date for identifying terms to be construed.
9  THE COURT: Okay.
10  MR. TYLER: I'm actually happy to
11  hear what you said about Leo Pharma case, so in
12  a sense there was some claim construction before
13  this ordering and apparently some afterwards.
14  And that goes to my other point
15  that one of the other Delaware cases we cited,
16  the Masimo case, was similar in that it's one
17  opinion but there are actually two different
18  cases discussed in the opinion, and there had
19  been claim construction in one of the cases
20  before the Court ordered a narrowing in the
21  second case, but the claim construction had not
22  occurred in the second case at the time that the
23  limitations were imposed.
24  And in that connection, also I

89

1  note that in the first case the Court limited
2  the number of patents both parties could assert
3  because they were cross claims or claims back
4  and forth from 24 down to 7 before any claim
5  construction had taken place, and that's a far
6  more dramatic stretch even than limiting claim
7  construction.  And as you said, basically
8  there's no hard and fast rule.
9        One of the cases in our brief
10  said, it's well-recognized that waiting to limit
11  claims until after claim construction comes too
12  late in the process, and that's in part for the
13  reasons I mentioned, that a lot of work goes
14  into this before you get that far, not only by
15  the parties but also by the Court.
16        THE COURT:  All right.  Thank you.
17  Let me hear from Decco.
18        MR. SHARMA:  Your Honor, I will be
19  very brief.  So in the cases and in the previous
20  scheduling orders that were discussed, it is
21  common to have a narrowing of the number of
22  patents and the number of asserted claims before
23  a Markman proceeding, and that was particularly
24  what the Masimo court was doing.

90

1        Judge Thynge before the first
2  Markman hearing asked the parties because there
3  were cross claims as Mr. Tyler noted, to reduce
4  the number of patents and the number of asserted
5  claims to avoid unnecessary burdens on the
6  Court, having to address claims and clam terms
7  that ultimately won't be presented to the jury.
8        The distinction is, and this is
9  the distinction we were trying to make, when you
10  look at prior schedules and case schedules, it's
11  after Markman that's the more typical process as
12  to when the issues are more focused and as far
13  as the scope of the claims are defined at that
14  point, whether certain claim terms are definite
15  or not are defined at that point, and that's
16  typically when courts ask that the parties then
17  look again to see if the asserted claims can be
18  further narrowed or if the prior art can be
19  further narrowed.
20        And the issue we have here and why
21  we have so many references stems from -- in the
22  District Court, it stems from different
23  positions that are being argued with respect to
24  a particular claim term in these two patents.

91

1  If the claim term is molecular encapsulation
2  agent and if AgroFresh is interpreting that
3  claim language one way in its infringement
4  contentions here in the case and a different way
5  in the Patent Office in the IPR proceeding, so
6  why we have a larger volume of prior art for
7  those two claims is because we have to address
8  both scenarios until we know what the claim will
9  ultimately mean, whether it would mean what
10  AgroFresh is presenting or what we may present
11  on tomorrow or something else that the Court may
12  say that the claim term means.
13        So we feel we would be prejudiced
14  at this point to have to narrow our contentions
15  in terms of number of prior art references
16  before the Markman proceeding.  And as Mr. Tyler
17  noted the Markman proceeding, as Your Honor,
18  noted is coming soon and that decision is
19  expected in October.
20        The opening expert report is
21  January 23rd.  And in the context of validity,
22  that's our report so we have the burden on that
23  issue, so we'll be presenting the invalidity
24  reports at that point.  And the rebuttal reports

92

1  don't come until April 10, 2019.  So we feel
2  like there is time in the schedule after the
3  Court construes the claims to narrow the issues
4  further.
5        THE COURT:  All right.  Any
6  further response, Mr. Tyler?
7        MR. TYLER:  Well, it probably
8  doesn't surprise you that we don't agree that
9  there's any inconsistency in our position of the
10  construction of molecular encapsulation agent
11  between the District Court and the IPR, but
12  otherwise, no, thank you.
13        THE COURT:  Well, I imagine I will
14  be hearing more about that come September.  But
15  in any event, for purposes of this issue this is
16  one ruling I'm prepared to make on the record
17  today.  I'm going to deny AgroFresh's
18  application to place limitations on Defendants'
19  prior art references and combinations of
20  references, but that denial is without
21  prejudice.
22        And I would note that it is an
23  issue that has traction with me.  I think it's
24  reasonable case management to reduce at some

93

1  point prior art references and combinations
2  thereof with respect to obviousness.  So it will
3  be something that I will be looking into going
4  forward after Markman.
5         So if Defendants can work on that
6  process now, all the better.  But if not, if you
7  can't reach some type of comfortable mutual
8  agreement as the case goes on and it's an issue
9  that I will see again, I can probably more
10 likely than not assure Defendants that there
11 will be some reductions, so keep that in mind.
12 But for right now prior to Markman, I'm not
13 going to grant the request, but it's without
14 prejudice.
15        Having said that, I don't believe
16 there are any further issues today that require
17 my attention.  But let me hear from the
18 Plaintiffs if I am mistaken.
19        MR. TYLER:  Nothing further, Your
20 Honor.
21        THE COURT:  And Decco Defendants,
22 anything further?
23        MR. SHARMA:  Nothing further, Your
24 Honor.

94

1         THE COURT:  Mr. Brown, do you have
2  anything further on behalf of the Mir
3  Defendants?
4         MR. BROWN:  Nothing further, Your
5  Honor.
6         THE COURT:  All right.  Then I
7  will thank counsel for your presentations.  This
8  concludes our teleconference and I'm going to
9  disconnect.  Have a good day.
10        (The proceedings ended at
11 1:15 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

95

1         C E R T I F I C A T I O N
2
3  I, Taneha Carroll, Professional
4  Court Reporter, certify that the foregoing is a
5  true and accurate transcript of the foregoing
6  proceeding.
7
8  I further certify that I am neither
9  attorney nor counsel for, nor related to nor
10 employed by any of the parties to the action in
11 which this proceeding was taken; further, that I am
12 not a relative or employee of any attorney or
13 counsel employed in this case, nor am I financially
14 interested in this action.
15
16     /s/Taneha Carroll
17     Taneha Carroll
18     Professional Reporter and Notary Public
19
20
21
22
23
24